IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA ) Case No. 25 CR 636-1 and 2
)
v. )
)
MARIMAR MARTINEZ and ANTHONY )
IAN SANTOS RUIZ, ) Chicago, Illinois
) November 5, 2025
Defendants ) 12:00 p.m.

TRANSCRIPT OF PROCEEDINGS - EVIDENTIARY HEARING
BEFORE THE HONORABLE GEORGIA N. ALEXAKIS

APPEARANCES:

For the Government: HON. ANDREW S. BOUTROS
UNITED STATES ATTORNEY
BY: MR. RONALD DE WALD
MR. AARON BOND
Assistant United States Attorney
219 S. Dearborn Street, 5th Floor
Chicago, Illinois 60604

For Defendant Martinez: CHERONIS & PARENTE LLC
BY: MR. DAMON M. CHERONIS
MR. CHRISTOPHER V. PARENTE
140 South Dearborn Street, Suite 404
Chicago, Illinois 60603

For Defendant Ruiz: FEDERAL DEFENDER PROGRAM
BY: MR. JACK CORFMAN
MR. BENJAMIN HORWITZ
55 East Monroe Street, Suite 2800
Chicago, Illinois 60603

Court Reporter: JENNIFER COSTALES, CRR, RMR, CRC
Official Court Reporter
219 S. Dearborn Street, Room 1714
Chicago, Illinois 60604
(312) 435-5895
jenny.uscra@yahoo.com

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings in open court:)

THE COURTROOM DEPUTY: Case 25 CR 636-1, United States of America versus Marimar Martinez; case 25 CR 636-2, United States of America versus Anthony Ian Santos Ruiz.

THE COURT: Good afternoon, everyone. Why don't we start with appearances from the government.

MR. DE WALD: Good afternoon, Your Honor. Ron DeWald, D-E-W-A-L-D, on behalf of the United States and Aaron Bond.

THE COURT: Okay. And for Ms. Martinez's counsel.

MR. PARENTE: Good afternoon, Your Honor. Chris Parente and Damon Cheronis for Ms. Martinez.

THE COURT: And for Mr. Ruiz.

MR. HORWITZ: Good afternoon, Judge. Ben Horwitz, H-O-R-W-I-T-Z, with Jack Corfman on behalf of Mr. Ruiz.

THE COURT: Okay. Good afternoon, everyone.

So I reviewed the filings that were made this week. And as I said in my minute order yesterday, I want to just start off with some questions that I have for both sides.

You're welcome to remain standing at the podium. You're welcome to return to your counsel table. It's up to you.

MR. PARENTE: We'll stay here, Your Honor.

THE COURT: Okay. At a minimum, Ms. Martinez and Mr. Ruiz, you should feel comfortable going back to counsel

table.

All right. So let me start with some questions I have for the government, and then I have questions for the defendants.

Where are the defendants' cars now?

MR. DE WALD: The defendants' cars?

THE COURT: Yes.

MR. DE WALD: They're both at FBI Chicago.

THE COURT: Okay. So why the disparate treatment of their cars versus the agent's car?

MR. DE WALD: Well, with respect to defendant Martinez's car, as you know, there was an agent involved shooting. That car, there were several bullet holes that went through that car. That car is currently in the ERT bay or the evidence bay. An additional assessment or searches of that car need to be done.

So that's why when defense counsel described in his motion that FBI was so worried about the defense counsel getting close to that is they still needed to go through that car for other reasons. And that's --

THE COURT: Related to --

MR. DE WALD: -- trajectories and things like that, for bullet hole trajectories.

THE COURT: Related to this case or related to other issues?

MR. DE WALD: Both.

THE COURT: Okay. What about Mr. Ruiz's car?

MR. DE WALD: Mr. Ruiz's car is also at 2111. And that one was actually outside. And I suspect that we were prepared to return that car to him but for the fact that we had this issue with the Tahoe. And so that car is still at 2111.

THE COURT: What is the Tahoe?

MR. DE WALD: I'm sorry. So we call -- we have referred to the agent's car as the CBP vehicle. For ease today, we're going to refer to that as a Tahoe. It's a 2015 Tahoe. And just it's going to be easier to refer to it as the Tahoe.

And because of the agent's car being brought back, we decided we weren't going to let any cars go.

THE COURT: Okay. From the government's standpoint, does the disparate treatment of the cars undermine its position that there has been no loss of evidence, of evidence with respect to the agent's car, which doesn't remain under lock and key?

MR. DE WALD: It does not actually, because there is opportunity -- so the question is this, as far as the current condition of the Tahoe, so the current condition of the Tahoe is we know that a CBP mechanic has cleaned the scuff marks off of the Tahoe on October 14th of 2025. That cleaning is

actually on video. It's been preserved and it's been tendered to defense counsel.

The other damage such as the dents, the scratches, the cuts to the running boards, they're all still there.

And if you look at the complaint on page --

THE COURT: But my question, Mr. DeWald, is does the fact that the cars are being treated differently undermine the government's argument that there was no evidentiary value with respect to the agent's car?

MR. DE WALD: So from our position, all three cars go through FBI ERT. The Martinez car has not been released from ERT yet. That's why we've treated that one differently. The other two cars were.

And when the Tahoe was ready to go, we returned it right to the agent.

And then as far as Martinez's car, it was brought outside and we were having discussions about whether or not we should return --

THE COURT: You mean Ruiz's car?

MR. DE WALD: I'm sorry. Yes, defendant Ruiz's car, correct. So the car that we were able --

THE COURT: But the discussions post-date the release of the agent's vehicle.

MR. DE WALD: It does. They do.

THE COURT: Okay. So then your response to

Ms. Martinez's motion isn't supported by any sworn declarations or affidavits. Doesn't that reduce the amount of weight that I can give the representations that are made to the motion, that are made in the response to the motion?

MR. DE WALD: We were -- what we wanted to do was to collect as much discovery we had that accounted for what happened with that Tahoe and get it over to the defense as soon as we had. We did not attach any kind of sworn declarations. We can certainly supplement that if we wanted to, but we have those 302s, and we can make those 302s available for the Court for inspection. It will be essentially the same thing. It's not sworn declarations, but they are 302 reports.

THE COURT: Okay. So your brief, the government's response says that under *Youngblood*, the defendant must show that the evidence at issue was potentially useful. And then it goes on to say that under *Trombetta*, the defendant must show that the evidence at issue had apparent exculpatory value.

The Seventh Circuit actually says that the standards aren't different. In *McCarthy v. Pollard*, they made clear that the standards are the same and that the question is really just one, whether there is potentially exculpatory evidence at issue. There is a whole series of additional questions that get asked, but there isn't a bifurcated

approach of apparently exculpatory versus potentially useful.

Setting that aside, does the government dispute that the agent's vehicle post accident constituted potentially exculpatory evidence?

MR. DE WALD: We don't know the answer to that. We are -- and that's actually the point of why we think that this hearing is premature. We don't know if the cleaning off of the scuff marks off of the agent's car is exculpatory evidence. The defendant has not shown that those scuff marks are the only way to prove that the agent ran into --

THE COURT: That wasn't my question. The question is whether the government disputes that the agent's vehicle as it stood immediately after the accident constituted potentially exculpatory evidence.

MR. DE WALD: You're asking me if on October 4th, whether or not that was potentially exculpatory evidence?

THE COURT: Whether the government understood it to be potentially exculpatory.

MR. DE WALD: And the answer is no.

THE COURT: Okay.

MR. DE WALD: Or if it had potentially exculpatory evidence, that it was otherwise preserved by the FBI ERT.

THE COURT: If the government did not recognize it as potentially exculpatory or having apparent potentially exculpatory value, then why did the government -- and I say

government writ large --

MR. DE WALD: I understand.

THE COURT: -- why did the government go to the efforts to take photos, take paint samples, have the FBI ERT respond to the scene? Why do all of that if the value of the evidence wasn't apparent?

MR. DE WALD: So there is two different parts here, right. So we're talking about before it goes to ERT and after it goes to ERT. We have a car or a Tahoe that was involved in the collision that the decision was is that we wanted to preserve whatever evidence we have on there.

THE COURT: Why?

MR. DE WALD: Because there could be the evidence that we wanted to preserve, and whether or not --

THE COURT: Why?

MR. DE WALD: To determine whether or not there is any valuable evidence there, inculpatory or exculpatory.

THE COURT: So potentially exculpatory?

MR. DE WALD: Potentially, yes.

THE COURT: Okay. So the government does not dispute that the vehicle was potentially exculpatory?

MR. DE WALD: At that time?

THE COURT: Right, at that time.

MR. DE WALD: Yes, right.

THE COURT: Okay.

MR. DE WALD: But once it had been --

THE COURT: Understood. But my question is just at that time, when you have to make an initial assessment as to whether or not the agent's vehicle is potentially exculpatory or has apparently potentially exculpatory value, the government clearly believes that the answer to those two questions was yes, otherwise it wouldn't have gone to the trouble of taking the steps that it did to preserve the evidence that it did.

MR. DE WALD: Yes, Your Honor. Once I realized where we are in the discussion of prior to ERT and after ERT, yes, that's correct. Prior to the ERT, looking at the car, we didn't know whether or not we had inculpatory or exculpatory evidence or usable evidence, and we wanted FBI ERT to look at it.

THE COURT: Okay. So then setting aside *Youngblood* and *Trombetta*, you would agree that under Rule 16, a defendant has the right to inspect tangible objects that are within the possession, custody or control of the government if those materials are either material to preparing the defense or, or intended for use by the government in its case in chief, right?

MR. DE WALD: Yes, Your Honor.

THE COURT: Okay. And so there isn't really a dispute here I think that the agent's vehicle is material to

preparing a defense or something that the government would rely on in its case in chief, right?

MR. DE WALD: Right, yeah.

THE COURT: Okay. And so then you would also agree, Mr. DeWald, that under Rule 16, courts have discretion to sanction the government for failing to comply with discovery requests?

MR. DE WALD: Absolutely.

THE COURT: Okay. And so in determining -- and I'm obviously not saying that sanctions are appropriate, that is I'm not saying that at all. But I think we can all agree that if it did come to pass as to whether or not I needed to determine whether sanctions were appropriate, things that I would have to consider in the course of that determination are things like whether the government acted in bad faith and whether the defendant has been prejudiced by any loss of evidence, correct?

MR. DE WALD: Yes.

THE COURT: Okay. And so wouldn't a hearing assist me in making those kinds of determinations?

MR. DE WALD: Once again, we think it's premature at this point until we determine whether or not -- I mean, right now it's -- we don't even know -- well, we don't even know if it's potentially exculpatory. We had the --

THE COURT: You just said that it was.

MR. DE WALD: At the time that --

THE COURT: Right. That's the time that matters for purposes of determining whether something is potentially exculpatory.

MR. DE WALD: Right.

THE COURT: There is a separate question as to whether or not there has been prejudice to the defendant from the loss of any evidence. But I think -- I thought we were at a place where we could at least all agree that at the outset the vehicle was potentially exculpatory.

MR. DE WALD: And then it was brought back to FBI, and FBI started to pull the -- preserve the evidence off of it, and that's the preservation that we're talking about. And that's why I said at the beginning I didn't know on October 4th we're talking about prior to it going to the ERT or after it's going to ERT. But once it goes to the ERT, now the belief is is that whatever evidence is there is actually preserved, and that the remaining of the car can be returned.

And that's what we're talking about, is that still potentially exculpatory. And I don't know the answer to that. And that's why we have decided to engage with experts, and we assume that defense counsel is engaging in experts, to help us with that; that if the change of the scuff marks now, that's the only way to establish what defense counsel is trying to establish, is that it was the agent who initiated the contact

versus the defendant initiating the contact, that will help you in your prejudice determination to determine what sanctions need to be. But we're not even at that particular point yet.

THE COURT: Well, we're not at that particular point because the government wants me to take it in -- wants me to undertake the inquiry in a particular order. But you haven't pointed me to any cases that say that I can't have a hearing today, right?

MR. DE WALD: Yeah. I have not. Correct.

THE COURT: And both issues that are being raised, which is whether there has been prejudice to the defendant from the loss of any evidence, whether there has been a loss of any evidence, whether there has been prejudice to the defendant as a result of it, and if so, whether the government acted in bad faith, all of those questions are relevant to a potential spoliation motion or a motion for sanctions, right?

MR. DE WALD: Yes.

THE COURT: Okay. And so then there is no reason or, again, no one has pointed me to any authority that says that defendant has to make a prima facie case on element one before I can start to consider evidence about elements two and three.

MR. DE WALD: And we are unaware of anything that would say that.

THE COURT: Okay. So what would be the harm in

starting a hearing today?

MR. DE WALD: Which is I think the question you asked me two and a half weeks ago. And we're prepared to proceed with the hearing today.

THE COURT: Okay.

MR. DE WALD: Or at least beginning the hearing today.

THE COURT: Okay. So would the -- I guess one other question I have for the government. Would evidence of how the agent's vehicle was handled after the collision be relevant at trial?

MR. DE WALD: I don't think so. Well, it depends on what we want to be able to establish about the condition of the Tahoe. And so there may be some relevance to that, yes.

THE COURT: Okay. And so if it's relevant, it could be relevant at trial, either through cross-examination of an agent or actually it sounds like you're saying even through direct examination of an agent or an expert, then doesn't that also militate in favor of going forward with the hearing?

MR. DE WALD: That's fine, Your Honor.

THE COURT: Okay. One question on the law, on the concept of bad faith. Whose bad faith matters? Does the case law say anything about, anything more specific than just the government?

MR. DE WALD: My understanding, it's the -- well, for

the purpose if the bad faith of the actor, right, would be attributed to the government as a whole, but what you're looking for, I believe what you are looking for is the bad faith of the person who took the steps to destroy the evidence or if indeed this is a destruction of exculpatory evidence.

THE COURT: And if multiple people played a hand in any destruction of evidence, is everyone's intent then relevant?

MR. DE WALD: Not necessarily. It would just be the people that -- I mean, if the question is going to be that multiple people acted together in bad faith to destroy what is apparently exculpatory evidence, then yes, the people that were involved in that, it would be relevant.

In this situation, though, there are -- the people that were making the calls based upon the information that they had at the time, their intent, we would analyze those separately from any other bad faith that would be there of somebody who says, I understand that's exculpatory, and I need to destroy it.

So the short answer is not everybody.

THE COURT: Or maybe everybody. But it might be a fact-specific inquiry.

MR. DE WALD: Very well, yes.

THE COURT: Okay.

All right. Some questions for you, Mr. Parente, on

behalf of Ms. Martinez.

Have you now had a chance to inspect the agent's vehicle?

MR. PARENTE: We were allowed to get within 2 feet. I had an expert with me. We were not allowed to touch it.

I just want to clarify what he mentioned about the other vehicles. It wasn't just Ms. Martinez's car that we were not able to touch. We were not able to touch Mr. Ruiz's car either for the same reasons the agent proffered, was that there was still physical evidence there. So they were treated the exact same. We were not allowed within 2 feet of them.

THE COURT: Sorry. Just to clarify, you're saying that the fact that there are bullet holes in Ms. Martinez's car didn't actually distinguish her car, the treatment of that car relative to Mr. Ruiz's car, which I understand does not have bullet holes in it?

MR. PARENTE: It does not. But it was treated -- at least when we were there, my expert was not allowed to get within 2 feet. We were not allowed to touch it. It was still being securely held for the reasons that we can all probably assume, because it has evidentiary value.

And I'll just note we got a report from them yesterday that they had their own expert witness come and examine all three cars. So, I mean, think about the absurdity of that. They have now hired an expert to come and look at a

car that we demanded be returned. So to say that there is no evidentiary value when you are paying an expert to look at it according to the report I just got is absurd, right. I mean, of course there is value to it.

THE COURT: When did the government's expert inspect the agent's vehicle?

MR. PARENTE: Monday.

MR. DE WALD: The government expert examined the agent's vehicle on Monday, but did not go any closer than what defense counsel is just talking about when he was there.

MR. PARENTE: Well, of course. But why have an expert, who you are paying, I'm assuming, examine something that has no value, right? It's just buttressing the Court's questions that of course there is evidentiary value on the vehicle. And what we'll be able to show you --

THE COURT: Yeah, although evidentiary value is different than exculpatory evidentiary value.

MR. PARENTE: Well, what you will see at the hearing, Judge, I mean, we have photos. The stuff that we need is likely gone. I mean, they call it buffing or waxing or whatever they call it. It's gone, right. I mean, these scuff marks, which are going to likely be used to show the direction that things were hit were wiped away.

THE COURT: So let me ask one more question before we get to that, because that is a topic that I want to cover with

you. So you said you've been able to get within 2 feet of Ms. Martinez's car and Mr. Ruiz's car?

MR. PARENTE: Yes.

THE COURT: And your expert has been able to do the same?

MR. PARENTE: He wasn't allowed to touch it. We were allowed to take photographs. We weren't allowed to look in it or, you know, get within 2 feet of it.

THE COURT: Okay. Can you help me better understand though what the defendant's position is? And I recognize that you're speaking for Ms. Martinez. I'll certainly give an opportunity to Mr. Ruiz's lawyers to chime in as well.

But at this time, what is the evidence that you would say has been lost --

MR. PARENTE: The evidence --

THE COURT: -- that cannot be recreated, that you can't be put in the same position via photographs, via the paint samples, via the downloading of the onboard, whatever the onboarding system is or the online system in the car?

MR. PARENTE: It's certainly the work of what my expert has told me is like an accident reconstructionist, right. If one car hits another car, it's going to push certain things a certain way on that car. So my expert can go in an ideal world look at it, look at the way it was moved, and then from that say, Oh, yeah, you know, your client says

that she was hit by them. That's consistent with what this looks like.

And the opposite is true, right, vice versa. What they did, and you'll see it in the pictures that we'll have, is wipe that away. So now you can't tell from a picture which way like the paint is going, at least I can't from the pictures they've given me. It's also --

THE COURT: Can your expert? And I realize --

MR. PARENTE: He's not able -- the ones I've -- I mean, what I've shown him to date he can't. I mean, you can see them. There is not enough detail, right, for the same reason that of course once we retain our expert, we're not going to give him pictures. We're going to take him to the vehicles, right. I mean, that's the whole point of this. But we can't do that now because of what they did. And we'll get to some of that later.

But this like, We took paint chips, so you're okay, it's like having the -- we don't have the IRS agents do our taxes, right. Like we have the right to do things the way we want to do it.

In any case where the government tests DNA from a ski mask, the defense is allowed to look at the ski mask and have their own expert take DNA.

THE COURT: Understood. But for *Youngblood*, *Trombetta* purposes, I'm supposed to address prejudice, right.

MR. PARENTE: Yeah.

THE COURT: And so there is a difference between what in an ideal world, in a perfect world, in an equitable world the defense would have been able to do and what actually constitutes prejudice. And so that's what I'm trying to make sure that I have a handle on.

