**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | Case No. 25 CR 636 |
| | ) | |
| **MARIMAR MARTINEZ** and | ) | |
| **ANTHONY IAN SANTOS RUIZ** | ) | |
| | ) | |

**AMERICAN BROADCASTING COMPANIES, INC., WASHINGTON POST COMPANY
d/b/a THE WASHINGTON POST, CHICAGO TRIBUNE COMPANY, THE CHICAGO
SUN-TIMES MEDIA, INC, AND WBEZ'S MEMORANDUM OF LAW IN SUPPORT OF
THEIR EMERGENCY MOTION FOR LEAVE TO INTERVENE FOR THE PURPOSES
OF MODIFYING THE PROTECTIVE ORDER AND GAINING IMMEDIATE ACCESS
TO EVIDENCE INCLUDING VIDEO FOOTAGE AND PHOTOGRAPHS**

**INTRODUCTION AND FACTUAL BACKGROUND**

This case, involving the shooting of a civilian by federal agents, is of extraordinary

national importance and interest, with ramifications reaching far beyond the interests of the

immediate parties. According to the criminal complaint, on October 4, 2025, a group of Border

Patrol Agents ("BPA") and Customs and Border Protection ("CBP") officers were followed by a

caravan of civilian vehicles. (Dkt. No. 1). At some point, Defendant Martinez's vehicle collided

with a CBP vehicle, and a BPA officer fired five shots from his service weapon at Defendant

Martinez striking her five times. On October 9, 2025, both defendants were indicted by a grand

jury on charges for having

> forcibly impeded, intimidated, and interfered with persons
> designated in Title 18, United States Code, Section 1114, namely,
> U.S. Customs and Border Protection Border Patrol Agents,
> employees of the United States, while they were engaged in and on
> account of the performance of their official duties, and such acts
> involved a deadly and dangerous weapon, to wit a motor vehicle.
> (Dkt. No. 22).

On November 20, 2025, the government moved to dismiss the indictment, with prejudice, and this Court granted that motion the same day. (Dkt. Nos. 69, 70). This case raises important questions about the government's recent practice of detaining and charging members of the public without sufficient evidence to secure a conviction. As the federal government continues to carry out its "Operation Midway Blitz" immigration enforcement campaign in Chicago, courts have expressed concern about tactics the government has employed including the conditions under which detainees are kept, the apparent use of unreasonable force against the media and protesters or seemingly leveling charges that it cannot prove. Just yesterday (November 20, 2025), in another matter involving ICE and CBP agents' conduct, U.S. Magistrate Judge Gabriel A. Fuentes expressed concern that the government brought charges "so hastily that it either could not obtain the indictment in the grand jury or was forced to dismiss upon a conclusion that the case is not provable, in repeated cases of a similar nature." *United States of America v. Dana Briggs*, 25-CR-610, Order p. 7, November 20, 2025. In doing so, he noted the seriousness of even a short detainment. *Id.* Indeed, Magistrate Judge Fuentes modified the protective order in the case to allow the public to see and evaluate the same kind of footage that the prospective intervenors are seeking in this case so that viewer "may reach their own conclusion about [] this prosecution" *Id.*

The public has a significant interest in understanding the evidence—or lack thereof—on which the government relies in bringing cases against civilians related to their interactions with federal agents. In this case, the government relied on body-worn camera footage of the vehicle collision and the subsequent shooting of Ms. Martinez in its October 5, 2025 submission to the Court to corroborate the government's version of events and induce Magistrate Judge McShain to sign the Complaint. Consequently, the footage is a judicial record that would shed light on the

1

circumstances surrounding the incident. If that were not sufficient to demonstrate that the footage qualifies as a judicial record, the footage has also been the subject of arguments by counsel in open court (See Ex. A, Tr. October 6, 2025, pp. 9 - 13) and testified to in an evidentiary hearing (See Ex. B, Tr. November 5, 2025, pp. 51- 53). However, the existing protective order prevents the parties from sharing these important records with the press and public.

American Broadcasting Companies, Inc. ("ABC"), the Washington Post, Chicago Tribune Company ("Tribune"), and Chicago Public Media, including the Chicago Sun-Times ("CSTM") and WBEZ (collectively, the "Media Parties") seek leave to intervene for purposes of accessing court records and to modify the protective order governing the exchange of evidence. The Media Parties request full and immediate access to the body-worn camera footage, photographs, and other evidence submitted to the Court to induce it to act or otherwise addressed in open court during the pendency of this case. The protective order prohibiting the release of video footage and other relevant evidence serves only to deepen public suspicion and fear that the government is misrepresenting its actions in Operation Midway Blitz, trampling bedrock constitutional freedoms by taking a "shoot first, and ask questions later" approach to dealing with the public, and that evidence of this unlawful conduct is being secreted behind closed doors. Full and contemporaneous access to the evidence in this case by the press, as the eyes and ears of the public, is an antidote to those fears and concerns.

