IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 25 CR 636-1 and 2 |
| | ) | |
| v. | ) | |
| | ) | |
| MARIMAR MARTINEZ and ANTHONY IAN SANTOS RUIZ, | ) | Chicago, Illinois |
| | ) | November 25, 2025 |
| Defendants | ) | 9:00 a.m. |

TRANSCRIPT OF PROCEEDINGS - MOTION
BEFORE THE HONORABLE GEORGIA N. ALEXAKIS

APPEARANCES:

| | |
|---|---|
| For the Government: | HON. ANDREW S. BOUTROS<br>UNITED STATES ATTORNEY<br>BY: MR. RONALD DE WALD<br>Assistant United States Attorney<br>219 S. Dearborn Street, 5th Floor<br>Chicago, Illinois 60604 |
| For Defendant Martinez: | CHERONIS & PARENTE LLC<br>BY: MR. CHRISTOPHER V. PARENTE<br>140 South Dearborn Street, Suite 404<br>Chicago, Illinois 60603 |
| | GALLAGHER LAW OFFICES LLC<br>BY: MR. MICHAEL L. GALLAGHER<br>161 North Clark Street, Suite 3050<br>Chicago, Illinois 60601 |
| For Defendant Ruiz: | FEDERAL DEFENDER PROGRAM<br>BY: MR. JACK CORFMAN<br>MR. BENJAMIN HORWITZ<br>55 East Monroe Street, Suite 2800<br>Chicago, Illinois 60603 |
| For Intervenors: | MANDELL PC<br>BY: MR. STEVEN MANDELL<br>MR. BRIAN D. SAUCIER<br>1 North Franklin Street, Suite 900<br>Chicago, Illinois 60606 |

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

Court Reporter: JENNIFER COSTALES, CRR, RMR, CRC
Official Court Reporter
219 S. Dearborn Street, Room 1714
Chicago, Illinois 60604
(312) 435-5895
jenny.uscra@yahoo.com

(Proceedings heard in open court:)

THE COURTROOM DEPUTY: Case 25 CR 636, United States of America versus Marimar Martinez, United States of America versus Anthony Ian Santos Ruiz.

THE COURT: Good morning, everyone. Why don't we start with appearances, I'll start with the government.

MR. DE WALD: Good morning, Your Honor. Ron DeWald, D-E-W-A-L-D, on behalf of the United States.

THE COURT: Good morning, Mr. DeWald.

And then for Ms. Martinez.

MR. GALLAGHER: Good morning, Your Honor. Michael Gallagher.

MR. PARENTE: Chris Parente for Ms. Martinez.

THE COURT: And for Mr. Ruiz.

MR. HORWITZ: Good morning, Judge. Ben Horwitz and Jack Corfman on behalf of Mr. Ruiz.

THE COURT: Good morning to you both.

And then for the proposed intervenors.

MR. MANDELL: Good morning, Your Honor. Steve Mandell and Brian Saucier on behalf of the proposed intervenors.

THE COURT: Okay. Good morning.

So we are here on the proposed intervenors' motion to intervene and for purposes of modifying the protective order. I communicated, I think the message would have gone to

everyone sometime over the weekend, that my plan for this hearing was to hear initial responses from the government and the defendants to the motion, but I intend to set a briefing schedule. So that's my plan.

Let me hear from Mr. DeWald.

MR. DE WALD: Your Honor, the office's preliminary view is that we're going to oppose the media partners' motion for disclosure through the process that they argue. We are asking for time to collect the legal authority and to prepare our argument. So we're fine with a briefing schedule.

THE COURT: What do you mean when you say "through the process that they argue"?

MR. DE WALD: So they're attempting to argue that -- and what we're talking about here, my understanding is, the body-worn camera of one of the agents as well as photographs that were referenced in the complaint.

Now, as far as the photographs, those are actually set forth in the complaint. So it's really only body-worn camera of one of the officers. And that was never an actual exhibit that was considered by the Court in any way, shape or form.