MR. PARENTE: Yeah. And I guess, and this is why I'm trying to make this clear, from the beginning this was the issue, right. This really is a car accident where the agent -- where the other drivers shoot somebody. Like that's what this is. So it's all about who hit whom. And from the beginning we made it clear that our client was adamant that they swerved into her.

And this whole thing that blew up, you know, on the national stage is this ramming of a vehicle. Ramming is everywhere in this case. That is the central issue, because that justifies the shooting, which again we'll show you hopefully today was in violation of the agent's policy, which, again, if he -- if this agent is worried that he violated the use of force policy, which he did by shooting someone who is fleeing, then he's now, oh, man, if that hit wasn't good, if I wasn't actually rammed, then I'm in trouble.

And we have text messages that you'll see I think from this agent that show you this is not a typical case. This guy was following the newspaper articles. Every time a

new article came out, he's texting his friends about what is being said in court by me and others. He was on top of this.

And so when we get to the reasons that he had that car buffed out, I will argue to you, Judge, there is a fair inference that it was done intentionally, because he knew that if he can't support the ramming, which never happened, then the shooting was no good, and he's got bigger problems.

I mean, I'm not hiding the ball. I'm assuming the agent is not in here, is he?

MR. DE WALD: The agent is not in here, no.

MR. PARENTE: Okay. I'm not hiding the ball. I mean, you'll see on the cross of this agent that based on his own words, his own text messages -- and when you see the words that this agent is using, Judge, this is not -- if you want to find an agent who is acting in bad faith, it's going to be someone who is sending these test messages that he's sending.

THE COURT: Can you preview for me just at a high level the timeline of these, because I obviously haven't seen the text messages that you're referring to, but the timeline of the text messages relative to who has possession of the Tahoe.

MR. PARENTE: Well, remember, he's given the car back the same night. So, again, your car is rammed, which caused you to jump out and shoot somebody, and the FBI gives you the car back the same night in a national news story. That on its

own in my experience seems odd.

He's given it back the same night. He's texting within hours of this, and he's texting the new few days as articles are coming out. He's laughing about how many times she was shot. It's sad and it's pathetic.

MR. DE WALD: I have an objection to that characterization.

THE COURT: Well, there is no reason. There is no jury.

MR. PARENTE: It's disappointing as someone who lives in this community to see that this is how an agent is speaking after shooting a woman in a case.

MR. DE WALD: Same objection, Your Honor. I mean --

THE COURT: Yeah, I mean, look, I'm focused on what I'm focused on for purposes of deciding whether we're going to go on with the hearing today.

MR. PARENTE: Okay.

THE COURT: Mr. Parente is allowed to advocate for his client the same way that the government is allowed to advocate for its client. And none of this -- just because someone says something doesn't mean that it's actually going to influence my decision.

MR. PARENTE: I'm only saying I think the texts show you that this agent acted in bad faith, because you are going to see a mindset of a guy who is following the news as it's

going, and he's seeing what the defense is arguing, that there was no ramming, that he hit her, and then he's asking his mechanic to buff things out. And there is a dispute on that.

I mean, again, I don't want to preview my entire cross of these guys, but you will see there is a factual conflict between what he's saying, what his supervisor is saying about how that happened. And I think these text messages, which, again, are over the top, will show you who we're dealing with.

And so when you have to decide, hey, would this sworn 23-year veteran of the border patrol actually do this? I think when you see him saying the things he's saying about a woman he shot, you might, you might go toward maybe, maybe he did act in bad faith. That's the point of this.

THE COURT: Okay. And so, Mr. Parente, perhaps you've anticipated the next set of questions I had for you, which is that I don't think you would disagree with me that hearings on *Youngblood* and *Trombetta* issues are rare, correct?

MR. PARENTE: They are. But this case is rare.

THE COURT: Okay. And similarly you'd agree with me that as a general matter, defense attorneys don't have the opportunity to do an evidentiary hearing where they examine the government's discovery process, right? You'd agree with me on that?

MR. PARENTE: We don't get a chance to do -- examine

the discovery process.

THE COURT: Through like an evidentiary hearing.

MR. PARENTE: I've never been, I've never been a part of a hearing where something like this important was given --

THE COURT: I'm not saying it doesn't happen.

MR. PARENTE: Yeah.

THE COURT: I'm just saying as a matter of course it doesn't -- it's not a regular feature in criminal practice.

MR. PARENTE: It's not been in my limited practice, if I can answer that way.

THE COURT: Okay. And so then I'm not asking you to rehash everything that you just said, but on top of everything that you were just alluding to, is there any other reason in this particular case where you think a hearing, a hearing is justified?

MR. PARENTE: I do, Judge, because if we're right, and I think we are, dismissal of the indictment is one of the remedies here. And so Ms. Martinez, who stands here today accused of a very serious crime, has the opportunity to end this a lot sooner than later if Your Honor believes sort of what I think the evidence is going to show you.

THE COURT: Okay. So what I've heard so far previewed is evidence that would go to bad faith. I also say, I'll say the following, that I don't think anyone anticipated that today would be a one-and-done kind of hearing. When we

put it on the calendar, the idea was at a minimum let's have the agent testify today.

But can I get a preview from you, Mr. Parente, as to what additional evidence you anticipate presenting to help fill the other bucket, if you will, of proof, which is that you've been prejudiced, that Ms. Martinez has been prejudiced by a loss of evidence. Will I be hearing expert testimony, for example?

MR. PARENTE: Today or in the future?

THE COURT: In general.

MR. PARENTE: Definitely in the future.

THE COURT: Okay. All right. And then do you have any thoughts on the question that I posed about whose bad faith matters?

MR. PARENTE: I think it's -- I mean, so there is two arguments you'll hear us make regarding the bad faith. I don't think it matters for our -- anyone in the government. So it's CBP, FBI, US Attorney's office are your three bad actors, at least in this case.

And there is two main actions, right. There is the release of the vehicle, which I think was completely inappropriate, and then there is the repair of the vehicle, which I think was completely inappropriate.

US Attorney's office and the FBI are involved in the release decision. CBP alone is involved, and the agent who is

specifically going to testify today, is involved in the repair decision.

Both of those things caused the loss and destruction of material evidence that has prejudiced the defense in this case on the issue that, again, you weren't at the detention hearing, but this was from the jump, this was the issue.

THE COURT: Okay. All right. And then counsel for Mr. Ruiz, I just want some clarity as to what Mr. Ruiz's stake is in this motion.

MR. CORFMAN: Sure, Your Honor. So I think there are a couple things going on here. One of them is, you know, we batted around whether or not we should file something and what that should say. And in light of the Court's minute order, you know, we wanted to see what happened I think today before we --

THE COURT: You mean the minute order from yesterday?

MR. CORFMAN: Yesterday, sorry. Just to sort of get the lay of the land.

You know, obviously we think there is a problem here. You know, just to lay out the cards on the table, this vehicle, the government vehicle was treated extremely cavalierly given its evidentiary importance. What happens after that is not totally clear yet from the discovery. But it was not treated in a manner that I would have expected. And I was very surprised when we went through discovery to see

what happened.

THE COURT: And so what does that do for Mr. Ruiz? Because as I understand it, it's not his car that's being accused of the so-called ramming.

MR. CORFMAN: And so I think there are a couple of problems. First, and the accident reconstruction problem that Mr. Parente talked about, that's also true for Mr. Ruiz. You know, how these cars interact with each other, it's indicted as an assault with a deadly weapon case, so how they interact with each other, what happened, that's crucial to understand what happened in this case.

More information is always better. And if we don't know, you know, how the first incident occurred, and I don't think there is any real dispute that whatever that happens, it seems like it happens first, it's really hard to understand in reconstruction how that might follow on and how any contact that may have occurred between the government vehicle and Mr. Ruiz's vehicle would have occurred and under what circumstances and, therefore, what could have happened as a result.

But then second, so this hadn't been touched on as much, you know, the FBI technicians did not know how to investigate a vehicle accident. They did not pull any electronic data from the vehicle on the day it was, you know, searched at the ERT and then released. They had to go back,

get consent to pull some electronic data a couple days later when the vehicle was actually driven to US Attorney's office for this meeting.

They don't pull --

THE COURT: That was before the car went back to Maine?

MR. DE WALD: Correct.

MR. CORFMAN: Yes. It was still in Chicago.

They don't pull frankly the most important electronic data from the vehicle at that time. They pull basically this, you know, the engine readout error codes from the onboard computer.

But there is also a separate airbag deployment system, excuse me, that tracks both deployments and sort of non-deployment events that I don't think has been -- maybe they've done it now, but we haven't seen any reports that they even, you know, thought to look for that. And that gets overwritten by ignition turn-ons. And so the more times a car is turned on and off, the more of that data gets overwritten.

And so every single time the car gets turned on and off after the accident, there is a risk that that data could be completely overwritten. We haven't seen it. I don't know.

You know, my colleague asked them not to turn the car on or off anymore to preserve that data. But we just don't know what's in it. But we do know it could be overwritten.

And it's not -- usually it's not time stamped. And so you need to reconstruct from the data and from everything else you know about a case to understand what event in the logs is the right one. And so the more times, even if it's still there, the more times a car is used and turned on and off, the more difficult it becomes to understand what happened and what data is captured by the vehicle.

THE COURT: And is it your, I guess is it your understanding, Mr. Corfman, that the turning on and turning off of the ignition affects only portions of the electronic data that's available or all of the data that's available?

MR. CORFMAN: So it affects I think what is commonly called the EDR data, which is this airbag deployment system. I don't know offhand, vehicles now have a variety of like infotainment computer systems, I don't know enough about the one that may have been in this car to know.

THE COURT: On this car.

MR. CORFMAN: But I know that the airbag system is almost always overwrite-able over time.

THE COURT: Okay.

MR. CORFMAN: Because it's basically -- it's not actually a black box, but it's in some ways like that. It's like in a different location in the car that serves a different function.

THE COURT: Okay. And then in light of the questions

that I've posed to the government and to Ms. Martinez's counsel, is there anything else that you want to say on behalf of Mr. Ruiz?

MR. CORFMAN: I think I just want to touch on a couple of other things. You know, the government I think undersells a little bit the extent of the differential treatment. There is a report that was produced in discovery of moving Mr. Ruiz's car from the evidence bay to the garage, where it's been stationed since, after it's presumably been cleared, you know, by the evidence technicians.

And the technician, you know, basically dresses up in a haz mat suit, in scrubs. You know, he has a whole report about how much sort of forensic material he's trying to prevent from getting into the car.

He gets permission from the case agent to do this and then drives it, you know, I don't know how many feet, but presumably not very far from the bay to the garage.

And so, A, I'm not sure it's true that being cleared by the evidence technician bay is -- it doesn't seem like that's the end of the process.

THE COURT: Otherwise why would he have suited up is your point?

MR. CORFMAN: Right.

THE COURT: Okay.

MR. CORFMAN: But even if it is, you know, I do not

think that's how the government vehicle was treated. Certainly there is no evidence to suggest that in the discovery we have so far. And there are a number of questions I think that are still open about how the vehicle was treated while it was in FBI custody.

And so, you know, I have a concern there. I also have a concern, the government has not produced a lot of information about why various people have done the things that they have done. You know, and when they said before we don't know what kind of information people had when they took these actions, if that's true, that's because they didn't ask in these interviews for some of these individuals what information they were working on, or they weren't in reports that they provided to us.

And so I think it's important that we have hearings, because those are important questions that need to be answered, and it doesn't seem like they're getting answered by the reports that we have so far.

And as the Court noted I think at the last hearing, at the status hearing, you know, the longer we wait to get answers, the more likely it is that memories might fade. People might not remember what information they had, especially because it seems like there is an unusually large lack of paperwork regarding the intake and release of the vehicle.

And so it would be unusually difficult I think to reconstruct over time what people were working with when they tried to make a decision about the vehicle.

THE COURT: Okay. All right. Mr. DeWald, anything you want to say in response to anything that's been said by the attorneys for the defendants?

MR. DE WALD: Your Honor, Mr. Corfman is exactly right, we're learning, Mr. Bond and I are learning quite a bit about accident reconstruction at this time. We have learned about the EDR. And we are taking steps. It has not been done yet. And we understand about the turn of the key.

And our general point is is that we're still working through this. And if evidence is lost, we will make those decisions at that time. We're just not prepared to do that right now.

THE COURT: What do you mean?

MR. DE WALD: We understand that there is a hearing.

THE COURT: What do you mean you'll make those decisions at that time?

MR. DE WALD: What we are trying to figure out is what happened. We're still in that kind of collection status. We're still trying to get the reports over to both defense counsel to meet our discovery obligations and to prepare for this particular hearing. And so what we're trying to figure out is is there exculpatory evidence on the car that has been

destroyed, and that's what we're trying to figure out.

THE COURT: Okay. Anything, Mr. Parente?

MR. PARENTE: Just, I mean, again, I don't -- it's just this -- this is only on their radar because we filed the motion and pushed it. So I know that there is this hesitancy about we're pushing this. But there would not be an accident reconstructionist if we didn't file our motion. And this might be gone, it might not be. That's the urgency here. So that's where this is coming from.

I know these AUSAs haven't worked this case, but the FBI is certainly trained on these things. How this has happened is beyond me. And that's the point of this hearing, to figure some of this out.

THE COURT: Okay. So, I mean, the question in front of me right now literally is just do we have a hearing today. That's the very limited narrow question that is in front of me. And the answer is yes. And, frankly, you know, I'm not hearing a lot of pushback from the government on that position either.

So we are going to proceed with the hearing this afternoon. My plan is to have the agent testify, and then we can recess and figure out what next steps might need -- what additional evidence might need to be presented at a later date.

I do want to say for the record just a couple of

things to explain why I think we should go forward with the hearing and why it should happen today or why we should start that process today.

So when I think about the need for a hearing, I think about the questions I would ultimately have to answer if I were asked to resolve a motion brought under *Youngblood* or *Trombetta* or Rule 16 for some kind of relief related to an abuse of the discovery process.

You know, and the first question I have to ask is whether the evidence at issue, which I understand to be the agent's vehicle following the accident, whether it is potentially exculpatory and whether its exculpatory value was apparent at that moment in time, so at that time after the accident.

And I think it's clear that the evidence was potentially exculpatory, and that its potentially exculpatory value was apparent because, as I was saying during my back and forth with Mr. DeWald on this point, it's not otherwise obvious to me why the government would have taken all the steps that it took to photograph the car, the Tahoe, take the paint samples, download the information.  I mean, these are -- bring in the FBI ERT.  These are not steps that the government would have taken if they really didn't see any value in the car in and of itself.

So then that leaves the two next questions, which is

whether the car, the evidence that's valuable about the car, has been sufficiently preserved through the steps that the government has taken, and if there has been a loss of evidence, whether that loss of evidence was motivated by bad faith.

And those two questions are fact questions. Fact questions are resolved in evidentiary hearings. The government has not actually put in front of me any evidence in the form of sworn declarations and affidavits, so I don't actually have evidence from the government to support their version of events.

Even if I did, meaning even if I did give the government time to give me sworn declarations and affidavits, I go back to the other first principle in our criminal justice system, which is that it's an adversarial system where people present evidence in an adversarial manner and that's how the truth comes to light.

And the government is effectively asking me at least at this juncture to accept the version of events that they've put forward. And I fully acknowledge that it may turn out after a hearing that the government's narrative is in fact the true narrative. That might in fact be, that might in fact be the conclusion that I come to. But I can't accept that, but I can't accept that possibility, I can't accept that possibility at this juncture.

What gives me great pause is the fact that the cars have been treated differently. And I'll also note that the story has changed, even in the limited amount of time that I've been assigned to the case, the story has changed in small ways. At one point I was told that the car was a personal car for the agent. Then I was told that it was the CBP car. There was a hearing where no one mentioned the mechanic. Then I learn about a mechanic.

There was a hearing in which I was told that a CBP officer authorized the release of the vehicle. I'm now finding out that it's either FBI and/or someone at the US Attorney's office.

And it is entirely possible that none of these differences really matter at the end of the day. But the fact that these discrepancies are popping up cause me to question the narrative that has been put forward and lead me to the conclusion that the only way to get to the bottom of the situation is through a hearing.

And I guess I'll also say in response to the government's point that, you know, they're also learning information on a compressed timeframe. You know, from my perspective, that's not a reason to give the government leeway here, because the compressed timeframe is a timeframe of their own making.

There is no reason why Ms. Martinez needed to be

charged same day via criminal complaint. And there is no reason why an indictment needed to be returned as quickly as it was. And it's not my place to second-guess the government's decisions in either of those regards, in either of those respects. But the government can't make those decisions to move the case as quickly as it is choosing to move it and then at the same time ask me to be, to give it -- to be more patient with the government and give it more opportunity to meet its discovery obligations.

You know, and at the end of the day I simply think that the defendants are entitled to a fair opportunity to develop support for their motion. And that is especially true when something that they're going to have to prove if they're going to prevail goes to an individual's subjective intent, which is an incredibly difficult thing for anyone to establish, period, and certainly difficult if I limited the defendants' opportunity to develop such evidence to documentary evidence as opposed to live testimony subject to cross-examination.

So for all of those reasons, we're going to go forward with the hearing. And, again, with respect to the scope, let's just do the agent today and then take it from there.

Any questions at this time?

MR. DE WALD: Yes, Your Honor. So with respect to

the scope, and we believe that the Court wants to have this hearing with respect to the change in the Tahoe from October 4th and who worked on it and who ordered those type of things, and which is far afield from the cause of the collision at issue and the prosecution and further far afield from the actual shooting itself, we want to prevent the defense counsel from doing a fishing exercise or essentially, essentially deposing the agent up there. So we're trying to figure out what the guidelines are. We're going to present the evidence with respect to the Tahoe itself.

THE COURT: Yeah. I mean, I want to hear from Mr. Parente and Mr. Corfman and obviously co-counsel as well if they want to chime in.

My understanding was that, in terms of the scope of the hearing, is that it would be focused on evidence preservation. And so the starting point of the Q and A would effectively be, Okay, so an accident happened, an incident happened. Set aside how it happened. You know, anything that would arise in a jury trial about let's set the stage for the actual facts associated with the alleged offense itself and let's start from the point of, okay, now it's after the accident, and what happens to the car.

MR. DE WALD: Yes.

THE COURT: Mr. Parente.

MR. PARENTE: A little different than that, Judge.

My thought was there is some discrepancies in the discovery about how the car looked, because, again, we're talking about what's been lost. So I need to know what the car looked like beforehand, right, and then what the agent's position is that actually what was the damage, right, because I have to prove what -- I have to show you prejudice. So how he says the car was hit, that matters.

So I need to show what the car should be when it was seized, right. And that means a little, just two or three questions about what it looked like before based on something he said that was odd.

THE COURT: Meaning like before he ever cross paths with Ms. Martinez?

MR PARENTE: Yeah, yeah, because he himself admits in one of -- he calls it like there was minor damage. I mean, that's a very odd term. But to prove to you the prejudice, I need to show you what the car looked like before, what his position is about where it was hit and when it was hit so I can show what the damage should be had they not removed it, and then I need to go into what was lost, which is what you are saying.