The Media Parties are all respected members of the American press with long histories of providing trustworthy coverage and reliable information to the public. Their award-winning content has driven civic engagement and conversation for decades for a large and diverse audience. The print media parties have all won Pulitzer Prizes for their investigative journalism and news coverage., and ABC News has won countless Emmys for its coverage. American

Broadcasting Companies, Inc. is an indirect, wholly-owned subsidiary of The Walt Disney Company, a publicly traded corporation. WP Company LLC d/b/a The Washington Post is the publisher of *The Washington Post* newspaper, the website washingtonpost.com, and a wide array of mobile and digital journalism products. The company also operates a syndicated news service and licenses proprietary digital publishing technology to hundreds of customers through its operating division Arc XP. WP Company LLC is a wholly owned subsidiary of Nash Holdings, LLC, a private investment firm owned by Jeffrey P. Bezos.  Both the Chicago Sun-Times and Chicago Tribune have been stalwarts of Chicago media for several decades. They operate in print and on the internet at chicago.suntimes.com and chicagotribune.com, respectively. In 2022, the Sun-Times joined Chicago Public Media and began operations as a 501(c)(3) nonprofit organization. WBEZ is a 501(c)(3) nonprofit organization that broadcasts local and national news and iconic programming on 91.5 FM radio and streaming on the internet at wbez.org.

## ARGUMENT

I.     **THE MEDIA PARTIES HAVE STANDING TO INTERVENE IN THIS CASE AND THE COURT SHOULD GRANT THEIR MOTION TO INTERVENE**

Federal courts have long recognized the right of the media to intervene in matters to assert a right of public access to judicial records. *Globe Newspaper Co. v. Super. Ct. for Norfolk*, 457 U.S. 596, 609, n. 25 (1982) ("representatives of the press and general public must be given an opportunity to be heard" on matter of access) (quotations and citations omitted); *In re AP¸* 162 F.3d 503, 508 (7th Cir. 1998) ("representatives of the press and general public must be given an opportunity to be heard on the question of their exclusion from the proceedings or access to documents") (quotations and citations omitted). This right to intervene is "rooted in the public's well-established right of access to public proceedings." *Jessup v. Luther*, 227 F.3d 993, 997 (7th Cir. 2000). Moreover, intervention is not only permitted, but also "the most appropriate

3

procedural mechanism by which to accomplish this task [of ensuring a right of access]" and "affords the court an opportunity for due deliberation." *In re AP*, 162 F.3d at 507; *see also*, *Jessup*, 227 F.3d at 997 (the Seventh Circuit has "recognized intervention as the logical and appropriate vehicle by which the public and the press may challenge" orders limiting access to court records).

Courts in this district routinely grant the press leave to intervene to assert a claim for access. As the court recognized in *U.S. v. Torres*, 602 F. Supp. 1458, 1461 (N.D. Ill. 1985):

> a cursory review of cases involving news media interest in criminal prosecutions (usually involving evidence to be captured or copied) shows that courts, *without discussion*, have permitted applications to be made for certain relief, or have granted news media organizations leave to intervene. In such cases, news media entities or organizations have been named and treated as applicants or as intervenors.

(emphasis added) (collecting cases). The Seventh Circuit further recognizes the importance of a *timely* right to intervene, holding that: "[i]n order to ensure the right of access -- of 'immediate and contemporary' access -- our case law has recognized that those who seek access to [court documents] have a right to be heard in a manner that gives full protection of the asserted right." *In re AP*, 162 F.3d at 507.

Upon discovering the Department of Justice's decision to move for dismissal earlier that day, one of the Media Parties attempted to move for intervention before dismissal was entered, while the controversy was still live. ABC requested that the government's motion to dismiss be continued for one day to allow ABC to file a written motion to intervene. The Court declined that request but informed counsel for the Media Parties that the Court would consider a written motion the following day. Ex. C, Transcript of Proceedings, November 20, 2025, 3:18-7:2. Accordingly, the entry of dismissal the day before this motion is filed should not affect the Media Parties' standing to bring this motion to intervene.