So we intend to argue that that's not judicial record. So when they're asking for judicial -- through judicial records, this wouldn't be the proper avenue for it.

We believe that in order to get records from the

Executive Branch, the appropriate way to do that is through the Freedom of Information Act or FOIA request, and that's the appropriate channel here.

And so an argument that calling nonjudicial records judicial records for the sake of disclosure or modifying an existing protective order in place is not the appropriate avenue here.

THE COURT: Okay. Mr. Mandell, can I just get a point of clarification. Are the proposed intervenors only seeking the body-worn camera?

MR. MANDELL: No, Your Honor. Thank you for bringing that -- that's what I was going to say. We asked for the body-worn camera footage, body cam footage, photographs and any other material. This would raise specifically the text messages, right. And I understand that some text messages were made public, but there are a number of text messages that the Court actually reviewed in camera that were not made public on the record, and so we would be seeking those as well.

THE COURT: So it's body-worn camera, photographs, and text messages?

MR. MANDELL: Right. And any other information --

THE COURT: I need to know what you mean by "any other information."

MR. MANDELL: Any other information the Court

considered, which I wouldn't --

THE COURT: Such as?

MR. MANDELL: I wouldn't know. But that's what I know right now that the Court considered.

THE COURT: Why wouldn't you know?

MR. MANDELL: Well, I wasn't there with Your Honor to know what --

THE COURT: Well, I mean, but you have access to the docket. So what other information do you think I could have considered?

MR. MANDELL: Whatever --

THE COURT: Just it's hard for me to assess the merits of your motion if you're not going to be specific about what it is you are trying to get access to.

MR. MANDELL: Okay. Well, then I would say obviously the body cam footage, the text messages, any photographs that, for example, were not included in the court file. And I suppose that Judge McShain --

THE COURT: What's the court file?

MR. MANDELL: I'm sorry?

THE COURT: What's the court file? What court file are you referring to?

MR. MANDELL: The court file as reflected on the docket. So if there were information that were submitted under seal that I'm not aware of because of what's on the

docket --

THE COURT: Okay. So you're looking for both a modification of the protective order to get materials from the parties themselves and you're seeking any materials that I reviewed during the course of the case?

MR. MANDELL: Or any materials that were debated, discussed in open court. For example, the body cam footage was described specifically during the evidentiary hearing, so were the text messages.

THE COURT: Well, what besides the body cam footage? And if it's discussed in open court, then you should be able to identify it with specificity for me.

MR. MANDELL: Right. So that would be the body cam footage and the text messages.

THE COURT: Okay. All right. I should clarify for the record, I think what I said last week was that I didn't have anything in my possession. And, in fact, I do have in my possession the text messages, the unredacted version of text messages that the government tendered to me for in-camera inspection.

I say that to clarify the record. I'm certainly not the only person who possesses that information. But I just wanted to clarify the record, that I do have those, the unredacted version of the text messages in my possession.

Okay. So it's body cam footage, photographs, and

text messages.

MR. MANDELL: Correct, Your Honor.

THE COURT: Okay. All right. Let me hear from Mr. Parente.

MR. PARENTE: Yes, Judge. You know, we don't object to this necessarily, although if anything is released, we'd like it all released, so the video and the text messages. We don't have the unredacted version. We just have the ones Your Honor told us we can have.

THE COURT: And can I just ask there, my last minute entry directed the government to produce those additional text messages promptly. I just -- were they ever produced before --

MR. DE WALD: That afternoon.

THE COURT: Okay.

MR. PARENTE: They were produced promptly.

THE COURT: Okay.

MR. PARENTE: You know, we -- right, they were produced promptly. We don't have the other ones.

THE COURT: You mean anything that wasn't produced voluntarily by the government or anything that I said didn't need to get produced?

MR. PARENTE: Right.

THE COURT: Okay.