So I think there is just one part before what you two were saying, I do think I need to get into just a tiny few questions about what the car looked like before October 4th and how he believes the car was actually impacted by her car

so I can show you the prejudice down the road.

THE COURT: Okay. All right. I mean, I understand your point. I understand it to be a limited inquiry. What I'm trying to avoid is exactly what Mr. DeWald I think is rightly concerned about, that you are not getting a chance to depose him on I guess what I would call the heart of the collision.

MR. PARENTE: Right. I'm not, I'm not -- again --

THE COURT: Where were you? What were you doing?

MR. PARENTE: Not that stuff at all.

THE COURT: When did you see Ms. Martinez?

MR. PARENTE: Now, when we do get to bad faith, I do think I'm going to argue to Your Honor to allow me to show you that his shooting of her was in violation of the use of force policy, because I do think that under my theory, that impacts why he had the car buffed out.

THE COURT: You would have to establish that he knew or believed that it was in violation of the policy.

MR. PARENTE: Yeah. And I think I can do that.

THE COURT: Okay. Well, I think we should just start.

I appreciate you, Mr. DeWald, flagging the issue. If at some point you think that Mr. Parente or Mr. Ruiz's attorneys are going too far afield, we can talk about it. I mean, the nice thing about doing this in the context of a

hearing as opposed to a jury trial is we don't have to worry about the jury hearing something that they shouldn't otherwise hear. And I'm obviously capable of blocking off evidence for purposes of resolving any motion down the road.

In terms of the mechanics, I'm assuming that the government wants to put the agent on first and then Mr. Parente would cross?

MR. DE WALD: Yes, Your Honor.

THE COURT: Okay. And then with respect to Mr. Ruiz's attorneys, are you looking for an opportunity to separately cross the agent, or are you tagging along with Mr. Parente's questions?

MR. CORFMAN: No, Your Honor. I think we'd like an opportunity to separately examine.

THE COURT: You'd like an opportunity to separately examine. Okay, that's fine. I would just ask obviously that we not ask cumulative questions.

MR. CORFMAN: Yes. I do want to I guess just quickly ask, so I would expect I think the agent's, you know, I guess earlier stuff, you know, his background, his training and things like that to be relevant to this question. Obviously those things technically are earlier in time than, you know, after the collision, but I think they're clearly going to be relevant to how he understands what's then going on around him at that point.

THE COURT: Yeah, I mean, a limited number of questions, of course. But, yeah, if your point being that someone with his experience should know proper procedure, et cetera, et cetera, I can see the relevance of those questions.

MR. CORFMAN: Thank you.

MR. DE WALD: One more thing, Your Honor?

THE COURT: Hmm-hmm.

MR. DE WALD: As you had mentioned early on during our conversation with Martinez's or defendant Martinez's vehicle, there is a standard incident review and assessment that for agent involved shootings in this case is no different. The border patrol agent has been cooperative and has agreed to testify here today. His attorney will be present in the courtroom.

THE COURT: His separate attorney with the agency or personal attorney?

MR. DE WALD: Correct, it's through the agency, I believe.

THE COURT: Okay.

MR. DE WALD: I don't know -- honestly, I just don't know the answer to that.

THE COURT: Okay.

MR. DE WALD: But he will have an attorney here.

THE COURT: Okay. And do you anticipate the agent's attorney participating in the proceedings in any way?

MR. DE WALD: I do not.

THE COURT: Okay. All right. Why don't we get going. I'll plan on taking a break probably around 1:30 or so. But yeah, we can get going then.

MR. DE WALD: Very well.

THE COURT: All right.

MR. BOND: Judge, do you want us to get the agent?

THE COURT: Yes, please.

My courtroom deputy will swear you in.

THE COURTROOM DEPUTY: Please raise your right hand.

(Witness duly sworn.)

THE WITNESS: Yes, ma'am.

THE COURT: Have a seat.

Go ahead, Mr. DeWald.

CHARLES EXUM, GOVERNMENT'S WITNESS, DULY SWORN,

DIRECT EXAMINATION

BY MR. DE WALD:

Q. Sir, would you introduce yourself to the Court, please.

THE WITNESS: Your Honor, my name is Charles Exum. C-H-A-R-L-E-S, last name Exum, E-X-U-M.

THE COURT: Good afternoon.

THE WITNESS: Good afternoon, ma'am.

BY MR. DE WALD:

Q. Agent Exum, what do you do for a living?

A. I'm a supervisory border patrol agent with the US Border

Patrol.
Q. How long have you worked with the US Border Patrol?
A. I've been with US Border Patrol for a little over 20 years.
Q. Where are you currently assigned?
A. I'm currently assigned to Calais, Maine border patrol station.
Q. How long have you been assigned to the Calais station?
A. I've been in Calais since June of 2008.
Q. You said your current position is a supervisory border patrol agent?
A. Yes, sir, that is correct.
Q. What is that -- what are the responsibilities of a supervisory border patrol agent?
A. Primarily I make the work schedule for subordinate agents that work under me. I deal with any disciplinary issues that may arise at work. I approve time sheets. That's primarily the job that I have.
Q. How long have you been a supervisory border patrol agent?
A. I've been a supervisor since 2011.
Q. I'm going to turn your attention to September 4th through October 7th of 2025. Where were you working during that time?
A. I was on a temporary duty assignment in Chicago, Illinois.
Q. Why?
A. I was assigned to go there by the US Border Patrol.

Q. What was your role here in Chicago?
A. I was assigned to a quick reaction force, to protect and be security for a strike team.
Q. What is a strike team?
A. A strike team is a group of border patrol agents that target illegal immigrants and through their interrogation or contact with them determine whether or not they're illegal and they arrest.
Q. And so your role is to protect those strike teams?
A. That is correct.
Q. And is this all for Operation Midway Blitz?
A. Yes, sir, it is.
Q. And when did your detail to Operation Midway Blitz here in Chicago begin?
A. It began on September the 5th.
Q. When was it supposed to end?
A. Initially it was a 45-day temporary duty assignment, then that was changed to a 30-day, and then it was changed to the last operational day being October the 6th.
Q. So when were you supposed to travel back to your home base in Calais, Maine?
A. I was supposed to travel back on October the 7th.
Q. So back in September when you came, first came out, how did you get to Chicago to serve in this detail?
A. I drove my government issued Tahoe.

Q. Can you describe that for us?
A. Yes, sir. It is a silver 4-door 2015 Chevrolet Tahoe.
Q. And we're going to describe that as "the Tahoe" from now on, is that okay?
A. Yes, sir.
Q. What license plates did that Tahoe have while it was in the Calais station in Maine before you came to Chicago?
A. Before I came to Chicago, it had US government plates on it.
Q. What license plates did you have on it when you drove the Tahoe from Maine to Chicago?
A. State of Maine issued license plates.
Q. Why did you have different plates for it?
A. Usually when we travel or we're somewhere, the government plates tend to draw attention to it, whether it be criminal, you know, just to target that for whatever supplies or equipment may be in that vehicle simply because it is a government vehicle.
Q. And so having Maine plates gave it a covert aspect to it?
A. Exactly. It made it stand out no more than any other vehicle in a parking lot or on the road.
Q. What license plates did you have on the Tahoe when you were doing work at Operation Midway Blitz in the third week or in the weeks of September and the beginning of October?
A. During that time, I was issued and I had a Kentucky plate

on my vehicle.
Q. Why did you change plates from Maine to Kentucky?
A. While we were operating in Chicago area, we didn't want any -- there had been a lot of targeting of agents off duty and did not want the vehicle being from -- having Maine plates have that problem follow that vehicle back to Maine.
And also sometimes we were swapping vehicles, you know, tag numbers or tags on the vehicles during the operation. That way if a vehicle was videoed, say, a silver Tahoe with a Kentucky plate, we could swap it out with an Illinois plate. That way people couldn't figure out which hotel we were staying at or what restaurant we were eating at.
Q. So I want to turn your attention now to October 4th of 2025. And at approximately 10:30 in the morning in the area near 39th Place and Kedzie Avenue in Chicago, did the Tahoe collide with other cars in traffic?
A. Yes, sir, it did.
Q. And I'm going to take you to -- were you able to see the damage done to your Tahoe?
A. I was.
Q. When was the first time you noticed the damage to your Tahoe from that collision?
A. Some time after the collision, I was standing on the driver's side of it. It was several minutes later that I did see the damage.

Q. And you said it was on -- so where exactly was the car? Was it in the middle of the street at that point?
A. Correct. It was in the middle of Kedzie Avenue or Kedzie Street.
Q. Did you move the Tahoe anywhere after that initial collision?
A. Yes, sir, we did.
Q. Where did you take it?
A. To the -- in the direction I was facing, I drove it off the left side of the vehicle -- of the road onto the grass shoulder.
Q. Why did you move it out of traffic to bring it over onto the grass shoulder?
A. There were three of us in the vehicle. After the events that had just transpired, we did not know if there were any more bad actors in that area. So the three of us defending that vehicle in a 360-degree area was not, not very safe.
So we chose to move it off of the road. That way traffic could continue as it was, because we were -- there was traffic coming in both directions, from behind and in front of us, and we thought the best safety idea would be to move it off of the road. That way we would be out of traffic. And because there was a fence on that side of the road, we also only had to defend 180 degrees around that vehicle in the event something else happened.

Q. Where did the other cars that were involved in the collision, were they still on Kedzie Avenue when you moved the Tahoe?
A. No, sir. Both of those vehicles had left the scene.
Q. Did you have an opportunity to look at your Tahoe when you moved it to the side of Kedzie?
A. I did.
Q. Can you describe to the Court the damage that you saw on the Tahoe?
A. Yes, sir. Just in front of the driver's side wheel, the front driver's side wheel, there was a scratch mark. There were intermittent scratch marks down the driver and rear door. And there was a black mark or circular mark over the -- or on the driver's side door.
The driver's side running board was broken and cracked. And there was a dent with a black mark in it just in front of and above the gas cap, gas cap lid.
Q. And that's on the driver's side of the Tahoe?
A. That's correct.
Q. Did you notice any other damage on the passenger's side of the Tahoe?
A. I did.
Q. Can you describe that to the Court.
A. There was a scrape mark on the corner of the rear passenger side of the vehicle. And just in front of that, the

plastic continues to the rear fender well, and that plastic portion of the bumper had been popped out away from the aluminum frame.
Q. And was the damage you just described to the Court, is that all new damage from when you first started driving it on October 4th, the Tahoe, on October 4th?
A. Yes, sir. All of that was new damage.
Q. How long did you stay with that Tahoe near the area of 39th Place and Kedzie when you brought it up onto the grass?
A. Maybe a couple of hours.
Q. Was there other law enforcement agencies that arrived?
A. Yes, sir, there were.
Q. What other agencies arrived?
A. Okay. Our backup units that came were more US Border Patrol, Office of Field Operations Special Response Team, Homeland Security Investigations, ICE, FBI, and also a little later on the Customs and Border Protection Office of Professional Responsibility had two, at least two agents there.
Q. Was the Chicago police at the scene eventually?
A. Eventually they were, yes, sir.
Q. Did you drive the Tahoe from the area of 39th and Kedzie, did you drive the Tahoe home from there?
A. No, sir, I did not.
Q. Why not?

A. I was informed by the FBI on the scene that they were going to need that for evidence.
Q. So where did -- what happened to you? Where did you go?
A. There were two of the CBP OPR agents, the Customs and Border Protection Office of Professional Responsibility agents drove myself and another agent back to the Great Lakes Naval Station, where our base of operations was.
Q. So why did you go up to Great Lakes with the OPR agents?
A. I was instructed by them to do so.
Q. What happened up at Great Lakes?
A. We went up to the room that the OPR was utilizing. I took out my pistol, dropped the magazine, took the round out of the chamber and gave that to them as well as the two spare pistol magazines that were on my duty belt.
Q. And is this because you fired your service weapon that day at 39th and Kedzie?
A. That is correct.
Q. What else did you do while you were in Great Lakes at the -- first of all, what is located at Great Lakes again? What is --
A. That is where our tactical operations center or TOC is.
Q. Okay.
A. And, also, that's where the majority of my chain of command for Operation Midway Blitz is.
Q. So besides working with OPR and handing over your weapon

and your ammunition, what else did you do while you were up at the tactical operations center at Great Lakes that day?
A. I docked my body camera.
Q. And what does that mean?
A. I took my body camera and put it on the -- it's a charging station that recharges the battery, and it also downloads any information that had been recorded since the last time it had been on a charging station.
Q. Were you wearing your body-worn camera at the time of the collision?
A. I was not.
Q. Okay. Where was it?
A. It was on my tactical vest in the passenger seat of the vehicle.
Q. And what were you wearing?
A. I was wearing my issued border patrol combat shirt with a cover shirt over that, a tan button-up shirt.
Q. Why?
A. Sitting in the front of the vehicle, our side windows are not tinted. And due to the nature of our operations, we were trying not to be seen until we got to targets. And I didn't want my position in a vehicle behind the vehicle that we're doing the investigations and the apprehensions to give away our location and draw undue attention and crowds to prevent them from being able to do their jobs and have, you know --

cause safety concerns.
Q. Where were the other two agents in your car? Where were they seated?
A. They were sitting one behind me and one in the passenger side of the rear seat.
Q. Did you put on your body-worn camera at some point?
A. I did.
Q. When?
A. Once I deemed it was safe enough for me to call for backup, I transitioned from my pistol. I put on my body armor, transitioned to my M4, which is my rifle, and at that point is when I believe I turned my camera on. I can't remember if I turned it on at that point, because we still weren't sure exactly what was going on. But I did put my vest on, which had my camera on it.
Q. So the body-worn camera was on at some point at 39th and Kedzie, is that correct?
A. That is correct.
Q. And is that why you needed to dock the camera up at Great Lakes?
A. That is correct.
Q. What does that do when you dock a body-worn camera?
A. It uploads or downloads, whichever the term is, with the information that had been recorded on it since the last time it was docked, it uploads or downloads it from the camera, and

it also recharges the rechargeable battery.
Q. What else happened at Great Lakes at the tactical operations center on the afternoon of October 4th with respect to you? What else did you do?
A. Just general conversation with my chain of command, OPR, about nothing to do with this, but just talking to them, just federal agent to federal agent.
Q. How long were you at Great Lakes at the tactical operations center after the incident?
A. At least four to six hours.
Q. Where did you go after four to six hours?
A. To the FBI office downtown Chicago.
Q. Why?
A. I was notified that my -- that my issued Tahoe was able to be released, and I went to go pick it up.
Q. How did you know that the Tahoe was being released by FBI?
A. Agent Ray Torres, one of the people in my chain of command, notified me that they had been told that it was ready for me to pick up.
Q. Did you ask for that FBI -- the Tahoe to be released to you?
A. Could you repeat that, please?
Q. Did you ask for the Tahoe to be released to you?
A. No, sir.
Q. How did you know where to go in Chicago?

A. Agent Torres told me that it was the FBI office downtown. And to my knowledge, there was just one location. And he also gave me a point of contact. And she sent me a Google map of how to get there.
Q. And who was that point of contact?
A. FBI Agent Tucker.
Q. And did she tell you where to meet?
A. She sent me the Google Map pin. She didn't tell me. She just dropped that pin, and that was the assumption, that was her office.
Q. How did you get back to Chicago?
A. An agent, a fellow agent gave me a ride.
Q. And did you follow the Google pin that Agent Tucker sent to you?
A. That is correct.
Q. And what did you find when you arrived at the Google pin?
A. There was a -- we saw the FBI facility. It was a secure facility. There was an entry gate with a manned guard hut there or guard building. And as we drove up to the building, we were asking the security guard, you know, what procedures we needed to follow to get on there. And at that point, Agent Tucker sent me a text message saying stand by outside the gate on the street, that she would have the Tahoe sent out to me.
So we backed up and parked on the street in front of the guardhouse and stood by.

Q. Do you remember the street?
A. I do not.
Q. Can you describe the street for us?
A. It was dark, so. It was a two-lane quiet street, the FBI building on one side. I cannot remember what was on the other. It was just a small two-lane not-very-busy street.
Q. How long did you wait outside the gate?
A. Maybe 5 or 10 minutes at maximum.
Q. And had you ever been to the FBI Chicago before that time?
A. No, sir, never.
Q. What happened after 5 minutes or so?
A. I saw the Tahoe that I had been driving earlier that day. It pulled up behind the vehicle we were in, and another vehicle pulled up behind that vehicle.
Q. So two different vehicles?
A. Correct.
Q. How many people were in those vehicles?
A. There were three total in both vehicles.
Q. Okay. So what happened with you and the Tahoe that they brought out to you?
A. I can't remember if they handed me the keys or if the keys were in the ignition, but it was conveyed that I was able to take it, you know, from there.
Q. Did they place any restrictions or tell you to preserve the car in any way, shape or form?

A. No, sir.
Q. And, again, this is on October 4th?
A. Yes, that is correct.
Q. And it was dark out?
A. Yes.
Q. Where did you go from there?
A. Once we left there, I took lead, and we followed Google Maps or I followed Google Maps back to Great Lakes Naval Station, and the agent that had taken me followed me.
Q. And where did you go that night?
A. After Great Lakes?
Q. After Great Lakes.
A. Back to our hotel.
Q. During the next two days, Sunday, October 5th, and Monday -- well, before I do that, did you notice the damage on the Tahoe when you picked it up from FBI?
A. No, sir, because it was dark, so I couldn't really tell.
Q. Did you have an opportunity to look at the Tahoe after, at some point after you received it back from the FBI?
A. Yes, sir.
Q. And did you see the same damage that you saw on October 4th?
A. Yes.
Q. During the next two days, Sunday, October 5th, and Monday, October 6th, did you do any further operations relating to

Operation Midway Blitz?
A. No, sir, I did not.
Q. Why not?
A. We were told to stand down as far as operations go. But we were still on a standby status in case of emergencies and in case we were needed somewhere.
Q. Did you drive the Tahoe anywhere on Sunday, October 5th?
A. Yes, yes, sir, I did.
Q. Where did you go?
A. I took the agent that was with me back to Great Lakes, because he had some paperwork to do. And I also retrieved my body-worn camera, if I'm not mistaken.
Q. Okay. Did you go anyplace else?
A. We went to the naval exchange there on base while we were there.
Q. And you used the Tahoe to get there?
A. Correct.
Q. Do you remember going anyplace else that day with the Tahoe other than back to the hotel?
A. Back to the hotel I believe is it.
Q. Did you drive anywhere, the Tahoe anywhere on Monday, October 6th?
A. I can't, I can't remember. I don't recall.
Q. Okay. You told us earlier that you were supposed to travel back to Maine on October 7th. Did you do that?