Further, this case falls within the mootness exception for matters capable of repetition, yet evading review. *Milwaukee Police Ass'n v. Bd. Of Fire & Police Comm'Rs of Milwaukee*, 708 F.3d 921, 932 (7th Cir. 2013). The exception applies when (1) the challenged action is too short in duration for the issue to be fully litigated; and (2) there is a reasonable expectation that the same complaining party will be repeatedly subject to the same action. *Id.* Here, the issue is the press's ability to challenge a protective order. "If a party does not show good cause to justify the ongoing concealment of certain information, the protective order may be dissolved or modified to unseal that information." *See Chi. Mercantile Exch., Inc. v. Tech. Research Group, LLC*, 276 F.R.D. 237, 241 (N.D. Ill. 2011) (quoting *In re Bank One Sec. Litig.*, 222 F.R.D. 582, 586 (N.D. Ill. 2004). The government's decision to move for dismissal in this case presents this type of change in circumstances because the public's interest in understanding the dearth of evidence in the government's case and the Court's reasons for dismissal outweighs any good cause initially shown. As discussed, the government has seemingly engaged in a pattern of detaining civilians only to eventually dismiss the charges. Because the dismissal decisions are made quickly with little notice—often less than a day as was the case here—the press cannot adequately obtain counsel, file an appearance, and submit a motion to intervene before the case is dismissed. Therefore, the duration to act is too short and the press will be subject to the same difficulties each time it attempts to intervene in a case like this. As such, the Court should recognize this as a situation capable of—even likely of— repetition but evading review and grant the Media Parties' motion to intervene notwithstanding the dismissal.

The Media Parties seek leave to intervene in this matter to modify the protective order and gain access to body-worn camera footage, photographs, and any other material on which the government relied to induce the assigned Magistrate Judge to sign the Complaint or that any of

5

the parties may have used to influence this Court in rendering its decision to grant the

government's motion to dismiss or any other decision. Through intervention, the Media Parties

may fully explain to the Court their positions why, under applicable law, the Court has discretion

to modify the protective order and allow to access these materials. Permitting the Media Parties

to intervene and be heard on this matter will also afford the Court the opportunity for due

deliberation on the important matter of public access to the evidence supporting (or not

supporting) the claims of the federal government to justify the use of force, and to arrest and

detain members of the public.

II.     **THE COURT SHOULD GRANT THE MEDIA PARTIES ACCESS TO THE
        VIDEO AND PHOTOGRAPHIC MATERIALS AS WELL AS ANY OTHER
        EVIDENCE THE GOVERNMENT OR THE DEFENSE SUBMITTED TO THE
        COURT IN THIS CASE TO INDUCE IT TO RULE**

   A.   **Any Evidence, Including Video Footage And Photographs, Referenced In Public
        Proceedings And/Or Submitted To The Court Is A Public Record To Which The
        Common Law And Constitutional Rights Of Access Attach**

        The public and the press have a well-established right of access to court proceedings and

documents. *Grove Fresh Distribs. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994). In

*Nixon v. Warner Communications*, 435 U.S. 589, 597-98 (1978), the Supreme Court recognized

"a general [common law] right to inspect and copy public records and documents" that pre-dates

the Constitution and arises under centuries of common law. The Supreme Court subsequently

held that the right to attend criminal trials and access court records was also constitutionally

rooted in the First Amendment. *E.g.*, *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 603

(1982).

        In the Seventh Circuit, courts have specifically recognized that the right of access extends

to the right to copy audio and video evidentiary material. *See U.S. v. Guzzino*, 766 F.2d 302, 303

(7th Cir. 1985) (recognizing "the right of the media to copy audio or video tapes which have

6

been admitted into evidence in a criminal trial"); *U.S. v. Andreas*, No. 96 CR 762, 1998 U.S. Dist. LEXIS 11347 at *3 (N.D. Ill. July 16, 1998) (granting access to copy audio recordings admitted into evidence). These courts have generally analyzed the right of access under the common law. *See, Guzzino*, 766 F.2d at 303; *U.S. v. Edwards*, 672 F.2d 1289, 1292 (7th Cir. 1982); *Andreas*, 1998 U.S. Dist. LEXIS 1347 at *3. The common law right of access imposes a high hurdle to denying access. It includes a "strong presumption in support of the common law right to inspect and copy judicial records." *Edwards*, 672 F.2d at 1294; *see also Guzzino*, 766 F.2d at 303; *In re Application of CBS*, 540 F. Supp. at 771; *Andreas*, 1998 U.S. Dist. LEXIS 1347 at *3. The common law right is "more general in its contours" and "establishes that court files and documents should be open to the public unless the court finds that its records are being used for an improper purpose." *Grove Fresh Distribs.*, 24 F.3d at 897.