MR. PARENTE: And the only other thing I'll note,

Judge, as you consider this is that, you know, even after the dismissal of the indictment, DHS still put a press release out, you know, calling Ms. Martinez and Mr. Ruiz domestic terrorists that rammed federal agents with their vehicles and, again, go on with these facts where, I mean, you were in this courtroom where Agent Exum was clear that there was no ramming, and they're still putting these press releases out.

So, I mean, to the extent that the media companies are trying to correct the record, which I think they are, it is somewhat disconcerting that the government is putting out a press release that goes against what the actual witness testified to in this courtroom, right. I mean so, you know, as you try and balance this, I would just note that as well.

THE COURT: So Ms. Martinez's position is that you don't oppose the motion?

MR. PARENTE: We don't.

THE COURT: Okay. All right. Mr. Ruiz, counsel for Mr. Ruiz.

MR. HORWITZ: Yes, Judge. Mr. Ruiz was appreciative of the Court moving forward with the motion to dismiss last week. He was anxious to get it resolved, and he still remains anxious to have it completely resolved. We find ourselves in a bit of a strange situation where he's not subject to any criminal exposure anymore and still we're back here.

So as far as the request from the intervenors,

Mr. Ruiz doesn't have a position on that. None of the material -- or I should reverse that. All of the material that seems to be at issue here is from the government. And so it seems largely to be a question of the intervenors getting material that originated from the government, so --

THE COURT: But you'd be in possession of materials, right, same way with counsel for Ms. Martinez?

MR. HORWITZ: We are in possession of those having been provided them from the government.

THE COURT: And subject to the protective order?

MR. HORWITZ: Correct.

THE COURT: But if I grant the intervenors' request to modify the protective order, then you and counsel for Ms. Martinez would be free to turn over that information if Mr. Ruiz and/or Ms. Martinez wanted to, right?

MR. HORWITZ: Correct. We don't have a position or a plan on disclosing that information at this point.

THE COURT: Okay. There was a reference last week, during last week's hearing to an investigation. There was like a discussion as I gathered that or some reference to the fact that at least Ms. Martinez's car would remain in the government's possession pending another investigation.

I don't -- is Mr. Ruiz's car still in the government's possession?

MR. DE WALD: I believe so. We were making steps to

return it, but I think it's still with us.

THE COURT: Is Mr. Ruiz's car in any way tied to whatever this other investigation is?

MR. DE WALD: No.

THE COURT: Okay. And so am I understanding correctly that Ms. Martinez's car will remain in the government's possession for the foreseeable future for purposes of this investigation?

MR. DE WALD: Yes.

THE COURT: Okay. So one question I have, and I don't know what information can be shared, but a question I have is if this is a separate criminal investigation, how does that impact my analysis of the intervenor's request for modification of the protective order?

MR. DE WALD: Because the standard is is it in the interest of justice to pierce the protective order. We understand that. There is not much more I can share with that.

There is two different agencies involved, our office, because of the prosecution against the defendants, that there was for different reasons that a separate office was going to continue that investigation elsewhere.

THE COURT: Separate United States Attorney's Office?

MR. DE WALD: Yes.

THE COURT: For a criminal matter?

MR. DE WALD: Yes.

THE COURT: Is there any other information you can share?

MR. DE WALD: Not at this time.

MR. PARENTE: Judge, I do want to share some -- I just want to make sure, because there is press in the room obviously, this is not into Mrs. Martinez. This is a separate -- to the extent it's a criminal investigation, it's not into Mrs. Martinez. So that part is clear.

And I do think we could --

THE COURT: I want to be -- that was my understanding, Mr. Parente.

MR. PARENTE: Okay.

THE COURT: And also because the charges were dismissed with prejudice.

MR. PARENTE: I've received a lot of calls wondering if some other office is investigating Ms. Martinez. I just want to be clear they're not. This is a criminal investigation of someone other than Mrs. Martinez. I don't know who it is. I'm trying to get information. It's the South Bend US Attorney's office I've been told. I'm not -- they haven't called me back.