A. I did not.
Q. Why not?
A. I was notified by either the FBI or the US Attorney's office that I needed to be at a meeting with a couple of the assistant US Attorneys and the FBI in regard to the incident that had taken place.
Q. And where did you meet the assistant US Attorneys and the FBI agent?
A. In this building.
Q. Did you drive the Tahoe from your hotel down to the federal building?
A. I drove it to the federal garage, which is down the street from this building.
Q. You came in for the interview?
A. Yes, sir.
Q. And after that interview concluded, where did you go?
A. Back to the garage where I had the Tahoe parked.
Q. Was anybody else with you?
A. Yes, sir.
Q. Who?
A. Agent Matt Nagl of the FBI and Agent Adam Perkins, US Border Patrol.
Q. Did anybody else join you at the FBI garage?
A. Yes, sir, they did.
Q. Who?

A. There were two, I believe, IT guys from the FBI.
Q. What did they do?
A. They downloaded whatever information the Tahoe had to be downloaded from its computer.
Q. What were you doing when that was happening?
A. I took that opportunity to borrow a screwdriver from the IT guys and took the Kentucky plate off of my vehicle and put the Maine state plates back on it, because we were finished with our operations, and it seemed like an opportune time to do that.
Q. Did you go back to the hotel that night?
A. Yes, sir, we did.
Q. Did you take the Tahoe there?
A. Yes, sir.
Q. What did you do the next day, Wednesday, October 8th?
A. Wednesday is the day I began my travel back to Maine.
Q. Why?
A. That was my assigned travel day. Since we had to meet here on the 7th, the 8th was my first travel day back home.
Q. Who did you come from Maine to Chicago -- did anybody accompany you from Maine to Chicago?
A. Yes, sir.
Q. Who?
A. Agent Adam Perkins, US Border Patrol.
Q. And then when you went back to Maine, did Agent Perkins go

with you?
A. No, sir, he did not.
Q. Why not?
A. He stayed behind in case he was needed for grand jury testimony.
Q. So he was with you on October 4th of 2025?
A. Yes, sir.
Q. So who did you drive home with?
A. I drove home by myself.
Q. Do you remember the general route you took back to your station?
A. Yes, sir, I do.
Q. Please tell us.
A. Okay. From my hotel, Google Maps got me from there to Interstate 90. Interstate 90 all the way to the bypass around Boston, which is Interstate 495. From that north on Interstate 95 to Bangor, Maine. From Bangor, Maine, I took Maine Route 9 or Route 9 all the way to my border patrol station.
Q. How long is that entire trip to drive?
A. 20 some odd hours driving time.
Q. How long did you travel each day?
A. Eight to ten-ish hours.
Q. Where did you stop on Wednesday night, October 8th?
A. Wednesday night I stayed in Avon, Ohio.

Q. Is that near Cleveland?
A. I have no idea.
Q. Where did you stop on Thursday, October 9th?
A. Thursday I stayed in Worcester, Massachusetts.
Q. What did you do with the lodging and the gas receipts that you had for your trip?
A. Took photos of them. I kept them and took photos of them.
Q. And why did you keep them?
A. The hotel receipts, I need those as proof of what I spent to be reimbursed for hotel expenses. The gas receipts, I need them for our fleet cards to be paid for for gas purchases.
Q. Did you share those receipts with the US Attorney's office in this case?
A. I did.
Q. What did you do on Friday, October 10th, when you left Worcester, Massachusetts?
A. I drove north toward Bangor. I stopped to stretch my legs for an hour or so at the Cabela's in southern Maine. And then I arrived at the Bangor airport in Bangor, Maine to pick up Agent Perkins, who had flown back from Chicago.
Q. What time did you pick up Agent Perkins?
A. I believe it was around 3:00 or 4:00 that afternoon.
Q. Did you and Agent Perkins then go up to the Calais station at the Canadian border?
A. Yes, sir, we did.

Q. What time did you and Agent Perkins arrive in Calais?
A. Approximately 2 hours later.
Q. Where did you park the Tahoe?
A. In our garage at the border patrol station.
Q. Please describe the garage to the Court.
A. It's a brick building attached to the border patrol station. It's inside of a fenced-in area. There is a roll-up garage door on each end. Beside each of those doors are pedestrian doors to walk in. One side of the garage has a door going to the mechanics garage or mechanics work area. The other side of the garage opposite that is a pedestrian door that goes into the station.
Q. Does it have a working security recording system inside that garage?
A. Yes, sir, it does.
Q. Tell us what you did when you pulled into the garage.
A. Once I pulled into the garage, Agent Perkins and I took all of our personal gear out of it and the majority of our work-related equipment and supplies out of it.
Q. How long did you stay at the Calais station after you got there?
A. Maybe an hour, hour and a half.
Q. Did you then leave for home?
A. Yes, sir, I did.
Q. Did you drive the Tahoe after October 10th when you

arrived back in Maine?
A. No, sir, I did not.
Q. So to this day, that's the last time you drove the Tahoe?
A. That is correct.
Q. When is the next time you reported to work after you left the Calais station on October 10th?
A. The following Thursday.
Q. So is that on October 16th?
A. Yes, sir, I believe that's correct.
Q. So on Thursday, October 16th, what were your hours of work duty that day?
A. That day I worked 3:00 in the afternoon until 1:00 in the morning.
Q. And 1:00 in the morning going into Friday?
A. That would be correct.
Q. And before you went to work, did you receive a call from the FBI agent in Chicago?
A. I did.
Q. What did you talk about?
A. He told me that they may need to get the Tahoe back and wanted to know if there had been any work done to it.
Q. What did you tell him?
A. I told him to my knowledge there had been none, no work done to it, and it had not been driven any.
Q. Did you then go to work?

A. I did.
Q. And at some point after you got settled at the work, did you go out and take a look at the Tahoe?
A. Yes, sir, that's correct.
Q. What did you find?
A. Number one, the vehicle had been moved from where I had parked it. So I took a little closer look at it, found out or found that the black marks that were on the driver door were missing. And also the black mark that was in the dent that was in front of and above the gas cap was also missing. The two, the two black marks were what caught my attention.
Q. And when you are saying the black marks were missing, they were not on the car anymore, is that correct?
A. That is correct.
Q. Can you describe the condition of the car otherwise?
A. It looked the same as it did when I parked it, except for the two black marks were missing, and the dust and road grime around those areas were also missing.
Q. Did it look like somebody had cleaned the car?
A. Those spots, yes, sir.
Q. Okay. Were there still the dents and scrapes that you had described to the Court from October 4th? Did you still see those?
A. Yes, I could still see all of those.
Q. Okay. Just not the black marks?

A. Correct.
Q. Did you call the FBI agent back or contact the FBI agent back to let him know what you saw?
A. I did send him a text message saying that I was mistaken, and that work had taken place.
Q. What did you do after that to make sure that no one else touched the Tahoe?
A. I sent an email out to my chain of command telling them that the vehicle was potentially going to be needed for further evidentiary value, and it was not to be moved or worked on, and any email past that was going to be also kept as evidentiary value.
MR. DE WALD: Your Honor, I'm using the Elmo. And it's been a long time since I've done this.
BY MR. DE WALD:
Q. I'm going to show you, sir, what has been previously marked as Government's Exhibit or been marked as Government's Exhibit 1A. You can see the exhibit number on the bottom there.
Do you recognize what this is? Using the screen that's in front of you.
A. Yes, sir, I do.
Q. What is this?
A. That is the email that I sent out after I heard from Agent Nagl.

Q. What time? What is the time and day for this email?
A. The time and date is 11:55 p.m. on October the 16th.
Q. And that is Eastern time?
A. That is correct.
Q. Okay. The subject line is M55404. What is that?
A. That is just the identification of asset number of the Tahoe.
Q. And who did you send this email to?
A. I sent it to all of the supervisors and the two bosses above me at the station and also our station mechanic.
Q. And you sent this email because of the information you got from the FBI agent?
A. That is correct.
Q. And to make sure that this is a part of the record, I'm going to ask you to read this email that you sent. And who did you send this to again?
A. Again, there were four other supervisors, my deputy patrol agent in charge and the patrol agent in charge and the mechanic.
Q. And so you sent it to the management team and the mechanic, is that correct?
A. That is correct.
Q. All right. Please tell us what you wrote in the email.
A. "Do not use Mike 55404 until further notice. Leave it as is in the garage. The keys to it are on my desk. I was

contacted by FBI Agent Matt Nagl this evening about it. The defense attorney in the shooting case is wanting Mike 55404 held as evidence, and the Judge signed off on it. The FBI will be reaching out in the next few days about having it hauled to a secure FBI facility and held as evidence.

"The FBI has also requested the reasoning behind why the scuff marks were buffed off the Tahoe from Chicago. The defense attorney will be asking, so they want to have an answer ready. They want to know the chain of command of how and why the decision was made.

"This and any further emails about the incident will be preserved as evidence in the case. Thanks."

Q. So if you sent this email on October 16th, why didn't you send this email on October 10th, when you arrived back in Calais, Maine?

A. I didn't know the Tahoe had any more evidentiary value.

Q. Why not?

A. It had been returned to me.

Q. By whom?

A. The FBI.

Q. In your email, you told your management that Chicago wanted to know how and why the decision was made to buff out the scuff marks from the Tahoe. Did you request, direct or request or seek approval to get the Tahoe repaired?

A. Negative, I did not.

Q. Who, who authorized -- did you later learn who authorized the repair?
A. I did.
Q. Who approved the work on the Tahoe?
A. My immediate boss, Deputy Patrol Agent in Charge, Kevin Kellenberger.
Q. How did you find out?
A. He told me.
Q. Did you attempt to obtain an approval email from management that authorized the work on the Tahoe?
A. I did.
Q. Did you actually obtain that email?
A. Yes.
Q. I'm going to show you what has been marked as Government Exhibit 1B. It's actually a continuation in the same string. So this is 1B. It's two pages. Sorry. So this says 1B at the bottom.
Here is your original email from the night before, is that correct?
A. Yes, sir, that's correct.
Q. So then there is another email that comes in, and it's from Kevin Kellenberger, is that correct?
A. That is correct.
MR. DE WALD: And if I could have just one moment, please.

And for our purposes here, it's Kellenberger, K-E-L-L-E-N-B-E-R-G-E-R.

BY MR. DE WALD:

Q. Who is Kevin Kellenberger?

A. He is my deputy patrol agent in charge, and at that time he was the acting patrol agent in charge of the Calais border patrol station.

Q. And what time and day was this email sent?

A. 5:59 a.m. on October the 17th.

Q. And this is 5:59 a.m. Eastern time, is that correct?

A. Eastern time, yeah.

Q. And since it's a response to your previous email, it has the same subject line of M55404?

A. Yes.

Q. This is Deputy Patrol Agent Kellenberger emailing you back, is that correct?

A. Correct.

Q. And there are other people on this email string, is that right?

A. That is correct.

Q. Okay. Tell us what the email you received, what does this say?

A. It says, "Charlie, you can tell them that I said that Mr. Erskine could start work on the vehicle because I thought that all the necessary pictures and evidence was taken in Chicago

during the initial investigation.

"Additionally, if they needed it as evidence, I did not think they would have released it from the investigation, from the investigation, had you drive three days all the way back to Maine, possibly destroying some of that evidence along the way if they still needed it.

"Please tell them to contact me if they need a statement. Thank you."

Q. And then his signature line is at the top of the next page?

A. That is correct.

MR. DE WALD: Your Honor, I just want to make sure that Government's 1A and 1B be entered into evidence for this particular hearing.

THE COURT: Sure. We can talk about it at the end of the hearing. But yes, let's talk about how to best make it part of the record.

MR. DE WALD: Yes, Your Honor.

BY MR. DE WALD:

Q. When is the last time you saw the Tahoe?

A. I saw it at the station on the back of a rollback truck. I forget the day of the week. But it was on the back of a rollback truck.

Q. And it was on the back of the -- I'm sorry, you called it a rollback truck?

A. Yes, sir. A transport truck.
Q. Where was the Tahoe being transported?
A. Back here to Chicago.
Q. And was that on or about Friday, October 24th?
A. That sounds correct, yes, sir.
Q. Okay. Between October 4th and October 24th, did you personally make any repairs to the Tahoe?
A. I did not.
Q. Did you request or authorize anybody else to make repairs to the Tahoe?
A. No, sir, I did not.
Q. And when was the first time you realized that no one should have touched the Tahoe after you received it back from FBI?
A. When I spoke with Agent Nagl.
Q. And was that on October 16th?
A. Yes, that is correct.
Q. And had the scuff marks or those black marks you described, had they already been cleaned off the Tahoe by then?
A. They had.
Q. Did you later learn who removed those scuff marks?
A. I did.
Q. How?
A. Sir?

Q. How did you learn?
A. The deputy patrol agent in charge, Kellenberger told me.
Q. And who removed them?
A. The station mechanic.
Q. Is that Erskine?
A. That would be correct.
Q. That's what that email was talking about?
A. Yes, sir, it is.
Q. So between the time that the FBI released the Tahoe to you on October 4th until the time that the FBI called you on October 16th, were you aware of any need to preserve the current condition of the Tahoe?
A. I was not.
Q. Why not?
A. It was returned to me.
Q. And what significance is that?
A. The investigating agency gave it back, so.
Q. What did that tell you?
A. That told me that everything that was needed from it was already taken.

MR. DE WALD: Your Honor, I have no further questions.

THE COURT: Okay. Thank you, Mr. DeWald.

Why don't we take a 10 minute break.

And then, Agent Exum, you'll be cross-examined after

that. So you can step off the stand, but no discussions with Mr. DeWald or Mr. Bond about anything related to the case.

THE WITNESS: Yes, ma'am.

MR. DE WALD: Your Honor, is he allowed to -- I'm assuming he's allowed to talk to other people, including his attorney?

THE COURT: Defendants?

MR. PARENTE: Judge, he can talk to his attorney about anything but his testimony, that's fine.

THE COURT: Okay. Yep, that makes sense.

All right. Mr. Exum, do you understand, Agent Exum?

THE WITNESS: Yes, ma'am.

THE COURT: Okay.

MR. DE WALD: And so we're just going to ask him to go across to the room there?

THE COURT: Into the witness room?

MR. DE WALD: Yes.

THE COURT: That's fine.

MR. DE WALD: Thank you.

(Recess at 1:32 p.m. until 1:42 p.m.)

THE COURT: Okay, folks, can we get Agent Exum back in the courtroom.

MR. DE WALD: Yes, Your Honor.

THE COURT: Whenever you are ready, Mr. Parente.

MR. PARENTE: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PARENTE:

Q. Good afternoon, Agent Exum.

A. Good afternoon, sir.

Q. Just so you know, I'm the attorney for Ms. Martinez, okay?

A. Okay.

Q. So thank you for coming back to Chicago and answering some questions. It's not going to be too long.

One question was, you had mentioned that when you got here you were on I think you called it a 45-day detail?

A. Yes, sir.

Q. Initially?

A. Correct.

Q. And you got here September 4th?

A. Yes.

Q. Okay. And 45 days from September 4th would be October 20th, is that about -- or 19th, I think?

A. Thereabouts, yes, sir.

Q. Okay. So you ended up going home early?

A. It was changed. I didn't go home early. The length of the detail changed three times while we were here.

Q. Okay. But if you were sent here for 45 days, and you left after maybe a little more than 30, it kind of got shortened, right?

A. That would be correct.

Q. Okay. And it sounds like you're familiar with Operation Midway Blitz to the extent you talked about it on direct?
A. Yes, sir.
Q. Would it be fair to say that they weren't -- it didn't kind of die down. It was still pretty active even when you left, right?
A. I don't know. I'm not part of it anymore.
Q. Okay. So you weren't aware that other agents were actually being brought here because they needed more people, and you're getting sent home early?
MR. DE WALD: Objection, relevance.
BY MR PARENTE:
Q. If you know.
THE COURT: He can answer if he knows.
BY THE WITNESS:
A. It's a continuation. I mean, that's all I know.
BY MR PARENTE:
Q. Okay. Do you believe that you were sent home early because of this incident?
A. Negative.
Q. Okay. I want to talk about the vehicle, right. This was your personal work vehicle. Is that how you describe it?
A. Assigned vehicle.
Q. Okay.
A. Assigned work vehicle.

Q. Do you take pride in the vehicle?
A. I do.
Q. Yeah. And were you excited when you got the vehicle?
A. Yes, sir.
Q. Was it a nicer vehicle than you usually drive up in Maine?
A. More or less.
Q. Okay. And when you were in Maine and this was your vehicle that you're somewhat prideful of, do you know if anyone else was driving it at that time?
A. If it was needed, it was used. I mean, we had assigned vehicles. But if there was a shortage, vehicle shortage for any reason, we would take whatever vehicle was needed.
Q. Okay. Before you came to Chicago, is it fair to say that there was some damage to the vehicle?
A. Just minor scratches.
Q. Okay. And what do you describe as a minor scratch?
A. Say if you were to lean up against it with a jacket with something metal on it, it would scratch it. That would be about what I would equate any damage on the vehicle to.
Q. Okay. And how many of those minor scratches do you think there were?
A. I don't recall.
Q. Okay. But certainly nothing similar to what happened after October 4th, is that fair to say?
A. That would be correct.

Q. There were no black marks on it in advance?
A. That would be correct.
Q. Okay. And no dents to your knowledge?
A. That would be correct also.
Q. So I want to kind of talk about what happened just with respect to the damage on October 4th, right, okay. So you've described, you know, sort of -- I think you used the word that you were rammed, is that right?
A. Rammed wouldn't really be the -- I may have used that, but it would be more like a hit. Ram to me is more of a head-on maneuver. So this was side to side. So I would describe it more of, I guess you'd say hit and not rammed.
Q. Okay. So you would agree with me there was no ramming here, or at least the way that most people use the word "ram"?
A. Not from the front end, that would be correct.
Q. And what about from the back end?
A. There was no -- like again, to me, ramming is the front of a vehicle striking another vehicle. And that is not what happened.
Q. Well, but, I mean, if someone drove at the side of your vehicle, that's a ramming, too, right?
A. If it was the front of their vehicle.
Q. Okay.
A. Like I said, that would be my description of that.
Q. Okay. And so if someone -- again, it didn't happen -- if

someone backed into your car at a high rate of speed, you wouldn't call that ramming?
A. Almost getting into a technicality there.
MR. DE WALD: Objection, relevance. Objection, Your Honor.
THE COURT: He can answer.
BY THE WITNESS:
A. I wouldn't really call that ramming. I'd almost -- it would be intentional, but that would be backing. Ramming is almost a front driving maneuver I guess you would say.
BY MR PARENTE:
Q. Let's just -- we'll both agree there was no ramming here, is that fair to say?
A. By my definition, yes, sir.
Q. Great. Mine, too.
So you say that you were hit on the side, the driver's side?
A. That is correct.
Q. Okay. How many times?
MR. DE WALD: Objection, Your Honor. This is getting far afield. It's getting into that deposition aspect of the collision itself, which is irrelevant for the --
THE COURT: Go ahead, Mr. Parente.
MR. PARENTE: We just heard that the car had no damage. I'm now trying to figure out what damage occurred so

we could then talk about what damage is now not there. I don't know how I'm supposed to do that without getting into --

THE COURT: I agree, some leeway. Go ahead, Mr. Parente.