The Seventh Circuit has often observed that the right also has a constitutional footing. *E.g.*, *Grove Fresh*, 24 F.3d at 897 ("Justified originally by common-law traditions predating the enactment of our Constitution, the right of access belonging to the press and the general public also has a First Amendment basis"); *U.S. v. Peters*, 754 F.2d 753, 763 (7th Cir. 1984) (in deciding a right of access to trial exhibits, recognizing "a longstanding common law right of access to judicial records" that "is of constitutional magnitude through the first amendment"); *but see Edwards*, 672 F.2d at 1294 (the right to access and copy audio recording "is of a non-constitutional origin").[1] Courts viewing the right of access through a constitutional prism apply strict scrutiny to assess limitations on access, requiring a "compelling government interest" that

---

[1] In *Nixon*, the Court held that the First Amendment did not grant a greater right of access to audio recordings to the press than it did the public. 435 U.S. at 609. However, at the time it decided *Nixon*, the Court had not yet recognized *any* constitutional right of public access to a criminal trial. That changed two years later in *Richmond Newspapers v. Virginia*, 448 U.S. 555 (1980) when seven justices of the Court found that the First Amendment guaranteed public right of access to criminal trials. *See Globe Newspaper Co.*, 457 U.S. at 603.

is "narrowly tailored" to meet that interest. *Globe Newspaper*, 457 U.S. at 607; *Peters*, 754 F.2d at 758. The court in *Grove Fresh* explained:

> The First Amendment presumes that there is a right of access to proceedings and documents which have "historically been open to the public" and where the disclosure would serve a significant role in the functioning of the process in question. This presumption is rebuttable upon demonstration that suppression is essential to preserve higher values and is narrowly tailored to serve that interest.

Regardless of whether the right arises from the common law or the First Amendment, formidable democratic underpinnings favor access. As the *Grove Fresh* court explained, public scrutiny promotes community respect for the rule of law, provides a check on the activities of judges and litigants, and fosters more accurate fact finding. 24 F.3d at 897. In *In re Continental Illinois Sec. Litigation*, 732 F.2d 1302, 1308 (7th Cir. 1984), the court recognized that the public right of access to judicial records was "fundamental to a democratic state."

Here, certain materials that are currently restricted under the protective order are judicial records because they were either offered by the government as evidence to support the Complaint or considered in the decision to indict defendants or they were the subject of extensive argument in open court. Attached to the Complaint was the affidavit of Special Agent, Caitlin Malone of the Federal Bureau of Investigation. Special Agent Malone states that the affidavit is based on, in part, body-worn camera footage. (Dkt. No. 1, Malone Affidavit ¶ 3). In the affidavit she explains that "[a]ccording to body-worn camera footage collected by BPA 3, the strikes by the Martinez Vehicle and the Ruiz Vehicle happened at approximately 10:29 a.m." *Id.* ¶ 10. She continues, "According to BPA 1 *and corroborated by the audio of BPA 3's body-worn camera*, BPA 1 proceeded to fire approximately five shots from his service weapon at the driver of the Martinez vehicle." (emphasis added) Based on these statements, the body-worn camera footage depicts crucial details related to the shooting of a civilian by federal agents and forms a

significant portion of the evidence on which the government's Complaint was based and on which Martinez was detained and charged. As such, the footage is a judicial record that was central to the Magistrate Judge McShain's decision to sign the Complaint.[2] *See Smith v. U.S. Dist. Ct.*, 956 F.3d 647, X (7th Cir. 1992) (discussing access to a memorandum that was read, in part, in open court and relied on by the magistrate judge and noting that "courts have also held that judicial records include transcripts of proceedings, everything in the record, including items not admitted into evidence . . . The Court believes that the policy behind the common law presumption of access is what transpires in the courtroom is public property"). Further, during a pre-trial hearing, the defense described in detail this evidence and offered to enter it on the public docket. Ex. B, 51:9-52:21 The at-length discussion of this video and photographic evidence in open court demonstrates that they are judicial records, not private discovery governed by the protective order. The government has not even attempted to offer any compelling reason why this crucial evidence should be hidden from public view.