I would assume we could get -- I mean, we're not pushing for the car back. We want this investigation to go on. I would assume we could demand it back and maybe be back

before Your Honor. But we're not doing that because we support it, but --

THE COURT: I guess my question then for you is the same for Mr. DeWald, as it was for Mr. DeWald, is that if there is another criminal investigation in play, doesn't that -- how does that affect my analysis as to whether I should permit the intervenors to intervene, and if so, to modify the protective order?

MR. PARENTE: Yeah, I don't know the answer to that. I guess I would say that the text messages that we're talking about are probably going to be potentially pertinent in that other investigation if it's the investigation I suspect it might be.

THE COURT: Okay.

Anything, Mr. Horwitz, you want to say on this, or Mr. Corfman?

MR. HORWITZ: I would just reiterate that certainly there is no criminal investigation we're aware of into Mr. Ruiz. We're aware of no evidentiary value that remains for Mr. Ruiz's vehicle. We look forward to getting it back just in the normal course here. But other than that, we have nothing to add.

THE COURT: Mr. Mandell, because your motion didn't -- I'll admit I have not studied it in depth. But I've reviewed it enough to know that it didn't really address this

concern that I have, that if there is a pending criminal investigation, how does that affect the request for relief that you're making?

MR. MANDELL: Your Honor, this case is over. There were materials submitted or argued about in court that the public has a right to see. There is a presumption, both Constitutional and common law, presumption in favor of access. It's not unlimited, right. There is a balancing test that usually goes on. And here, in our view, the balance tips so firmly in favor of the public.

THE COURT: Did you cite any criminal cases?

MR. MANDELL: I'm sure I did, Your Honor. If I didn't --

THE COURT: Well, because what you mentioned in court was the case pending in front of Judge Ellis, which is not a criminal case. And then your motion mentioned Judge Fuentes' decision to release body cam footage in -- I forget the name of the case that was pending in front of Judge Fuentes.

MR. MANDELL: That's the *Briggs* case.

THE COURT: *Briggs*. And correct me if I'm wrong, Mr. Mandell, Judge Fuentes wasn't presented with a motion for modification of the protective order in that case.

MR. MANDELL: He did it on his own because he felt that it was important, given the government's --

THE COURT: But I guess my point is is that his

analysis from looking at the relevant order didn't grapple with this issue, correct?

MR. MANDELL: Grapple --

THE COURT: He didn't grapple with the issue of can I do this if there is a related pending criminal investigation?

MR. MANDELL: Right, his order did not address that.

But I would say that under Supreme Court precedent and Seventh Circuit precedent, the right of access in criminal cases is actually far greater than in civil cases. And we've heard nothing here other than an allusion to some other criminal investigation without anything going on.

And where you have a pattern and practice by the government of going to judges, swearing out affidavits, suggesting that they have evidence to prove criminal conduct, only to later jettison those actions, and Judge Fuentes made reference to five such actions, and the same thing is going on here -- the evidence is disputed here.

Judge Fuentes found that the public should see the body cam footage in that case so that they could draw their own conclusions in the context of such disputed evidence, and the same thing should apply here.

And for the government to say, oh, you know, there is something else going on, that is not a sufficient basis. That's not the demonstration of a compelling interest that's required to keep this information from the public and the

press.

THE COURT: Okay. So I would like to set a briefing schedule on this, at a minimum to give the government an opportunity to more comprehensively lay out their opposition.

In your reply brief, Mr. Mandell, I would encourage you to point me to criminal cases that address the particular concern. The only criminal case I see cited in your motion just based on another review that I'm doing -- I shouldn't say the only one, but the main one that you're citing is *United States v. Torres*. But that's from 1985. And you're citing it for the proposition that district courts routinely grant the press leave to intervene.

I mean, if it happens so routinely, I would hope that you would be able to find a case from after 1985. And there is another 1985 case from the Seventh Circuit.