BY MR PARENTE:

Q. So tell us, you were hit on the driver's side is what you are claiming?
A. That is correct.
Q. Okay. How many times?
A. One.
Q. One time. Okay.

And you also I think you said were hit on the passenger side?
A. I later found out that. Initially I did not know that.
Q. You didn't know that?
A. Correct.
Q. And when you say you found out, how did you find out?
A. One of the other agents in the vehicle told me.
Q. Which one?
A. I don't recall that.

THE COURT: Mr. Parente, this isn't necessary.

BY MR PARENTE:

Q. Okay. So we have as far as new damage goes, we have one hit on the driver's side, right?
A. Correct.

Q. And then one hit in the rear?
A. On the passenger's side, correct.
Q. Any other damage on October 4th?
A. No, sir.
Q. Okay. Now, you knew, right, that this wasn't just a car accident after it happened, right? This sort of turned into a bigger deal. Is that fair to say?
A. That would be very fair to say.
Q. Okay. And you've been an agent for 23 years, right?
A. Yes, sir.
Q. And you go to agents school somewhere, right?
A. That would be correct.
Q. Where do border patrol agents go to school?
A. Artesia, New Mexico.
Q. Artesia, New Mexico.
And I have a feeling there is a class there on evidence preservation, is that true?
A. Very minor, but yes.
Q. It's not -- border patrol doesn't stress evidence preservation?
A. More like scene preservation, which in itself preserves whatever is in that area. But the evidence itself, not so much.
Q. So is it your testimony in your 23 years as a border patrol agent, the agency didn't kind of equip you with

knowledge of evidence preservation?
A. Very moderately.
Q. Very moderately, okay. Meaning there is a small class when you are first trained, and then you are not given yearly trainings on evidence preservation?
A. That would be correct.
Q. Okay. Do you feel that you have a good sense of what's important as far as evidence goes?
A. I do.
Q. Okay. And have you ever been involved in another collision before?
A. Professionally or just in general?
Q. Let's start with professionally.
A. No, I have not.
Q. Okay. How about personally?
A. Yes.
Q. Okay. Was it a serious accident or minor accident?
MR. DE WALD: Objection, Your Honor, as far as --
THE COURT: I'll allow it.
BY THE WITNESS:
A. One minor, one serious.
BY MR PARENTE:
Q. Okay. And in those cases, were you at fault or the other driver?
MR. DE WALD: Objection.

THE COURT: Yeah, sustained.

BY MR PARENTE:

Q. As this case went on, it's fair to say you were following the news about it, right?

A. That would be correct.

Q. It was national news, right?

A. Yes, sir.

Q. From the moment it happened, national news, right?

A. Correct.

Q. And you were reading those articles, right?

A. Some of them.

Q. Some of them. Which ones?

A. I couldn't tell you which. Just --

MR. PARENTE: I'm going to show the witness, Judge, if I may turn on the Elmo, what's been marked as Defendants' Exhibit, I have it 2. I think I have another one.

BY MR PARENTE:

Q. Okay. I can't tell because a lot of the texts I was given were redacted, so I don't know who a lot of this is coming from, so maybe you can actually help me out.

Did you send this article to somebody or did they send it to you?

A. Can I see the top of the phone?

Q. Literally they -- oh, yeah. This is what I have.

A. That didn't help much. In that context, I couldn't tell

you.
Q. I'm assuming, because they gave it to me, and the production was limited, that the blue means it was yours?
MR. PARENTE: If Mr. Bond can tell me if this is the agent's text?
MR. DE WALD: In testimony I think he can tell you that.
MR. PARENTE: He said he doesn't know.
BY THE WITNESS:
A. I think that's the way it works, but I'm not a hundred percent sure.
BY MR PARENTE:
Q. Okay. Do you remember sending this article to somebody and saying, "Read it. 5 shots, 7 holes"?
A. Okay. Well, if I did -- I did send that. So the little -- I don't know what you call it. The little --
THE COURT: Bubble?
BY THE WITNESS:
A. -- bubble is pointed my way. So by that, yes, I did send that and the follow-up.
BY MR PARENTE:
Q. Okay. And so the "5 shots, 7 holes" is a reference to an argument that I made at the detention hearing that you shot Ms. Martinez five times and that there were seven holes in her body, is that true?

A. Yes, I actually believe that is true.
Q. Okay. And you were sending that out to somebody else, meaning I would assume that you read the article?
A. Yes.
Q. Okay. And what did you mean by "Read it. 5 shots"? Why are you pointing that fact out?
A. I'm a firearms instructor. And I take pride in my shooting skills.
Q. You take pride in your shooting skills?
A. That is correct.
Q. Okay. I'm going to show you Defendants' Exhibit 3. This wouldn't be pride in your shooting skills, but, again, this goes to sort of what you are putting out there to your network. Can you read it to us?
A. It says, "I have a MOF amendment to add to my story. I fired 7 rounds, and she had 7 holes. Put that in your book, boys."
MR. DE WALD: Your Honor, at this point I'm going to object as far as the deposition aspect of this. He's inquiring as to what happened at the scene with respect to the shooting, which is exactly what this hearing is -- it has nothing to do with the Tahoe itself.
THE COURT: Mr. Parente.
MR. PARENTE: No, Judge. What I'm showing is that he's digesting the news, and that he's putting it out there,

which is going to go to other things that he did along the way here that are in contrast to what he testified to on direct.

THE COURT: Yeah, Mr. DeWald, I understood Mr. Parente to say that these text messages go to the issue of subjective intent, and that is what he's describing now. So I'm going to allow these questions.

But can I just say something from the record. Agent Exum, you said "7 rounds," but the text actually says "5 rounds." I just want to make sure that that's clear.

THE WITNESS: Thank you, ma'am.

BY MR PARENTE:

Q. And then you say, "Put that in your book, boys." What book are you talking about?

A. No particular book. This is a group of agents that I'm friends with. It's almost like a -- relieving stress, like, what do you call that when you go -- I'm at a loss for words here. Like a group to make you feel better about your -- I'm just trying it figure out the word I'm striving for here.

Q. This is like a support group?

A. That's what I'm looking for.

Q. Great, okay.

A. Okay.

Q. I'm not from Maine. You guys have a book of women that you shoot, is that -- what book is this?

A. Negative. That is not an actual book, just a saying. Put

that in your book or put it in your pipe and smoke it. Similar, just a saying, not an actual book.

Q. And did your support group cheer you on?

MR. DE WALD: Objection, relevance.

THE COURT: What is MOF?

THE WITNESS: Okay. We had an agent many years ago at our station, and this is going to -- and his nickname was Miserable Old Fuck. And anything that anybody could do, this guy had done it better and done it one more time, so.

BY MR PARENTE:

Q. He had done it better, is that what you said?

A. Yeah. Whatever you done, he done it better. He did it more. He did it grander.

Q. Again, you're bragging that you shot her five times and she has seven holes. You're literally bragging about it?

A. I'm just saying five shots and seven holes.

Q. But to the Judge's question, Miserable Old Fuck, that's because you'd done it better, I thought you just said?

A. Better than the original story. This seven is more than five. That's what I'm saying, more, more.

Q. Yeah, meaning you shot her five times, but she has seven holes, like you did a great job. That's what you're saying?

A. I didn't say anything other than just I fired five rounds and there were seven holes.

Q. But I thought you just said, and I think you were

interviewed on this, that you explained to these AUSAs that you in fact were saying that you did it better. Isn't that what you said?
A. The "MOF" amendment I'm just saying is either more, better, I mean, it's just a higher level of whatever. I fired five rounds. Where there should have been five, there were seven.
Q. I'm assuming you don't like shooting people?
A. No, sir.
Q. Right?
A. I would prefer not to.
Q. CBP has a respect for life policy, right?
A. Very much so, yes, sir.
Q. You're supposed to protect the life of US citizens, right?
A. Protect anyone's life.
Q. You know Ms. Martinez is a US citizen, right?
A. I do now.
Q. And yet this seems like you're in a support group bragging about shooting her?
A. I did what I had to do to save my life.
Q. And now you want to put it in your book, boys?
A. The result of it, not my actions themselves.
Q. It's certainly not weighing on you, is that fair to say?
MR. DE WALD: Objection.
THE COURT: You can move on, Mr. Parente.

BY MR. PARENTE:
Q. I'm going to show you Defendants' Exhibit 4. I think this is still part of your support group, although I'm not sure, because I don't have the actual unredacted versions.
Again, are you sending articles to the support group?
A. Can I see the top part of that picture?
MR. PARENTE: The government has unredacted copies. Maybe you want to give him the book so he can orient himself.
MR. DE WALD: You have -- Your Honor, Mr. Parente has 804, which is the top part of that. It goes right to 805. He's asking to see it.
MR. PARENTE: No. But this here, this is a redaction, Ron, and this is a redaction. It might give him context if he can see that.
MR. DE WALD: Right, that's what he's asking for. He wants to see this.
MR. PARENTE: I know. But he can't tell who's sending this to him. If you show him what it looks like.
BY MR. PARENTE:
Q. Is this to your support group as well?
A. It may be. I'm not sure.
Q. Okay.
THE COURT: Mr. Parente, can we pause there though, because is the government willing to give the agent an unredacted version so we can get some helpful testimony?

And if it's redacted, Agent Exum, there is no reason to lay out the redaction for the record, to effectively unredact the information that the government attorneys say should be redacted. But if there is an unredacted version of the message that would at least allow you to truthfully answer Mr. Parente's question about who the exchange is with, then that's what I'm trying to accomplish here.

THE WITNESS: Okay.

MR. DE WALD: So we do have the unredacted portion of 806.

MR. PARENTE: 805.

MR. DE WALD: 805.

THE COURT: Okay.

MR. PARENTE: By the Bates number, yeah. It's Defendants' Exhibit 4.

THE COURT: All right. And so can we get that to the witness?

MR. PARENTE: Yes.

Okay. So we think you're -- are you going to show it to him though so he can -- I just want to know if this is his report.

MR. DE WALD: It's coming. Just give us a second.

MR. PARENTE: So, Judge, I was just going to wait so he can know.

THE COURT: Yeah, yeah, yeah. We're on the same

page.

MR. DE WALD: We're pulling it out, Your Honor.

THE COURT: Thank you.

MR. DE WALD: Do you want this, or should I show it to him?

THE COURT: You can show it to him, Mr. DeWald.

MR. PARENTE: May I see it?

MR. DE WALD: The Court is instructing me.

MR. PARENTE: Judge, at the end of this we will move for the unredacted copies, which we think we should be provided again, especially if this is some kind of agent support group, and he's texting into it. I think that's going to go to his subjective intent. At the end of this we'll move to be provided with unredacted copies.

THE COURT: Let's do one step at a time.

Agent Exum, do you have the unredacted version of what appears on the screen in front of you as Defendants' Exhibit 4? And I think a way for you to know whether you have the unredacted version is --

Can you slide it up, Mr. Parente, so we can see the Bates number.

So do you have a document in front of you that doesn't have redactions that has a digit -- digits at the bottom right-hand corner that end in 805.

THE WITNESS: No. This one doesn't have an exhibit

number on it.

MR. DE WALD: Your Honor, it does not have a Bates stamp, but it is the same if he can compare it in other ways.

THE COURT: Do you want to take a look at it, Mr. Parente, so that you can assure yourself that you're --

MR. PARENTE: Yes.

THE COURT: -- that what Agent Exum has is the unredacted version of the redacted version of the exhibit.

MR. PARENTE: May I use this version so we can all see?

THE COURT: No.

BY MR. PARENTE:

Q. Seeing that, sir, are you now in your agent support group or is that a different text?

A. Different text.

Q. Who is that?

A. My wife.

Q. Your wife, okay.

So are you -- is it fair to say that you're texting articles about this case. And I think again the dates aren't on here, but I'm pretty sure this is October 5th, which is one day after the incident, right? You have the car in your possession on October 5th, right?

A. Say again.

Q. You have the car in your possession on October 5th, right?

A. Yes, sir.
Q. Okay. And now you're reading articles about the incident, right?
A. Yes, sir.
Q. And is it fair to say you're sending articles with commentary to agent support group texts, right?
A. Yes.
Q. And now a separate chain, same -- maybe the same articles to your wife, right?
A. That would be correct.
Q. Okay. And when you say "shit happens," what was that in reference to?
A. People say what they say.
Q. Well, you said this, right?
A. Yes.
Q. Yes. So I'm asking you -- I know people say what they say. But you said this. What does that mean?
A. That means other people say what they say, and there is nothing I can do about it.
Q. Okay. And then I'm going to show you defendants' -- this one has a date, so I know this is October 5th. The car is in your possession.

And, again, I'm struggling with context because it's redacted. But the AUSAs can give you the unredacted version if that would help. But can you read that for me?

A. It says "Cool. I'm up for another round of 'Fuck around and find out.'"
Q. So this would be at 4:00 o'clock, a little over 24 hours after you shot Ms. Martinez. What are you talking about here?
A. I would be up for another round of, that means illegal actions have legal consequences.
Q. And you're up for it?
A. That's my job.
Q. Okay. Your job is to shoot people?
A. No, sir.
MR. DE WALD: Objection.
THE COURT: Sustained.
BY MR. PARENTE:
Q. And then what does the LMAO mean?
A. Laugh my ass off.
Q. Okay, okay. Have you been suspended by the border patrol?
A. Never.
Q. Have they been given these text messages?
A. No, sir.
Q. I'm now going to show you Defendants' 6. Are you able to tell if this is agent support, your wife or someone else? Would it help to see the unredacted version?
A. I think there were only three groups or three different text streams. This would not be to my group or my wife. This would be my brother.

Q. Okay. And you also, and you sent your -- you sent the articles to your brother too?
A. I don't remember.
Q. Would it help to see the unredacted versions?
THE COURT: I don't think that's necessary at this point, Mr. Parente.
MR. PARENTE: Okay.
BY MR. PARENTE:
Q. So here you're kind of leaning into your 15 minutes of fame, right?
A. I mentioned it.
Q. Okay. You said "Sweet."
A. I don't know what he said.
Q. I don't either.
Okay. But the car is in your possession. Articles are coming out. You're reading them. You're understanding the importance of what's happening, right?
A. I am.
Q. And you would agree with me that in these articles it's clear that Ms. Martinez's position is that you hit her, right?
A. Could you say that again, please?
Q. You're aware from reading multiple articles that you're sending to the agent support group, your wife and potentially your brother that Mrs. Martinez's position is that she never rammed your vehicle, that you hit her. Is this news to you?

A. No. That would be fair.
Q. Okay. So you're on notice that there is a factual dispute?
A. Yes.
Q. And you're on notice October 5th, hours after you get the car back, right?
A. Yes.
Q. Okay. And even with your limited exposure in 23 years of being a federal agent, you have to recognize that there is potential evidentiary value to the vehicle that the FBI gave you back, right?
A. No.
Q. You don't realize that?
A. If they gave it back, it shouldn't have any more evidential value.
Q. I'm not -- you as a federal agent for 23 years who had some training, some training on evidentiary value, you're telling us today, never closed your mind that there might be some value as you're digesting these stories and laughing with your boys about shooting this woman?

MR. DE WALD: Your Honor, I object to defense counsel interrupting the witness when he was about to answer that question.

THE COURT: I understood the witness to be done.

But, Agent Exum, if there is more that you want to

say, please answer the question.
BY THE WITNESS:
A. It's my opinion the evidentiary value had been gone. My 23 years of federal agent's experience taught me to trust other people and their opinions.
BY MR. PARENTE:
Q. So you just blindly trust other people?
A. Not blindly.
Q. Okay. Who was it that you trusted?
A. The FBI.
Q. Generally?
A. Yes, sir.
Q. Okay. So if they gave you the vehicle back, you're reading this stuff, it doesn't matter, I trust the FBI?
A. That is correct.
Q. Okay. You would agree with me that -- were you surprised that the FBI gave it back to you?
MR. DE WALD: Objection, Your Honor, relevance.
THE COURT: Allowed. Go ahead. Overruled.
BY THE WITNESS:
A. I really had no opinion one way or another on it.
BY MR. PARENTE:
Q. Isn't it true that you were, you were told that you would likely be getting a rental car from CBP because you wouldn't be getting your car back?

A. That would be correct.
Q. Okay. So why do you think they were giving you a rental car?
A. I had to get back home.
Q. Okay. And why couldn't you take the vehicle that was allegedly just rammed?
A. If the FBI determined it had evidentiary value past my time to leave, they would need to keep it.
Q. Okay. So it was at least in your mind that, hey, I might have to get a rental car here?
A. It's a possibility.
Q. Okay. And, again, I mean, you're not -- this isn't a personal car accident. You're a 23-year experienced federal agent. Were you surprised that mere hours after a shooting that's now national news they're like, hey, take your car?
A. Again, I had no emotion one way or another. I was told to leave it. I left it. I was told to pick it up. I picked it up.
Q. Okay. I want to talk about what's been referred to as the buffing or the change to the vehicle, right. You would agree with me that when you got the vehicle back from the FBI on October 4th, there were what we call scuff marks, right?
A. What are you referring to as scuff marks?
Q. I thought you said scuff marks. But what would you call the damage that was done to the vehicle?

A. It was varying degrees depending on what portion of the vehicle was hit. There were scratches, surface scratches. There were dents. There were scratches through the paint. There were broken parts.
Q. Lots of scratches, right?
A. Scratches, scrapes, dents in other parts.
Q. Let's focus on scratches and scrapes for right now, okay. That would be because the two vehicles came into contact, right?
A. I would call those scrapes, yes, sir.
Q. Okay. Let's talk about the scrapes. There is scrapes on the car that weren't there before the impact, right?
A. Correct.
Q. Okay. And those scrapes are because one car hit the other car. We don't know right now who, right?
A. That would be correct.
Q. Okay. You would agree that it's possible to look at those scrapes and determine which car hit which car, possible?
A. I have no idea on that.
Q. You have no idea?
A. I'm not trained on that, so I don't know.
Q. Well, I mean, just picture it. If I am coming up next to a car, and I hit it this way with my front, won't it sort of push the paint and stuff one way?
A. I'm not trained on that, so I have no opinion one way or

another.
Q. Will you trust me like you trust the FBI?
MR. DE WALD: Objection.
THE COURT: Folks, there is no jury here, okay. I don't know if you are posturing for, but let's just ask questions that get to the relevant evidence.
BY MR. PARENTE:
Q. Sir, you can't say whether there is evidentiary value in the way that a vehicle is scratched?
A. That is correct. I cannot say.
Q. Okay. But you would agree with me at least I think that it's possible?
A. Again, I'm not trained on this stuff. I do not know.
Q. Okay. Will you agree with me that it was your decision to ask to have those scratches taken off of the vehicle?
A. That was definitely not my decision.
Q. That was definitely not your decision, and you're sure of that?
A. Yes.
Q. Okay. And you remember you were interviewed by the FBI in this case, right?
A. Yes, sir.
Q. And, again, that's an agency that you trust, right?
A. That is correct.
Q. And you trust them because they're good agents, right?