A finding that all body-worn camera footage, photographs, and additional evidence submitted or argued to the Court should be accessible to the public would be consistent with other related decisions in this District. For instance, this month, Judge Ellis granted a motion to intervene by the Chicago Sun-Times, the Chicago Tribune, and WBEZ who were seeking access to materials the Court had ordered the government to submit including body-worn camera footage and use of force reports. *Chicago Headline Club v.* Noem, 25-cv-12173, Dkt. No. 215, November 4, 2025. As a result, Judge Ellis ordered the release of all previously sealed evidence

---

[2] As noted above, Magistrate Judge Fuentes recognized the importance of this kind of evidence to the public's understanding of the merits of the government's charging decisions. *United States of America v. Dana Briggs*, 25-CR-610, Order p. 7, November 20, 2025.

that on which she relied in granting a preliminary injunction restricting use of force by federal immigration agents in Chicago.

The Protective Order in this case does not apply to judicial records. (Dkt. No. 20, Protective Order ¶ 8) ("The restrictions set forth in this Order do not apply to documents that are or become part of the public court records."). The Media Parties are seeking access to information that is central to this case and qualifies as judicial records not governed by the Protective Order. Media Parties should be granted immediate access to anything submitted to the Court for consideration including the body-worn camera footage and photographs.

**B. This Court Has The Discretion To Modify The Protective Order And Allow The Parties To Share This Evidence With The Public And Press**

The protective order does not entirely prevent access to the evidence in this case. The Seventh Circuit largely disapproves of overbroad protective orders that are "so loose that it amounts . . . to giving each party carte blanche to decide what portions of the record shall be kept secret." *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999)*.* "The judge is the primary representative of the public interest in the judicial process and is duty-bound therefore to review any request to seal the record (or part of it)." *Id.* Just as good cause is required to enter a protective order, good cause is required to modify it. *See Murata Mfg. Co. v. Bel Fuse, Inc.*, 234 F.R.D. 175, 179 (N.D. Ill. March 15, 20-6). A significant change in circumstances affecting fairness and necessitating a modification constitutes good cause. *Id.*

At the November 20, 2025 hearing on dismissal, the Court indicated that the evidence in question is not in its possession and has only been privately exchanged by the parties in

accordance with the Protective Order.[3] Ex. C. But that does not foreclose the issue. The Court has the discretion to modify the protective order and allow parties to share access to materials if they are willing. The Protective Order states that "Defendant and defendant's counsel shall not disclose the materials or their contents directly or indirectly to any person or entity other than . . . any other persons to whom the Court may authorize disclosure." (Dkt. No. 20, Protective Order, ¶ 2). Further, the Protective Order discusses how the parties should handle materials after the conclusion of the case and states that the information should be destroyed, returned, or retained "unless otherwise ordered by the Court." The government's motion to dismiss the case and the subsequent dismissal – against the backdrop of similar actions by the government in other cases -- present a significant change in circumstances affecting the public's need for information. The Court can and should exercise its discretion and find that good cause exists to modify the protective order and allow the distribution of the body-cam footage and other evidence to the press, thereby permitting the public and the press access to the crucial evidence in this case.

## CONCLUSION

For the reasons set forth herein, American Broadcast Company, Inc., the Washington Post, the Chicago Tribune, the Chicago Sun-Times, and WBEZ respectfully request that the Court grant them leave to intervene in this matter and grant them access to any evidence relied on in bringing and dismissing charges against the defendants.

---

[3] The Court also suggested that the Media Parties could request the records in issue under the Freedom of Information Act ("FOIA"), but one of the Media Parties' FOIA request has already been denied.

Dated:  November 21, 2025

Respectfully submitted,

**AMERICAN BROADCASTING COMPANIES, INC., WASHINGTON POST COMPANY d/b/a THE WASHINGTON POST, CHICAGO TRIBUNE COMPANY, THE CHICAGO SUN-TIMES MEDIA, INC, AND WBEZ**

By: /s/ Steven P. Mandell

One of their attorney

Steven P. Mandell (ARDC #6183729)
smandell@mandellpc.com
Brian D. Saucier (ARDC #6226006)
bsaucier@mandellpc.com
Julia P. Dacy (ARDC #6351557)
jdacy@mandellpc.com
MANDELL P.C.
One North Franklin, Suite 900
Chicago, IL 60606
(312) 801-6337

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that a copy of the foregoing document has been served on November 21, 2025 via the Court's CM/ECF system on all counsel of record who have consented to electronic service.

 /s/ Steven P. Mandell