MR. MANDELL: Your Honor, I apologize. I had a day to pull this together.

THE COURT: That's fine. I'm just telling you what would be helpful for me to have in a reply brief.

MR. MANDELL: Sure. Can I ask one other, raise one other issue, and that is, there is really a two-part step here, one is the motion to intervene, and then the request for leave in terms of access and modifying the protective order.

Both defense counsel have said that they don't object to intervention. I wasn't clear on what the government's

position was, whether they were objecting both to intervention and access or just access.

So I would ask the Court to at least grant the motion to intervene since that is -- I don't know that there is a case on file that has rejected intervention for the press under these kinds of circumstances.

THE COURT: Yeah, so I'm not prepared to do that today.

And I guess I had another question for you, which is that under the Federal Rules of Civil Procedure, there is quite an extensive rule about intervention, Rule 24. There is a whole host of factors that I'm supposed to consider.

Your motion doesn't lay out a process or framework by which I'm supposed to consider the first step of the relief that you're requesting.

So let me ask it this way, is there an equivalent rule for the rules of criminal procedure as there is under the Federal Rules of Civil Procedure for intervention?

MR. MANDELL: I'm not aware of any separate rule in the rules of criminal procedure.

THE COURT: Okay.

MR. MANDELL: But I think that --

THE COURT: And are you aware of any cases that sort of separate and apart from the substance of why the press is asking for the document or the documents, how the Court goes

about considering whether the press needs to intervene in a particular case to get the relief that they're requesting?

MR. MANDELL: My recollection from Seventh Circuit cases is that the whole analysis of intervention, permissive intervention is relaxed when the press seeks to intervene for purposes of seeking access to court proceedings and court records.

THE COURT: The reason why I ask is because in the civil context, one thing that I'm supposed to consider when presented with a motion to intervene is whether I need to grant the motion because no one has the same interest as the intervenor, right. That's one thing I'm supposed to think about. So I'm not supposed to let people or I'm not supposed to exercise my discretion to let people intervene if there is already a party in the case that is capable of advancing the same interest and has the same incentive to do that.

And Mr. Parente's comments earlier today is what flags for me, well, maybe I don't need to grant the press the right to intervene because Mr. Parente, Ms. Martinez's interest as articulated by Mr. Parente seem to be aligned with the relief that you are requesting, Mr. Mandell.

And so what would stop Mr. Parente from on behalf of Ms. Martinez moving to modify the protective order, thus obviating the need for the press to intervene at all?

MR. MANDELL: I don't think, respectfully, that the

interests are aligned. There are winners and losers in this case. The winners are the defendants are no longer subject to a prosecution. The government can dismiss this case and doesn't have to apparently explain how they brought this case and then dismissed it.

The only losers in the case would be the public if the Court were to deny this motion to intervene and for access. And it's the public that the media is here for, not for any one particular party. We stand in the shoes of the public. We're the eyes and ears of the public.

And in the context of what's going on here in the Northern District of Illinois with Operation Midway Blitz, the public deserves the right to understand and draw their own conclusions from the information that's been submitted, argued, reviewed about -- you know, to form their judgments about what's going on.

THE COURT: Okay. Anything, Mr. DeWald, you want to say in response to that at this time?

MR. DE WALD: Other than we continue to believe that the appropriate avenue here is through FOIA and that's how the public is going to get the information that can come out.

As far as semantics is concerned, I want to just clarify this, because it's a different office, I don't know if it matters to say it's a criminal investigation versus, say, a referral or a different term. I know that there is kind of

different categories as things progress through. I don't know whether or not it's actually a criminal investigation, but it's a referral. US Attorney's Office is involved. They were involved over the last several weeks. So things are progressing, so that's --

THE COURT: Right. Although this goes to Mr. Mandell's concern that given the department's I mean general position that the Department of Justice doesn't confirm or deny the existence of investigations, we're all a little bit in the black box as to what is going on, understandably so. But then that makes the analysis more -- it just adds a wrinkle to the analysis, because to Mr. Mandell's point, it's hard to say, well, the government is essentially asserting: Trust us, something is happening. But we don't really know what is happening.