A. Yes, sir.
Q. Honest agents, right?
A. That is correct.
Q. And you know that they take reports, right?
A. Yes, sir, I do.
Q. And you knew when they were interviewing you that this agency that we all trust, they were taking it down accurately, right?
A. Yes, sir.
Q. Okay. And they interviewed you in your home station in Maine on October 20th, right?
A. Yes, sir.
Q. Okay. And you told them that you, Agent Exum, obtained approval from his executive management in Maine to get the vehicle repaired. You told them that?
A. Was that a question?
Q. Yes.
A. What was the question?
Q. You told the FBI agent who interviewed you that you, sir, obtained approval from your executive management in Maine to get the vehicle repaired. Do you remember saying that?
A. I did not say that.
Q. You did not say that?
A. Correct.
Q. So the FBI, who we both trust, got it wrong is your

position?
A. They left one word out of that statement.
Q. Okay. Did you then tell them that you confirm that the mechanic at the garage that did the repairs was Fred Erskine, right?
A. That is correct.
Q. Okay. Did you then tell them that you, upon returning from Chicago with your vehicle, that once you obtained approval to get the vehicle repaired, the mechanic began repairing it, right?
A. No, sir.
Q. That's not what you told the agent?
A. That would be correct.
Q. Have you spoken -- do you know who Agent Rodriguez Aguilar is?
A. I only spoke with two. I believe that's the one from Bangor, the FBI agent from Bangor that I spoke with. I only met him once. So I really can't remember his name.
Q. Well, I mean, you're telling us on direct that you had nothing to do with the vehicle getting repaired, right?
A. That's correct.
Q. But yet when you're interviewed by the FBI, who we trust, they're telling us that you said that you were the one that asked to have it repaired?
A. It was -- he wrote it down incorrectly or misinterpreted

or misunderstood what I said.
Q. Do you think that he misinterpreted you obtaining approval from your executive management? Is that a term CBP uses?
A. "Executive management"?
Q. "Exum obtained approval from his executive management in Maine to get the vehicle repaired." It seems pretty straightforward.
A. I would -- don't think I would have used the term "executive." I would have said "chain of command."
Q. Okay. So is it possible that you told him that you got approval from your chain of command to get the vehicle repaired?
A. No, I did not say I had -- I did not get approval for anything. I didn't request any approval.
Q. So he's just putting these things in the report?
A. He left out the word "email." I requested an approval email.
Q. Well, what did he leave out in this next paragraph: "Exum advised the writer that upon returning from Chicago with his government vehicle, and once he obtained approval to get the vehicle repaired, the mechanic began repairing the vehicle by attempting to buff out some of the scratches on the vehicle"? What did he -- what word did he leave out there?
A. He didn't leave out any of that.
Q. Okay. So now we have sort of a conflict of what happened

here, right?
A. Correct.
Q. You're telling us on direct examination after being prepped by these AUSAs that you had nothing do with the vehicle being buffed out, right? Right?
A. We read the email from the guy that approved it.
Q. I'm not asking that. I'm saying on direct you just testified you had nothing to do with the vehicle being repaired, correct?
A. That is correct.
Q. And here, when this FBI agent is interviewing outside of this all blowing up, you're telling him that you in fact asked to have it repaired, right?
A. I did not say that. But that is what was written down.
Q. Okay. And so we just think the agency that you trust, right, is making things up?
A. He made a mistake.
Q. That's a pretty big mistake, right? This isn't a one-word thing as you said a moment ago, right?
A. I agree.
Q. Okay. So a huge mistake just happens to happen in a case where you are texting your buddies about all the stuff that's going on here and putting it in your book about shooting Ms. Martinez, right? Right?
A. Yes, sir.

Q. This is the issue, right? How did this happen? How did these, you know, these scratches get buffed out, right?
A. What was the question?
Q. So you said one thing back then and now it's completely different. Is that fair to say?
A. I have not changed my statement at all.
Q. Okay. And, in fact, when the FBI goes to interview -- do you know who Kellenberger is?
A. Yes, sir.
Q. Who is that?
A. That is my deputy patrol agent in charge, my direct boss.
Q. Did you and Kellenberger talk about this case?
A. Yes, sir.
Q. How many times?
A. I don't know. He's my boss, so that would have come up in conversation pretty regularly, so.
Q. Is he part of your support group?
A. No, sir.
Q. He's not in it. Does he know about it?
A. Maybe.
Q. Okay. Is that support group on Signal, by the way?
MR. DE WALD: Objection, that's -- I withdraw that.
BY MR. PARENTE:
Q. Do you know what Signal is?
A. Yes, yes, yes, it is Signal.

Q. Signal is an encrypted app, right?
A. As far as I know, yes.
Q. Okay. As far as -- well, you have iMessage, because we see you texting your wife on iMessage, right?
A. Yes.
Q. My understanding of Signal is that you have to download it separately?
A. Correct.
Q. Okay. Well, at some point I'm assuming you did that, right?
A. Yes.
Q. Why would you download that if iMessage comes free on a phone?
A. I'm not the IT guy. I'm the old guy in our group. So whatever they decide to go with, that's the way I go too.
Q. Any idea why a bunch of federal agents would need encrypted software to text each other?
A. No idea.
Q. It's your testimony that you were not aware that Signal was encrypted end-to-end texting?
A. No, sir. I don't know why we would need it.
Q. I don't either.
Okay. But so you didn't, you didn't communicate with Kellenberger on Signal, right?
A. That would be correct.

Q. Did you text him?
A. I do not believe I did.
Q. Okay. So how many conversations did you have with your supervisor about this incident?
A. I do not recall. I'm sure it was more than two or three, because he is my supervisor. I had to notify them that this incident took place.
Q. Okay. Are you aware that when the FBI finally interviewed Agent Kellenberger just this past week, I think actually on Halloween, that he says it was all his idea to get the car repaired? Are you aware of that?
A. Yes.
Q. How do you know that?
A. That's what he told me and that's also what the email said.
Q. Okay. And so he said no one suggested repairs to him, right?
A. That's what the email said, yes, sir, and what he told me.
Q. So isn't it a fact you told the FBI agents that you sought permission to repair it and that you then observed it being repaired. Now Agent Kellenberger is telling a different story, right? If the agents were -- if the FBI agent was right?
A. No.
Q. No?

A. Again, I said I didn't -- I never asked for it to be repaired.

MR. PARENTE: Just a few more questions, Judge.

THE COURT: Okay.

BY MR. PARENTE:

Q. Agent, you said that you noticed damage when the FBI gave you the car back, right?

A. Yes, sir.

Q. Okay. But we agree that apparently you're not any kind of accident expert, right?

A. That would be correct.

Q. Okay. You mentioned that you texted the FBI something about work being done to the car?

A. Yes, that is correct.

Q. And do we have that text yet? Here we go.

MR. DE WALD: It's four of the same copies. Here, I'll give it to them.

MR. PARENTE: Judge, we were just given these texts based on his direct. So can I just take one second to read these?

THE COURT: Yeah, of course.

BY MR. PARENTE:

Q. And so after you text the FBI that some work has been done, they in fact tell you that they're going to start needing all text messages and figure out who authorized this,

right?
A. Correct.
Q. Okay. And that's when your supervisor says, oh, it was all me?
A. That is correct.
Q. But he doesn't know what you already told the FBI?
A. That is also correct.
Q. Okay.
MR. PARENTE: Judge, just one moment, please.
THE COURT: Yep.
(Discussion off the record.)
MR. PARENTE: Thank you, Agent. Appreciate the time.
THE COURT: All right. Mr. Corfman or Mr. Horwitz, which one of you will be cross-examining Agent Exum?
MR. CORFMAN: I will, Your Honor.
THE COURT: Okay.

CROSS-EXAMINATION

BY MR. CORFMAN:
Q. Good afternoon, Agent.
A. Good afternoon.
Q. My name is Jack Corfman. I represent Mr. Ruiz, who is the other person charged.
A. Okay.
Q. So what is a ding sheet?
A. A ding sheet is just a sheet of paper with a generic

picture of whatever vehicle it's in showing the front, the rear, the right, and the left side, and the top to indicate minor vehicle damage that doesn't require an investigation or parts replacement.
Q. And when do you need to fill out a ding sheet or create one?
A. Whenever vehicle damage happens to a vehicle that is not required to be repaired or an accident, a full-fledged investigation for. It's just to document this is where it happened and this is what happened.
Q. And did you create a ding sheet for this incident on October 4th?
A. Negative. I did not.
Q. Why not?
A. There was plenty of documentation without that, a ding sheet. And this would have been something that would have required parts replacement and a crash investigation.
Q. How do you know it would have required parts replacement? How do you know that?
A. The running board on the driver's side was broke.
Q. It couldn't have been glued together or fixed?
A. There were parts missing. There was a hole in it.
Q. And what about the accident investigation, how do you know about that?
A. Supervisors, one of the things that I do as a supervisor

is traffic crash investigations when it comes to the agents. And that's significant enough damage to require an investigation internal, not a criminal or anything like that, but just an internal, I guess you'd call it fact finding about the damage.
Q. Sure, okay. So when you do -- when you're supervising a traffic investigation like that, do you cordon off the scene for whatever that incident is?
A. No, sir, we do not.
Q. Do you preserve some kind of record of what happened?
A. Just pictures.
Q. Just pictures?
A. That would be correct.
Q. And do those go in a file? How do those get preserved?
A. They go into a hard file, maybe electronic file. And it's just specific to that particular vehicle damage. That could be anywhere from a deer hitting the vehicle to another vehicle that didn't require an outside agency to actually investigate the traffic accident itself.
Q. And so that's -- the pictures, that's how you preserve an internal investigation of an accident that nothing else is happening?
A. Correct.
Q. Okay. And as you said I think before, you don't have a lot of expertise, you said, in traffic collision

investigation?
A. I had some prior to the US Border Patrol.
Q. And this was when you were a deputy sheriff?
A. That would be correct.
Q. Okay, good. And so tell me more about that. When you were a deputy sheriff, what kind of training did you get?
A. As far as?
Q. Sorry. As far as accident investigation or vehicle collision, things like that.
A. We investigated pretty much anything up to a serious injury or a serious injury that could lead to death. The Georgia State Patrol handled those because they had more investigative skills and training.
We would take yaw marks, skid marks, vehicle damage, recreate it on a piece of paper to demonstrate what we thought the -- what the causes for the accident were, where vehicle A started, where it hit B, and then where it went after the collision itself.
So basically just recreating it on a piece of paper and finding fault, if there was fault to be found, in a traffic vehicle accident or crash.
Q. And would you be the determiner of who was at fault in that report if you created one?
A. When I was a deputy sheriff, yes, sir.
Q. And when you recreated -- when you say "recreate," you

just mean sketch out on a piece of paper or something else?
A. Correct, sketch out on a piece of paper.
Q. And that would require looking at a vehicle and then making notations about it, or was there like some kind of computer process you used?
A. No. Back then it was just looking at it, eyeballing it. You walked off however many feet you, you know, were looking at yaw marks or skid marks or how many times it rolled.
Q. And did you ever seize a vehicle to continue your investigation when you were in the sheriff role?
A. Could you repeat that, please?
Q. Did you ever need to seize a vehicle that was involved in an accident when you were sheriff?
A. Seized?
Q. Take custody of.
A. Oh, okay. I don't recall. That was over 20 years ago, sir.
Q. And I think you said another agency came in sometimes to investigate more serious incidents?
A. That would be correct.
Q. Remind me, what agency was that?
A. The Georgia State Patrol.
Q. Okay. And they would, you know, take custody of the scene, right?
A. They had more training and more experience in that.

That's why if it was a serious injury or death or serious injury that could lead to death, their expertise was needed to find fault with a more serious case like that.
Q. And when they did that, would you sometimes stick around for a while to secure the scene or speak with investigators?
A. Just to secure the scene.
Q. And did you ever see them tow away a vehicle that had been involved in an accident?
A. Yes.
Q. Okay. If you know, do you know what they then did with those vehicles when they were seized by the state police?
A. No.
Q. Is it possible they were, you know, searched for evidence?
A. Depending on what the -- it's possible.
Q. You're also I think a member of a mobile response team for the border patrol, is that right?
A. That would be correct.
Q. And that's a special designation, right?
A. Yes, sir, it is.
Q. And it requires certain kinds of training?
A. That would be correct.
Q. Above and beyond the Artesia training in New Mexico?
A. That would be correct.
Q. And I think one of them is tactical decision-making, right?

A. Yes, sir, that is correct.
Q. And there is another one in vehicle assault training, is that right?
A. That would be correct.
Q. Okay. And so they actually train you about presumably how to respond to vehicle incidents, for lack of a better word?
A. Vehicle assault training is assaulting a vehicle, not being in your vehicle while you're being assaulted. That is two entirely different classes.
Q. And what did they tell you -- sorry, strike that.
What is the purpose of a mobile response team?
A. Our primary mission is riot response or mobile field force.
Q. Sorry, what does that mean?
A. Riot response, dealing with riots.
Q. Only to riots?
A. That is our specialty. That's not all we do.
Q. Okay.
A. We are one of three border patrol special operations group detachments. We've got BORTAC, BORSTAR and MRT. That's the three prongs of the border patrol special operations.
Q. And in your role as a border patrol agent and also before that in other law enforcement roles, I understand you testified in court before?
A. That would be correct.

Q. And were some of those testimonies at trial?
A. Yes.
Q. And probably also some kinds of pretrial hearings like this one?
A. Probably.
Q. And presumably those trials involved disputes about evidence, right?
A. I do not recall any evidence disputes. But I have been in court before.
Q. Okay. You don't remember anybody ever presenting evidence to you and then being crossed about that evidence with a different viewpoint?
A. Not by me.
Q. Okay. When you were a border patrol agent I think early in your career, you had other kinds of roles, right?
A. That would be correct.
Q. And so you weren't just a supervisor?
A. That would be correct.
Q. And were you a participant in law enforcement investigations in those roles?
A. In a use of force -- one use of force review board, I was on that for, I think it was a spiking, which is people, somebody used stop sticks, and I was part of the use of force review board for that, to see if it was justified or not.
Q. Sorry. You were on the board that made that determination

or you were the subject of the investigation?
A. I was on the board.
Q. Okay. But I guess what I'm asking, I think I have a report here somewhere, you once testified at a trial as a border patrol agent, right?
A. Yes.
Q. Which means you were part of the investigation for some reason of that case, right?
A. No. This happened about the time I transferred to Maine. I actually had to fly back to New Mexico within a month of getting there. So this would have been around June of 2008. I don't remember anything about it. I worked at a checkpoint. So it could have been narcotics, immigration, smuggling. There is -- I don't even remember what the case was about.
Q. So, Agent Exum, is that the last time you've ever testified in court before today?
A. Federal court.
Q. In federal court?
A. Correct.
Q. You've testified in state court between then and now?
A. Yes, sir.
Q. For other kinds of checkpoint investigations?
A. No, sir. Narcotics.
Q. Narcotics, good.
And so in those roles, do you seize evidence for

narcotics?
A. Yes, sir.
Q. And what do you do with that evidence when you seize it?
A. Put it in an evidence bag, and we date it and notate what is required on there, date, time, location, where it was seized.
Q. Do you have to track who has possession of that evidence?
A. Yes, sir.
Q. And if you give it to somebody, do you have to track that you've given it to somebody else?
A. Yes, sir.
Q. And do you make a log of that on the evidence itself, like in the bag?
A. Not in the bag. There is paperwork that accompanies the bag.
Q. Good. The paperwork goes with it until you need to do something, right?
A. That would be correct.
Q. All right. I want to ask you I think a little bit about just what it's like to have a vehicle from border patrol. So how did you get a vehicle?
A. What do you mean how do I --
Q. Who, you know -- does somebody give you a vehicle? Do you request to be assigned a vehicle?
A. Okay. The seniority I have and the position I have with

the mobile response team afforded me the opportunity to be assigned a vehicle, just primarily used by me.
Q. Do you have to apply to do that?
A. Sir?
Q. Do you have to apply to get a vehicle?
A. No. You just ask.
Q. Okay. But you have to ask to get the vehicle?
A. Most of the time. I mean, we have them -- if we have enough vehicles, we will just be assigned a vehicle without requesting it. But if you want one specifically for you -- and say if we've got five supervisors, three vehicles, I would be asked if I could be assigned a vehicle, because I'm not only a supervisory agent, I'm also the deputy commander of our special operations team and need that for temporary duty assignments and to carry special equipment in.
Q. Okay. Did you ask to be assigned this vehicle, the border patrol Tahoe?
A. I believe I did.
Q. And do you get any kind of paperwork that you have to fill out to get assigned a vehicle?
A. No, sir.
Q. Is there some kind of policy that governs how you can and can't use that vehicle?
A. Yes, sir, there is.
Q. Do you know what that policy is called? It's okay if you

don't remember.
A. Right off the top of my head, no, sir.
Q. Okay. Are you required to keep logs about how you use the vehicle?
A. No, sir.
Q. Well, you said I think before that you needed to keep some receipts for travel, right?
A. Yes.
Q. And for gas?
A. Yes.
Q. Are you required to keep mileage logs to support the gas purchases?
A. The mileage is reported on the fuel receipts. That's part of what we type in to the gas pump, and we also handwrite it onto the receipt as well.
Q. Okay. But you don't have to keep any record of where you go with the vehicle?
A. That would be correct.
Q. Or what you do with it?
A. That would be correct.
Q. If somebody else uses the vehicle, do they need to make a record of it because they're not the one assigned to it?
A. No, they would not.
Q. So somebody can just walk into the station, pick up the keys, take it for an operation, and there is no record that

that's true?
A. If it's a border patrol agent, we have what's called a daily, I believe it's called a CBP 481. It's got vehicle assignments and daily assignments on it, and that's where that would be notated.
Q. Who would make that notation?
A. Whoever took the vehicle out. We don't have enough supervisors on the northern border to staff the station 24/7.
Q. And so the only way that there would be a record is if somebody who took the vehicle actually went in and put it in to the system?
A. That, and we've got video cameras watching video cameras watching video cameras. So that would be on the video as well.
Q. Are there audits of your vehicle use by CBP at any point?
A. Not unless there is any allegations, there are not.
Q. Are there protocols for if you're involved in an accident on duty?
A. Yes, sir.
Q. What are those protocols?
A. It depends on the seriousness of the accident itself.
Q. Do you need to tell a supervisor?
A. Yes, sir, we do.
Q. Do you need to document what might have happened at the scene?