MR. DE WALD: And I can have more clarity with our filing I guess is my point, right, to know the exact spot and if there is a semantic difference. And I just didn't want to commit to a specific term if that matters in that realm.

THE COURT: Understood.

MR. DE WALD: That's all I'm trying to say.

THE COURT: Understood.

There was a reference in the motion from the proposed intervenors that a FOIA request has already been made and already denied. Do you know anything about that, Mr. DeWald?

MR. DE WALD: I don't. And I did notice that. They said one of them has been denied, suggesting that there is multiple involved. I don't know the reason it was denied. And I don't know if that reason or that exclusion still applies today or will apply in the near future. So, I mean, there is all kind of different, as I understand FOIA, all kinds of different analysis that happens over time.

THE COURT: Okay. Mr. Mandell, any additional information you can share on that point?

MR. MANDELL: Well, when I said in the brief that one of the parties submitted a FOIA, one of the parties submitted a FOIA seeking all body cam footage from that day. And there was a response that there are I think 10 videos. Whether they all relate to this incident, I don't know. But then there was a summary denial of that FOIA request.

With respect to FOIA --

THE COURT: Who made the request?

MR. MANDELL: The Washington Post.

THE COURT: And who did they make the request to?

MR. MANDELL: I believe DHS.

THE COURT: And was there an exemption cited in support of the summary denial?

MR. MANDELL: Yes.

THE COURT: And what was the exemption?

MR. MANDELL: I'd have to look.

THE COURT: Okay. I'd like to know that in the reply brief, please.

MR. MANDELL: Okay. Let me just make a comment about FOIA. I don't know if Mr. DeWald has made FOIA requests, right --

THE COURT: They take forever.

MR. MANDELL: Okay, right, they take forever. And the Seventh Circuit in *In re AP* has recognized that contemporaneous immediate access is extremely important. So to say that we should go and FOIA this information is just really nonpractical and not an option.

THE COURT: Okay.

MR. DE WALD: Your Honor, which is why we were talking about our preliminary position was that we intended to file an objection. We're continuing to evaluate this request.

THE COURT: Okay. All right. So when would you like to file a response, Mr. DeWald?

MR. DE WALD: Your Honor, given the holiday, we would like -- we were asking either for the end of next week, which would be December 5th, or the following Monday, which would be December 8th.

THE COURT: Okay. Let's make it December 5th. And then of course as you continue, as the government continues to analyze its position, if it turns out that you are not opposing the motion, please let me know as promptly as

possible.

MR. DE WALD: Absolutely, Your Honor.

THE COURT: Okay. And, Mr. Mandell, if you get a response on December 5th, when do you want to file your reply?

MR. MANDELL: 5 and 14 is 19. Does that sound feasible?

THE COURT: I would have expected you to want to do it sooner so that I can rule before the holidays.

MR. MANDELL: Okay. So 7 days?

THE COURT: Okay. So let's get your reply on file by December, I'm going to make it December 11th actually. And then I'll set a hearing, I'll set a hearing for December 19th. It will be a telephonic hearing, and we'll do it at 9:00 a.m.

Okay. Anything further?

MR. DE WALD: Not from the government.

THE COURT: Defendants?

MR. PARENTE: No, Your Honor. Thank you.

MR. HORWITZ: No.

THE COURT: Mr. Mandell?

MR. MANDELL: No, Your Honor. Thank you.

THE COURT: All right. Have a good holiday, everyone.

MR. MANDELL: You, too.

MR. DE WALD: Thank you.

(Proceedings concluded at 9:32 a.m.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/JENNIFER COSTALES* November 25, 2025

Jennifer Costales, CRR, RMR, CRC Date
Official Court Reporter