A. That would be correct.
Q. Do you need to make records of other kinds of relevant evidence that might have occurred at the time?
A. Depending. I mean, we've got our standard reports, and then we use other agencies primarily to investigate anything other than just minor damage and no personal damage, like no physical injuries we do internally. If there is something that happens high dollar amount or if there is an injury or property that's damaged by the vehicle, outside agencies are brought in to investigate that, whether it be city, county, state or, you know, federal.
Q. Have you been involved in one of these investigations other than on October 4th where an outside agency was brought in?
A. I don't think so, no, sir.
Q. Do you have knowledge of some of those circumstances, you know, in your role as a supervisor?
A. What do you mean by that? Am I aware of the roles?
Q. You're a supervisor at the -- is it Calais?
A. Yes, sir.
Q. At the Calais station, right?
A. Correct.
Q. And so if somebody you supervise was in some kind of incident like that, would you know about that?
A. If it happened on my shift or if there was no supervisor

working and I got called.
Q. Okay. And so it sounds like you know a little bit about this. So I'm guessing this has happened before, right?
A. Yes, yes, yes, because we've had agents hit deer where we've had to have a police report for that.
Q. And when you do that, does whatever agency come in, do they take the vehicle for inspections?
A. Negative.
Q. Okay. That's because they hit a deer?
A. Sir?
Q. That was because somebody hit a deer?
A. Yes.
Q. Have you ever been involved in an incident where somebody was injured?
A. No.
Q. Okay. Is there a protocol for what you do with a vehicle when it becomes relevant to an investigation itself? So, for example, if you take a vehicle out on patrol, and there is -- I don't know, you apprehend somebody. Do you have to make any kind of notation that the vehicle itself was involved in that incident?
A. As far as just apprehending someone, no, because they're just arrested, put in the back and transported. It's merely transport. The vehicle plays no part other than just transporting a person from point A to point B.

Q. And so there is no record of what vehicle was used if that's what's going on?
A. The agents who transport them is notated. And, again, that 481, the daily assignment form, has got the vehicle that they were assigned that day. So it would be able to be found, but just not in the reporting that we do.
Q. All right. So now I just want to back up. This is going to be a little repeating, but I just want to set the scene for a second.
You're ordered to come to Chicago as part of this operation in Chicago in September?
A. Correct.
Q. Who tells you to do that?
A. It initiates with our special operations group in El Paso. From there it can either go through DC and back through our chain of command or directly from SOG, which is the special operations group, through our chains of command. So it just depends on which way it goes.
Q. But, Agent Exum, who tells you you have now become part of this group that needs to go to Chicago?
A. I'm part of the decision-making process on that since I'm the deputy commander.
Q. So you tell yourself you need to go?
A. Sometimes, yes, sir.
Q. So you volunteered to go to Chicago?

A. Sometimes. Well, to this one, yes, sir, I did, because we had some agents that were going to be mandated, and one of them has a child coming, so I wasn't going to make one of my guys come when I could do it for him.

Q. And you drove your vehicle from Maine to Chicago?

A. Correct.

Q. I'm going to say this a lot, but did you need to make any kind of log that you were taking a vehicle from the Maine duty station to another time zone?

A. No.

Q. Okay. So we'll fast-forward a little bit now. After this traffic collision occurs, whatever it may be, the government talked about standing next to the Tahoe on the street. You get out, you're standing next to the vehicle. And at some point you move the vehicle from the middle of the street to the side of the street, right?

A. Off the side of the street.

Q. Off the side of the street?

A. Yes, sir.

Q. And then you move it a second time?

A. I may have. I don't recall. It was kind of stressful that afternoon.

Q. Kind of stressful, okay.

Who would have been in charge of the scene at the time?

A. Me.
Q. So if the vehicle was being moved at that point, it's because you decided it needed to get moved?
A. If there were only three of us there, I was in charge.
Q. Okay. And so the other -- you say "only three of us." That's because you were with two other agents?
A. Correct.
Q. And that's Agent Perkins?
A. Yes.
Q. And Agent Cordero?
A. That would be correct.
Q. And Agent Perkins has I think it's like 15 years of experience, right?
A. Sounds about right.
Q. And Agent Cordero has I think a lot less than that?
A. I don't know. He is from Yuma.
Q. Okay. But Perkins is from your duty station, right?
A. Correct.
Q. Is he in your Signal support group chat?
A. No, sir.
Q. And so after you moved the vehicle to the side of the road, you secure the scene, and then a bunch of people show up on scene, right?
A. Yes, sir.
Q. And that includes border patrol, backup?

A. Yes, sir.
Q. And I think you said HSI shows up at some point?
A. Yes, sir.
Q. You know, CPD is there for a while. So there's a lot of people just sort of around?
A. Yes, sir.
Q. Trying to figure out what is going on?
A. Yes, sir. The majority of the people were there not -- were not there to secure the scene. They were there to protect us and protect the crowd from themselves that was gathering at the scene.
Q. Okay. Let me break that down for a second. So the majority of people came there, you said, not to secure the scene, but to protect you?
A. We called for backup, not scene security. So yes, sir.
Q. Okay. And --
A. We knew we had to -- because there was a shooting, I knew that was going to need to be preserved as best it could. So that's why we did not leave. That's why we called for backup, to meet us there and not at another location.
Once we secured that, it went from scene preservation to crowd control. Once the crowd was controlled and pushed back, then it went back to scene preservation as best we could with what we had to work with at that point.
Q. Okay. But scene preservation because there was a

discharge of a weapon, right?
A. Correct.
Q. And so that needs to be investigated?
A. Yes, it do.
Q. And I think for border patrol that gets investigated by OPR, is that the right agency?
A. I think that is correct.
Q. Internally?
A. Yes.
Q. But the FBI also shows up, right?
A. That is correct.
Q. And they spoke to you?
A. Yes, they did.
Q. And they told you that they were investigating this as a crime, right?
A. They said they were investigating it.
Q. They didn't tell you what they were investigating?
A. Not specifically, no, they didn't. They asked, you know, what my actions were and why I did them, and I responded.
Q. Did you ask them why they were there?
A. No, sir. I knew why they were there.
Q. Did they ask you for permission to take your vehicle?
A. I'm not sure if they asked or if it was just a rhetorical question. But it was assumed that they were taking it one way or another, which I was fine with.

Q. Okay. Why did you assume they were going to take it?
A. Because they're the investigative agency for a border patrol shooting. So, therefore, they're going to need to take all the evidence with them because they investigate it.
Q. Because that's what you do when you investigate something, you take the evidence that's relevant?
A. That is correct.
Q. Including the vehicle that was used in the incident?
A. That's correct.
Q. That was involved in the incident?
A. Yes, sir.
Q. And that includes your vehicle even if you believe your vehicle was the recipient of some action, right?
A. That would be correct.
Q. Okay. And so when all these people are on the scene, some of them are doing crowd control as you said?
A. That's correct.
Q. Some of them are doing scene preservation?
A. The majority, crowd control. But a few were doing scene preservation.
Q. And some of them are talking to you, right?
A. Yes.
Q. And they're talking to you about the logistics of what happens next?
A. There was a whole laundry list of what went into the

discussions that afternoon.
Q. Okay. Like what?
A. What happened, what was going on, where do we need to go, how do we need to handle the crowd, is Chicago PD coming back. Pick a subject. It was pretty -- tense and uncertain is the way we describe things in our use of force training, and that's pretty much the description of that was tense and uncertain.
Q. And --
A. And rapidly evolving.
Q. And was one of the things that was discussed the fact that there would need to be a use of force investigation?
A. I don't know if it was discussed, but it was given. I mean, that's a given.
Q. Okay. Did an agent tell you what would happen next regarding specifically the OPR investigation?
A. OPR said they needed to take us back to Great Lakes Naval Station and speak with us and also take my -- take custody of my pistol.
Q. They told you they needed to take custody of the pistol while you were still at the scene?
A. They told us that's what was going to happen.
Q. Okay.
A. We did not do it at the scene because, again, there was a lot going on there.

Q. And you told Mr. Parente that you needed to inform your supervisor, I think Assistant Chief Kellenberger, about this incident on cross earlier?
A. Yes.
Q. Do you remember that?
Did you call or email or somehow communicate with Agent Kellenberger while you were still on the scene --
A. No.
Q. -- what was going on?
A. No.
Q. Do you remember when you first talked to Agent Kellenberger after the events, the collision on October 4th occurred?
A. Kellenberger, I don't remember. My actual patrol agent in charge, I texted him several hours later and informed him of what had happened. But my local chain of command, my operational chain of command here in Chicago was aware almost immediately.
Q. Who was your -- sorry, I'm just looking. Who was your actual patrol agent in charge?
A. James Trainor, T-R-A-I-N-O-R. He was on leave during that time.
Q. Okay. So you texted him to tell him what had happened?
A. Yes, sir. Well, I texted him to ask if he was busy, and I asked him to give me a call and he did.

Q. He called you?
A. Yes.
Q. Right then and there while you were on the scene?
A. No. This was hours later.
Q. Okay.
A. I was back at Great Lakes.
Q. At Great Lakes. And what did you guys talk about?
A. What had happened.
Q. So you talked about your understanding of the traffic incident?
MR. DE WALD: Objection, Your Honor.
THE COURT: Overruled.
BY THE WITNESS:
A. We discussed everything from start to finish on the ram -- the vehicle collisions, the shooting, what happened after the fact and everything until we got back to Great Lakes Naval Station, a condensed version, but basically the CliffsNotes version of what had happened.
BY MR. CORFMAN:
Q. When you say until you got back to Great Lakes Naval Station, that's because you were talking to him on the phone on the way there?
A. No. I was, I was at Great Lakes when I called him. So I had been back there for maybe an hour. And then I texted him and then spoke to him maybe 15 or 20 minutes after that.

Q. And did he talk to you about the procedures, what happens next?
A. No.
Q. He didn't?
A. No.
Q. He just listened while you told him what happened?
A. Yes.
Q. And then he --
A. He was at a wedding.
Q. -- you know, I'm sure he said something encouraging, but then he hung up?
A. He was at a wedding, so he had to go.
Q. Okay. When you spoke to the FBI at the scene, did they just find you? Did a border patrol agent coordinate that? How did they figure out who they needed to talk to?
A. When I called for backup, I called our tactical operations center, told them we had had shots fired, my location and that we needed backup. And they coordinated everything that was needed. I do not know who called who.
Q. Okay. But did they walk up to you and say, "We are FBI agents, you know, and we need to talk to you," or did you get --
A. I'm sure somebody pointed them to me, because most of the people there that were supervisors or had been there for 15 or 20 minutes knew what agents were involved with the accident.

Q. Did you know they were coming?

MR. DE WALD: Objection, Your Honor, as to the relevance of this. We're far afield as to what exactly is happening with respect to the Tahoe, which is the subject of this hearing.

THE COURT: Mr. Corfman.

MR. CORFMAN: Judge, I want to know what he thought was about to happen and who told him it was happening. If he knew from the minute the scene happened that it was going to be under investigation, that's obviously relevant to what happens next.

THE COURT: I think your questions are a little too granular for that purpose. I understand what you are saying. I'm saying that I think that there is a more expeditious way to go about it.

MR. CORFMAN: Okay, Your Honor.

BY MR. CORFMAN:

Q. All right. So on the scene, the FBI tows the car away, right?

A. Maybe.

Q. You didn't --

A. I left before the Tahoe did.

Q. You didn't see the Tahoe get towed?

A. That's correct.

Q. Did you see the black GMC get towed?

A. I didn't see anything get towed. Agent Perkins and I left with OPR. We were the first ones, probably the first ones to leave the scene other than Chicago PD.
Q. Did you eventually learn that your vehicle had been taken from the scene?
A. I did.
Q. When did you learn that fact?
A. I do not recall.
Q. Did Agent Ray Torres tell you that at Great Lakes?
A. He may have. I mean, I eventually found out somebody did tell me, because had I not known it was taken, I would not know I could get it back. So somebody at some point told me. I'm not sure who it was.
The FBI on the scene said they were going to need -- they needed to take it. So I'm not sure if anybody actually informed me that it had been taken. I think just somebody saying that it was going to be taken was sufficient.
Q. Okay. And so I mentioned Agent Torres. You get to Great Lakes, and there is like a whole bunch of border patrol people at Great Lakes, right?
A. Yes, sir.
Q. And one of those people is Mr. Torres or Agent Torres?
A. Correct.
Q. And he's I guess your supervisor in some way?
A. He -- with this operation, everybody is acting in a

capacity that they are normally not, because they've got temporary titles versus permanent positions. So I'm not sure exactly where he is in my chain of command. It's somewhere within the top three or four from the top, but I'm not sure exactly.

Q. Okay. And when you get to Great Lakes, do you ask him what's going to happen to your vehicle?

A. No.

Q. You didn't discuss the vehicle at all?

A. Say again.

Q. You didn't discuss the vehicle at all --

A. Yes.

Q. -- at the beginning?

Okay. What did you talk about?

A. With Agent Torres?

Q. Yes.

A. I told him what had happened. At some point I asked him when I was going to get it back or if I was going to get it back. And he was my point of contact with the FBI, or he's the one that let me know when I could go back and pick it up.

Q. Okay.

A. And he's the one that told me that if I didn't get it back, I would need to get a rental vehicle.

Q. And presumably he told you that before you learned you were going to get the vehicle back?

A. That's correct.
Q. Do you remember how much time between those two things?
A. No, sir, I don't.
Q. And I think you testified that Torres is the one who told you the vehicle is ready to be picked up, is that right?
A. That is correct.
Q. And did he also give you the information for FBI Agent Tucker?
A. That is correct.
Q. And we have some screenshots. But it looks like the first message is from Tucker. Do you know how that communication got established?
A. Yes. She probably got my contact information from Agent Torres.
Q. Okay.
A. So Agent Torres gave her my contact information and gave me her contact information. That way we'd know who the other person was that was calling or texting.
Q. And do you know if Torres and FBI Agent Tucker spoke or if there was an intermediary between -- sorry, excuse me -- if there was an intermediary between them?
A. No idea.
Q. Okay. And just to recap, when you're at Great Lakes Naval Station, you surrender your firearm to OPR, right?
A. That is correct.

Q. And they secure it somewhere?
A. Yes.
Q. Did you get that firearm back?
A. No, sir.
Q. Do you have it back today?
A. No, sir.
Q. Okay. At the FBI building, when you go back to pick up the car, I think you said there were three people, three border patrol agents?
A. That is correct.
Q. Do you remember who they were?
A. One of them I had met before. It was a patrol agent in charge of a Swanton Sector border patrol station. His name is DeBela or DeBelo, D-E capital B-E-L-O or B-E-L-A. I'm not sure which. But I had met him before. I don't know him personally. I just know him from the working environment.
Q. Did you meet the other two?
A. I did meet the other two.
Q. Do you remember what their names were?
A. It was a male and a female. That's all I remember.
Q. And you testified I think that you didn't remember how you got the keys to the vehicle?
A. That's correct. I don't know if they left them in the ignition or handed them to me.
Q. Did you speak to anybody from the FBI when you picked up

the vehicle on that night on October 4th?
A. No.
Q. You got the keys from a border patrol officer?
A. Agent, yes, sir.
Q. Agent, sorry.
Did you have to fill out any paperwork to pick up your vehicle?
A. No, sir.
Q. Did you meet Agent Tucker when you went to the FBI building?
A. No, sir. I never went onto the property. I didn't get any closer than the guardhouse.
Q. Okay. And then eventually you go back in a couple of days to the US Attorney's office, right?
A. Yes.
Q. And you drive your government Tahoe you said to a parking lot, right?
A. Yes.
Q. And you called it a federal parking lot. Do you mean the federal lot at the MCC or do you mean a different lot?
A. It's a parking garage on Federal Street. I mean, I think the literal name of it is the Federal Garage or Federal Parking Lot.
Q. Did you have to pay for parking there or did you have like a government pass to park there?

A. I've got a -- I've got government issued credentials, and that's what got me in.
Q. Okay. And then you went into the US Attorney's office to the meeting, right?
A. Correct.
Q. And you came back to do the digital extraction?
A. That's correct.
Q. And did the agents talk to you at all about what they were trying to do with the vehicle when they did that extraction?
A. In layman's terms, yes, sir.
Q. Okay. And what did they tell you they were trying to do?
A. Basically get the information from it that would be extracted from a black box of an airplane, that may contain like impact data from, you know, what sensors were struck first or second, and did it have any kind of acceleration, deceleration and whatever other kind of telemetry data may be stored on a Tahoe computer.
Q. Okay. Did you ask anybody why they had not done that a couple of days ago when the FBI had the vehicle?
A. No.
Q. Did they tell you why they needed to come back to do it?
A. No.
Q. Was there any discussion of the logistics of why they needed to do it on a different day?
A. No, sir.

Q. Do you think that was weird?
A. It just is what it is.
Q. You didn't think that was weird?
A. No, sir.
Q. Did you have to fill out any paperwork on that meeting?
A. What do you mean "fill out any paperwork"?
Q. Regarding the computer search of the vehicle.
A. No.
Q. Did you sign a consent form for them to take data from the vehicle?
A. I gave them a verbal consent.
Q. Did you need permission from anybody to give consent for the government to search the vehicle?
A. I wouldn't think so. As long as I've been in the federal government, I've never heard of that being needed.
Q. When you get your vehicle back, do you call anybody to tell them, hey, I got a car back?
A. I don't remember.
Q. Okay. Did you --
A. I take that back. Yes, I did. I texted Agent Perkins and told him I was on the way back to Great Lakes to pick him up.
Q. Because then you went back to Great Lakes to pick him up?
A. Correct.
Q. You went back to the hotel?
A. Yes, sir.

Q. Okay. In the couple of days that you were driving around Chicago after you got the vehicle back, were you involved in any traffic accidents?
A. No, sir.
Q. How about any hard-braking incidents?
A. No, sir.
Q. Any kind of like unexpected, you know, oh, my God, there is like a guy stopping in front of me, anything like that?
A. It's Chicago, so there is a lot of that.
Q. Okay.
A. But no contact was made with anyone.
Q. Sorry, I just want to back up. When you were at the US Attorney's office, did they tell you that this case was going to trial?
A. I can't remember if they did or not, but I'm -- it was kind of a given. I don't know it they told me or not. But I assume -- I would have assumed it whether they did or not.
Q. Well, they asked you about your availability to come back for trial, right?
A. Well, if they did, then they told me. I just didn't recall it.
Q. Did you think at all about what you would need to do to come back to the city for the trial when it happened?
A. What do you mean?
Q. Were you thinking about I have to come back to Chicago for

this trial in a couple of months?
A. I mean, that's part of the job. It's just a follow-up from one temporary duty assignment.
Q. When is the first time you talked to Acting Chief Kellenberger about I guess any of these events?
A. That would have been the afternoon of the 16th. When I walked out to my vehicle or to the Tahoe and saw it, he either came out shortly behind me or came out with me. I'm thinking he came out shortly behind me, because he and I hadn't really spoken one on one since I got back to work.
Q. Okay. So I guess let's back up just a little bit so I have context. You drive from Chicago to Maine, and you have this three-day travel set up for it?
A. Yes, sir.
Q. And you don't tell I guess Acting Chief Kellenberger that you're coming back?
A. It's not necessary. My itinerary was known. I'm a supervisor. So I'm -- you know, I can make my own decisions.
Q. Okay. And you don't call him from the road at any point?
A. No.
Q. And then you get into the station on the 10th?
A. Yes.
Q. With Agent Perkins?
A. Correct.
Q. And you guys parked the vehicle in the garage?

A. Yes.
Q. Do you make any record that you have returned the vehicle to the main -- to the Calais duty station?
A. No, sir.
Q. It doesn't go in the daily log you were talking about?
A. That vehicle is assigned to me. So wherever I go it goes, unless I fly somewhere. It's just understood that that's where it goes. If the vehicle is gone, and I'm out of town, it's with me.
Q. Okay. So if you take the vehicle out, that doesn't go in this daily log? Only if somebody else uses it?
A. Yes.
Q. And you don't need to check in with anybody when you get back?
A. That is correct.
Q. And so there is literally, other than a video, there is no other record of you returning to the border patrol station in Maine on the 10th?
A. Other than contact with our family and friends, no.
Q. You do not -- you're not required to check in in any way?
A. That's correct.
Q. Even just to confirm that you in fact arrived back at the place you're supposed to be?
A. We typically do, if we're going somewhere solo, just so we can, you know, make sure that everybody is okay. But if there

is multiple people, and multiple people know about it, it's not necessary or required.

MR. CORFMAN: Judge, can I have one moment?

THE COURT: Sure.

(Discussion off the record.)

MR. CORFMAN: I have no further questions, Your Honor. Thank you.

THE COURT: Thank you.

Are the parties okay if I ask Agent Exum a couple of questions of my own?

MR. PARENTE: Yes, Your Honor.

MR. DE WALD: That's fine, Your Honor.

THE COURT: I have a question about the CBP use of force investigation that you testified about.

THE WITNESS: Yes, ma'am.

THE COURT: You said that the investigation was a given?

THE WITNESS: Yes, ma'am.

THE COURT: Would inspection of the car have been a part of the CBP use of force investigation as far as you know?

THE WITNESS: No, ma'am.

THE COURT: Why?

THE WITNESS: It was not part of -- photographic evidence of it would be sufficient for the vehicle-on-vehicle portion of use of force. The shooting portion, the vehicle

really had nothing to do with, so it's not part of the shooting portion.

THE COURT: Why is the photographic -- well, how do you know that the photographic evidence would be sufficient for the vehicle-on-vehicle portion of the use of force investigation.

THE WITNESS: For the -- I'm an instructor in a couple of different disciplines. And the amount of force that we use has to be not too much for what we receive. So that one, it's just -- if a vehicle is hit with another vehicle, we use that as transferred intent. What they did to our vehicle they intended to do to us.

So a picture of the vehicle would be the leftovers from that use of force against us and that we used back.

THE COURT: What do you mean by what would the leftovers be?

THE WITNESS: The evidence I guess is what I'm trying to say, the leftovers would be the evidence that was left on the vehicle itself.

THE COURT: But you're saying that the use of force, your use of force needs to be proportionate to whatever force was used against you, right?

THE WITNESS: Yes, ma'am.

THE COURT: Okay. So if a car accidentally side swiped you versus a car ramming you, that would be relevant to

a CBP investigator's determination as to whether or not your use of force was proportionate, right?

THE WITNESS: Very.

THE COURT: But you're saying that they can make that determination just based on the photos, not based on an examination of the vehicle itself?

THE WITNESS: It would be both. But the pictures -- at the end of the day, all you have is somebody saying this is what I found from looking at these pictures. And when it gets to DC, all that they're going to have is pictures to look at. So at the end of the day the pictures of what happened is what the people in DC are going to have to make their determinations based on.

THE COURT: And when you say that, when you talk in this manner, "the people in DC would rely on the photos," what experience do you have with CBP use of force investigations? Because you're speaking in a manner as if to suggest this is typically what happens. And I'm trying to understand how you know what would typically happen in a CBP use of force investigation.

THE WITNESS: I've been on a local use of force review board, which is like a Taser incident that didn't result in injury, a spiking of a vehicle, you know, something similar to that. I've been on the local use of force review boards.

A shooting or any use of force that results in death or great bodily injury goes in front of a national use of force review board.

I've been an instructor of various, probably six or seven different disciplines with the border patrol since 2008. So I've been teaching this and teaching, you know, what investigations come from what type of actions to other agents for 18 years now. So because I've been teaching that, I kind of got a little knowledge into the process.

THE COURT: And so based on your experience, I guess it didn't strike you as unusual that FBI says the car can be released. But a CBP use of force investigator isn't saying, Well, fine, FBI says the car can be released, but I still need to look at it for my own use of force investigation.

THE WITNESS: Again, I don't even know if our investigators would even look at the vehicle. That, I'm not sure about.

THE COURT: Okay. Okay. All right. Thank you.

Mr. DeWald, any redirect?

MR. DE WALD: No, Your Honor.

THE COURT: Okay.

MR. PARENTE: Judge, I'm sorry, can I follow-up on the use of force questions?

THE COURT: Yeah. Go ahead. Just a few questions, Mr. Parente.

CROSS-EXAMINATION (Resumed)

BY MR. PARENTE:

Q. So it sounds like you're familiar with the use of force policies, right?

A. Yes, sir.

Q. Okay. And you're saying that you're using transferred intent meaning, although you're now saying she didn't ram you, but if she hit you, you could transfer that as a reason why you would need to use force?

THE COURT: Mr. Parente, to be clear, my questions were about use of force as a connected to the evidence preservation issue. So I just want to make sure that your questions are going to similarly limited.

MR. PARENTE: Very similar.

THE COURT: Okay.

BY MR PARENTE:

Q. Is that what you are saying?

A. All right. Repeat that, please.

Q. So you're saying under the use of force policy, that you're using the ramming or side swiping as a transferred intent process?

A. This incident is so unlike anything that we have trained for, this would almost equate to our counter vehicle assault training, which typically takes place out of country, in cartel controlled areas of Mexico, or combat situations.

An offensive vehicle-to-vehicle confrontation with a federal agent typically does not happen in the United States.

Q. Were you concerned that your conduct on that day could be in violation of the CBP use of force policy?

A. Not in the slightest.

Q. Okay. Is the policy that you can't shoot at a fleeing vehicle?

A. That is not our policy.

Q. That's not the policy?

A. No.

Q. Okay.

MR. PARENTE: Nothing further, Judge.

THE COURT: All right.

All right. Agent Exum, you are done.

THE WITNESS: Thank you, ma'am.

THE COURT: Thank you.

(Witness excused.)

THE COURT: Folks, why don't we take a 10 minute break and then just reconvene on next steps.

(Recess taken at 3:16 p.m. until 3:27

THE COURT: Okay, folks. What are the proposed next steps here? I'll start with the defendants since it's your motion.

MR. PARENTE: Thanks, Judge. I was first going to move in Defendants' 2 to 6 into evidence, which were the text

messages that we used with Agent Exum. I think you'll want them for the record.

THE COURT: Yeah, that's fine. My suggestion would be that the parties just file them on the docket.

MR. PARENTE: Okay.

THE COURT: And then that way, I mean, yes, all of the exhibits that were used are formally admitted into evidence. But I think the easiest way to do that is for everyone to -- for the government to file its exhibits as a separate entry on the docket and for the defendants to do the same.

MR. PARENTE: I think there is three witnesses that the defense, three law enforcement witnesses the defense needs to finish up this first prong of what we're arguing. The first is the FBI agent who interviewed Agent Exum, who has a 180 version of events than what we heard today from Agent Exum, namely, that, you know, he was told that Agent Exum was the one that ordered the repairs, which is key to our motion. So he is another agent who is in Maine.

THE COURT: What's the name of the agent?

MR. PARENTE: I don't want to get it wrong. It's José Guillermo Rodriguez Aguilar. And so he authored like a 4-page 302 summarizing his interview with Agent Exum in Maine that is the opposite of what we were told today. So we need him to find of prove up that.

THE COURT: Impeachment.

MR. PARENTE: Yep. And then for the second part -- so that's on the prong of the repair work. On the release prong we need --

THE COURT: Sorry. Before we move off of Agent Aguilar, just before I forget, I'm assuming that the agents have been instructed to hold on to handwritten notes?

MR. DE WALD: We have them, Your Honor. Yes, Your Honor.

THE COURT: Okay. Go ahead, Mr. Parente.

MR. PARENTE: So on the release of the vehicle, we would like to speak to AUSA Chris Veatch, who is the understanding of who authorized the release on the evening of the 4th, as well as FBI agent who apparently called and asked for its release.

THE COURT: And who is that FBI agent?

MR. PARENTE: We don't actually have a name right now, but the AUSAs know who het is.

MR. CORFMAN: The report is authored by --

MR. DE WALD: Yes. It's Senior Supervisory Agent Chad Knapp, K-N-A-P-P.

THE COURT: Okay. You said a fourth witness, Mr. Parente, if I --

MR. PARENTE: No, no. Just those three --

THE COURT: Just those three.

MR. PARENTE: -- for this first part.

THE COURT: Sorry, for the first part, meaning going toward the issue of bad faith?

MR. PARENTE: Yes.

THE COURT: Okay.

MR. PARENTE: And then we need a prejudice witness for Your Honor to hear from about what we could have done with this evidence that is now buffed out or whatever you would call it.

THE COURT: And that's presumably your expert?

MR. PARENTE: It will be our expert.

THE COURT: Is there anyone else that defendant Ruiz would like to throw into the mix? And I'm not -- I just want to see what the full spectrum of potential witnesses are.

MR. CORFMAN: So that's probably everybody. You know, my one concern is that we still don't really know everything frankly we should know about how the vehicle got released. And so we don't actually know, you know, who the supervisory special agent with the FBI, you know, what information he knew or who he told or released, you know, if he talked to the evidence tech people. So I suppose it's possible there could be some other person --

THE COURT: After Agent Knapp, you mean?

MR. CORFMAN: Yeah.

THE COURT: Okay.

MR. CORFMAN: And to the extent we learn that, you know, far enough in advance to set it all off at the same time, we will of course try and work with the government to do that. But I have, you know -- there has been a number of reports of one person talking to another person talking to another person. And so I have a concern that Knapp won't actually know everything we need to know. But he's a good starting point for sure.

THE COURT: Mr. DeWald, Mr. Parente, your reactions to these witnesses?

MR. DE WALD: Your Honor, as far as Special Agent Knapp and the assistant U.S. attorney, there was an allegation that Special Agent Exum had a motivation to lie. There has been no establishment at all regarding the FBI agent or AUSA Veatch to establish bad faith to require a hearing for them at this particular point.

Now, we understand the Court has laid out the different prongs that the Court wants to hear from. And if the Court wants us to call them, we'll call them. But at this particular point, we don't think that it's necessary to call them at this point.

THE COURT: But couldn't it -- well, setting aside my impressions of today's testimony, you know, whether I agree with your representation of it or your take on it, Mr. DeWald, I mean, isn't there a world in which Mr. Exum did not or Agent

Exum did not operate in bad faith and yet other individuals within the government did?

MR. DE WALD: Yes. But I don't believe that allegation is being made by this point. I mean, otherwise it would be everybody who ever had any contact with the car in this entire evidentiary hearing from the moment that the first evidence technician looked at it all the way until it was fixed, that all these different witnesses would have to come and testify in order to ferret out whether or not there was bad faith from all these people in this entire line.

THE COURT: Well, I guess I'm not tracking that because, one, I'm not hearing the defendant say that they want to call every single person along the way.

I understood Mr. Corfman to be saying it's possible that Agent Knapp would take the stand and say, I don't know who actually made the decision to release. The word got passed on to me. And so he's just not a helpful witness.

But I didn't understand Mr. Corfman to be saying that that means then that we're calling every single person along the way.

And with respect to your comment about there has been no allegation that anyone else has acted in bad faith, I guess I understood Mr. Parente to be saying that there are two junctures in which bad faith could have been exercised: Juncture one being the decision point to release the vehicle,

which was obviously not Agent Exum's decision; and then the second point being the decision to repair the vehicle. And there is a dispute there as to whether it was Agent Exum who ordered the repair or whether it was his, as I understand it, his supervisor, Kellenberger.

And so then I guess I don't understand the government's position then, because I understand the defendants to very much be saying that there might be bad faith around the decision to release the vehicle arguably prematurely.

MR. DE WALD: Very well then. We'll have them ready to testify.

THE COURT: Okay. Is it necessary to have both Agent Knapp and AUSA Veatch?

MR. PARENTE: Yes.

THE COURT: Why?

MR. PARENTE: Well, because we have a one-paragraph 302 from Agent Knapp that says, I called AUSA Veatch and he said to release the car. So there is no detail in it. So I want to know why he made the call. And I want to know based on my experience why AUSA Veatch would authorize the release of a vehicle that's at the center of a, you know, media storm and an agent involved shooting.

It doesn't comport to my experience. So I think they both have relevant information about what happened here.

And, again, if it's a Rule 16 violation, which is on the table, I don't know if we need to even show bad faith. I think the government could have made a discovery violation here without bad faith.

THE COURT: Okay. So if we're envisioning a lineup of additional witnesses of Agent Aguilar, Agent Knapp, AUSA Veatch, and a defense expert to speak on the prejudice point, is this something that realistically could get done in one day?

MR. PARENTE: Yes.

MR. DE WALD: I agree.

THE COURT: Okay. And then how soon would everyone be ready to go forward with that day-long hearing? And I guess the question more goes to the defendants, because I would imagine that the expert is the hardest piece of it.

MR. PARENTE: That's going to be the sticking point. So we're happy to coordinate with the government and co-defendant's counsel and maybe email your deputy.

THE COURT: Yeah. Let me just give you a couple of no-fly zones, if you will. I have a trial next week that may bleed over into the week of the 17th. So next week, the November 10th through the 17th are not good options.

And then I suspect, like many of you, I will be out of town the 26th, 27th and 28th. And then I have, I've mentioned this before, I have a professional obligation out of

town the week of December 8th and then a bench trial in that Vague Convention case on December 16th and 17th.

So those are my conflicts. So if we could schedule around them, I would appreciate that.

MR. PARENTE: Yes, Your Honor. And then I think the only final issue for us --

THE COURT: I'm sorry, one more potential conflict -- not potential, an actual conflict. December 19th, I have availability first thing in the morning and late in the day, but a significant conflict right in the middle of the day.

MR. PARENTE: The issue, I think you saw at least a taste of the text messages. And I think we have a different opinion about whether bad faith was exercised here. If we're right that Agent Exum actually ordered the repair and now he's denying it, right, the fact that he's now denying it is troubling if, again -- unless the agent made a mistake in the 302.

But let's assume the agent got it right, and Agent Exum did order the 302, and now he switched positions --

THE COURT: Ordered the repair, you mean?

MR. PARENTE: I'm sorry. Ordered the repair. And now he's kind of switched that and his supervisor is kind of saying something different, to the extent that there is bad faith, I think that there is enough there for that.

So these text messages, which we just have a flavor

of, are extremely troubling to us. And, again, I think when you're talking about whether a federal agent would engage in bad faith, I think character is in play. And I think some of these messages go to very troubling statements about things that happened here that aren't -- I don't think a typical federal agent would have those views.

So we would request the unredacted versions of this to understand what the context of some of these statements would be so that at the end of the day if this agent is who some of these text messages make him out to be, then his flipping on "I ordered the repair" to "I didn't order the repair, and the FBI is wrong or lying," I think those are going to be pertinent for the Court and certainly for us.

So we would like to see the unredacted versions of these text messages.

THE COURT: Mr. DeWald.

MR. DE WALD: Well, first off, Your Honor, whether or not he order the repair to be done, he told you that after October 10th, he didn't think there would be anything wrong with repairing the car up until the 16th. And then he has that email saying who authorized the repair, and that was on the 17th. This interview with FBI came on the 20th.

So whether or not he ordered repair or not, there is -- it would be irrelevant to the analysis of whether or not there is bad faith.

But if it is, if the Court believes that this is an important aspect, we provided -- first of all, the text messages that were provided to us, that he handed over to us, we treated it as 3500 material, Jencks Act material. And he has now testified. And so we don't believe there is any *Brady*. We don't believe there is anything else that would go to this. And so we are objecting to any unredacted.

We can hand it over to the Court for in camera inspection, but ultimately we don't believe that based upon our review of the text messages that that would be any further reason to have them unredacted at this time.

THE COURT: What's the volume of the text messages?

MR. DE WALD: It's about -- so what happened, we asked him who he talked to. He told us he had communications with three different people in text strings. He then took his phone and we took photographs. And so there is about 200 photographs. Now, some of them are overlap. But of the three different text strings, there is about 200 different photographs of those. That's the volume.

THE COURT: Okay. I mean, I think this is something I could handle with an in camera inspection.

MR. DE WALD: Sure.

THE COURT: And if there are additional text messages that I think bear on Mr. Parente's and the defendants' concerns, I can deal with them in an in camera inspection and

order, if necessary, any additional production.

MR. DE WALD: Sure.

MR. PARENTE: Thank you, Judge. And we did ask the government to bring you a copy of the unredacted version. So I think they have those today.

THE COURT: Oh, okay. Thank you.

MR. DE WALD: The only problem, Your Honor, is as we've learned, it doesn't have a Bates stamp on it. So we might want to put the Bates stamp on them so we make sure that we accurately identify them.

THE COURT: Yeah, I think that's the better course of action.

MR. DE WALD: Correct.

THE COURT: When can the government have Bates stamped versions for me?

MR. DE WALD: We think the end of the day tomorrow. We have somebody working with us that's very good.

THE COURT: Okay. All right.

MR. DE WALD: Everybody is very good, but --

THE COURT: Okay. Why don't we plan on that. You can hand-deliver them to my courtroom deputy by end of day tomorrow.

MR. DE WALD: Yes, Your Honor.

THE COURT: And I'll review them as quickly as I can. And then in terms of actual date for the next

hearing, I will leave it to all of you to confer, confer with your witnesses. And then whenever you are ready, email my courtroom deputy with, give me a couple of options preferably. And if it turns out that it needs to be half a day on one day and half a day on the other, that's fine too. Just lay out some options for me, and then we'll get it on the calendar as quickly as possible.

Okay. Anything else?

MR. PARENTE: No, Your Honor.

MR. DE WALD: Not from the government.

THE COURT: Okay. Mr. Ruiz?

MR. CORFMAN: No, Your Honor.

THE COURT: Okay. All right. Thank you.

MR. DE WALD: Thank you, Your Honor.

MR. PARENTE: Thank you, Your Honor.

(Proceedings concluded at 3:43 p.m.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/JENNIFER COSTALES* 11/11/2025

Jennifer Costales, CRR, RMR, CRC Date
Official Court Reporter