UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.    25 CR 636 |
| v. | ) | |
| | ) | Judge Georgia N. Alexakis |
| MARIMAR MARTINEZ, and | ) | |
| ANTHONY RUIZ. | ) | |

**GOVERNMENT'S RESPONSE TO MEDIA PARTIES' MOTION TO
INTERVENE FOR ACCESS TO JUDICIAL RECORDS AND
TO MODIFY THE PROTECTIVE ORDER**

The Media Parties[1] have moved to intervene in this proceeding to obtain access
to body-worn camera recordings, photographs, and text messages reviewed by the
Court ("Requested Materials") and that have been provided by the government to the
defense in discovery pursuant to protective orders entered by this Court. Because the
Requested Materials are not judicial records subject to a presumptive public right of
access but instead are properly obtained through a request made under the Freedom
of Information Act, because the Media Parties' motion is moot and untimely, and
because public dissemination of the Requested Materials could interfere with a
separate but related ongoing criminal investigation, the motion should be denied.

---

[1] The "Media Parties" in this matter are the American Broadcasting Companies, Inc. ("ABC"),
the Washington Post, Chicago Tribune Company ("Tribune"), and Chicago Public Media,
including the Chicago Sun-Times ("CSTM") and WBEZ.  Yesterday, on December 4, 2025,
CBS Broadcasting Inc., on behalf of CBS News Chicago and CBS News, also filed a motion to
intervene seeking the same materials as the "Media Parties."  R.86.  Therefore, for purposes
of this response, the government identifies and includes CBS Broadcasting Inc. as a member
of the "Media Parties."

I.     BACKGROUND

A. Criminal Complaint

On Sunday, October 5, 2025, the government filed a complaint alleging that, on or about October 4, 2025, Marimar Martinez and Anthony Ruiz forcibly assaulted, resisted, opposed, impeded, intimidated, and interfered with an officer of the United States, while he was engaged in the performance of his official duties, and in the commission of such acts used a deadly and dangerous weapon, in violation of 18 U.S.C. § 111(a) and (b). R. 1.

Attached to the complaint was an affidavit signed by a special agent with the Federal Bureau of Investigation ("FBI"), which described evidence establishing probable cause to support the charged offense. R. 1. The affidavit stated, based on information received from three Border Patrol Agents ("BPA 1, 2, and 3"), that on October 4, 2025, defendants Martinez and Ruiz chased, and ultimately collided with, the Customs and Border Protection ("CBP") vehicle in which the agents were riding. R. 1. The affidavit noted that the officers' statements were corroborated by three discrete portions of the audio-visual footage recorded by BPA 3's body-worn camera ("BWC") which: (1) showed the time of day that the alleged crime occurred; (2) captured the sound of five gunshots fired by BPA 1 after the collision; and (3) showed the path driven by Ruiz as he fled the scene of the collision.  R. 1 at ¶¶10, 15, and 16. The affidavit also included five color photographs showing the damage caused to the three vehicles involved in the collision.  R. 1 at ¶¶ 11 and 12.

### B. Protective Orders

Later during the day of Sunday, October 5, 2025, counsel for defendant Martinez requested any video the government had of the incident. Government counsel explained to defense counsel that the BWC appeared to include personal information that would require redaction in the absence of a protective order. Defense counsel agreed to receive an unredacted copy of the BWC pursuant to a proposed draft protective order.

The unopposed protective order followed the standard form used in criminal prosecutions in this judicial district. On the government's motion, R. 2, this Court entered the unopposed protective order with respect to defendant Martinez on October 7, 2025. R. 20. The same protective order was entered with respect to defendant Ruiz on October 23, 2025. R. 47, 50.

Subsequently, the government produced additional discovery materials, including BPA 1 and 2's BWC recordings and various photographs, to both defendants pursuant to the protective orders entered by the Court.

### C. Indictment

On October 9, 2025, a grand jury returned an indictment charging Marimar Martinez and Anthony Ruiz with having, on or about October 4, 2025, forcibly impeded, intimidated, and interfered with Border Patrol Agents from the U.S. Customs and Border Protection, while they were engaged in, and on account of, the performance of their official duties, and such acts involved a deadly and dangerous

weapon, namely, a motor vehicle, in violation of 18 U.S.C. § 111(a) and (b). R. 22 (Counts One and Two).

### D. Evidentiary Hearing Regarding Destruction of Evidence

On October 19, 2025, defendant filed a motion seeking a prompt hearing regarding possible "destruction of evidence." R. 43. On October 20, 2025, the Court granted the motion for a hearing, and conducted the hearing, beginning on November 5, 2025. R. 45. As ordered by the Court, CBP Agent Charles Exum, previously referred to as "BPA 1" in the complaint affidavit, testified and was subject to cross-examination by counsel for the respective defendants. The Court admitted as exhibits at the hearing two emails relating to the repair of the CBP vehicle (Gov. Ex. 1A and 1B), and five defense exhibits, relating to text messages between Agent Exum and either his wife, his brother, or his co-workers in Maine (Def. Ex. 2, 3, 4, 5, and 6).[2] All exhibits admitted during the hearing are publicly available on the Court's docket. R. 61, 62.

### E. Court's In Camera Inspection of Unredacted Text Messages

On November 17, 2025, the Court held an *ex parte, in camera* meeting with the government, during which it examined unredacted copies of Agent Exum's text messages, and ordered that the government to produce to the defense additional text

---

[2] The government explained in open court that Agent Exum stated that he communicated about the October 4, 2025, incident with his wife, his brother, and his co-workers in Maine. Prior to the hearing, Agent Exum allowed the government to photograph entire text exchanges, beginning on October 4, 2025, that occurred between the agent and his wife, the agent and his brother, and the agent with a group of his co-workers in Maine, and the government produced redacted copies of the messages to defense counsel in discovery prior to the hearing on November 5, 2025.

messages, the majority of which provided context for the previously-disclosed text messages. R. 63, 65. The government produced the additional text messages to the defense, as ordered, later the same day.

### F.    Government's Motion to Dismiss

On the morning of November 20, 2025, the government filed a motion to dismiss the indictment against both defendants. R. 69. The parties appeared in Court later that day for a previously scheduled status hearing and sought a ruling on the government's motion.

When the case was called, counsel for the Media Parties appeared and requested a continuance to file a motion to intervene. R. 74-3. Both defendants and the government objected to any delay of a ruling on the government's motion to dismiss. R.74-3 at 7. The Court declined to delay proceedings on the motion to dismiss, but stated that if the Media Parties wanted to file a motion to intervene after the Court ruled on the government's motion, the Court would take the intervention motion under consideration at that time. R. 74-3 at 6. The Court then granted the government's motion to dismiss the indictment. R. 70.

### G.    The Media Parties' Motion to Intervene

On the evening of November 21, 2025, the Media Parties filed an emergency motion to intervene together with a supporting memorandum, R. 73 and 74, and on November 24, 2025, filed a corrected version of the memorandum. R. 77. This Court scheduled a status hearing on November 25, 2025, at which time it confirmed that none of the parties in the case were a proponent of the Media Parties' motion.

Counsel for defendant Martinez represented that she would not oppose the motion, counsel for defendant Ruiz represented that he would take no position on the motion, and the government represented that it intended to oppose the motion. R. 80.

During the hearing, the Media Parties clarified that they were seeking access to all BWC recordings, photographs, and text messages reviewed by the Court ("Requested Materials") as judicial records, or to modify the protective orders issued by the court to permit disclosure of the Requested Materials from the parties themselves. *See* Exhibit A.

## II.    ARGUMENT

It is well settled that a rebuttable presumption of public access applies to judicial proceedings and records. *E.g.*, *In re Associated Press,* 162 F.3d 503, 506 (7th Cir.1998); This presumption "serves to (1) promote community respect for the rule of law, (2) provide a check on the activities of judges and litigants, and 3) foster more accurate fact finding." *Id, quoting Grove Fresh Distribs., Inc. v. Everfresh Juice Co.,* 24 F.3d 893, 897 (7th Cir. 1994). It applies to both civil and criminal proceedings as well as to documents submitted to the court in connection with judicial proceedings. *United States v. Corbitt*, 879 F.2d 224, 228 (7th Cir. 1989). It also applies to records that, while not filed, are relied on by a judicial officer in determining the litigants' substantive rights. *See Smith v. United States District Court Officers*, 203 F.3d 440, 442 (7th Cir 2000).

The presumption of public access does not, however, apply to non-judicial records, which include materials that are exchanged by the parties in discovery but

not filed with the court. Pre-trial discovery, "unlike the trial itself, is usually conducted in private." *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999). "[D]iscovered, but not yet admitted, information" is not a "traditionally public source of information." *Bond v. Utreras*, 585 F.3d 1061, 1074 (7th Cir 2009) (*quoting Seattle Times Co v. Rhinehart*, 467 U.S. 20, 33 (1984)); *accord Grove Fresh*, 24 F.3d at 897-98 ("[U]ntil admitted into the record, material uncovered during pretrial discovery is ordinarily not within the scope of press access.").

Although there is no provision in the Federal Rules of Criminal Procedure for intervention by a third party in a criminal proceeding, courts have permitted timely intervention when the potential intervenor has a legitimate interest in the outcome and cannot protect that interest without becoming a party. *See In re Associated Press*, 162 F.3d at 507–08 (allowing intervention in a criminal prosecution and collecting other cases on the subject); *Corbitt*, 879 F.2d at 226–27 (explaining that a newspaper publisher moved to intervene in the criminal case to request disclosure of the PSR and testimonial letters on which the district court had relied in sentencing, and that the district court apparently granted the motion to intervene and ultimately granted substantial access to the PSR and the letters). The time to file a motion to intervene in a criminal case to obtain access to judicial proceedings or records is upon notice that a court will consider an action potentially affecting the intervenor's interests. *United States v. Blagojevich*, 612 F.3d 558, 561 (7th Cir. 2010). *See also In re Associated Press*, 162 F.3d at 507-508 (noting that courts "have recognized

intervention as the logical and appropriate vehicle" to vindicate the public's interest in access).

The proper procedure for obtaining access to non-judicial records created or compiled by Executive Branch Agencies, including the Departments of Justice and Homeland Security, is a request pursuant to the Freedom of Information Act. 5 U.S.C. § 552.

### A.    The Requested Materials Are Not Judicial Records.

In this case, all proceedings have been conducted publicly, and all evidence and records filed by the parties, submitted as exhibits during the course of hearings, and relied on by the Court in making substantive rulings, have been filed on the Court's docket. Nothing has been placed under seal.

The materials to which the Media Parties seek access were not filed with the Court or submitted as part of any judicial proceedings and were not relied upon by the Court in reaching any substantive determinations. In support of the complaint, the government filed with the Court a supporting affidavit, which included detailed statements of three border patrol officers, BPA 1, BPA 2, and BPA 3, and five photographs that were incorporated into the document. As noted above, the affidavit referenced three discrete portions of one BWC recording (BPA 3's BWC) and stated that those portions corroborated specific aspects of the information provided by the BPAs regarding (1) the time of day that the collision occurred; (2) the number of shots fired by Agent Exum after the collision; and (3) the path taken by Ruiz as he left the scene of the collision.  No part of this BWC recording—or any other recording—was

presented to, or considered by, the magistrate judge in connection with the judge's finding of probable cause. Likewise, no photos other than those incorporated into the supporting affidavit, and no other records or documents, were provided to, or considered by the magistrate judge. Thus, even if the materials to which the Media Parties now seek access were relied upon by the agent who signed the supporting affidavit, none of them were reviewed or considered by the magistrate judge in determining that there was probable cause supporting the charges stated in the complaint, and thus none constitute judicial records.

Similarly, during the initial appearance and detention hearing on Monday, October 6, 2025, defense counsel described, but did not show or admit any portion of BPA 3's BWC. Defendant counsel even offered to "show it to you if your Honor wants to see it." R. 74-1 at 4. The magistrate judge did not accept defense counsel's offer and did not watch the BWC. Therefore, BPA 3's BWC was not a part of the judicial record.

After the defendants moved for relief based on the government's alleged destruction of evidence, this Court heard testimony and received exhibits during an evidentiary hearing on defendant's motion. R. 63. Both the transcript of the hearing and all exhibits admitted or otherwise used during the hearing were filed on the Court's docket and thus are publicly available. R. 61, 62, and 67. As noted above, the exhibits used during the hearing and subsequently filed on the docket were limited to two emails relating to the CBP vehicle and six photographs of text messages

between Agent Exum and his wife, brother, and co-workers. R.61, 62. No other exhibits were admitted or filed with the Court.

The Media Parties incorrectly claim that BWC recordings and unredacted text messages from BPA 1 (Agent Exum) are judicial records because they were mentioned during the evidentiary hearing, and (in the case of the text messages) subject to an *in camera* review. The record clearly shows none of these materials were submitted to the Court as exhibits or otherwise relied upon by the Court. With respect to Agent Exum's BWC recordings, during the hearing, Agent Exum testified that he was not wearing a BWC at the time of the collision but activated the camera when he put on his vest at some point after the collision. R. 74-2 at 3-4. Agent Exum's BWC was never submitted to the Court and the parties did not describe the BWC recordings further. No recordings from Agent Exum's BWC constitute judicial records.

Nor is the equation changed by the fact that Agent Exum's unredacted text messages were reviewed by the Court *in camera* for purposes of determining what should be turned over in discovery. The law is clear that such review does not make the unredacted text messages judicial records. *See, e.g, Bond v. Utreras*, 585 F.3d 1061, 1075, n.8 (7th Cir. 2009) (*citing SEC v. TheStreet.com*, 273 F.3d 222, 233 (2d Cir. 2001) (court review of documents for the purpose of determining whether a protective order should be entered does not "transform every document that a court reviews into a 'judicial document' presumptively open to the public"); *Chi. Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1312–13 (11th Cir. 2001) (holding that "material filed with discovery motions is not subject to the common-law right of

access, whereas discovery material filed in connection with pretrial motions that require judicial resolution of the merits is subject to the common-law right"); *United States v. Wolfson*, 55 F.3d 58, 61 (2d Cir. 1995) ("We are not aware … of any common-law principle that documents submitted to a court *in camera* for the sole purpose of confirming that the refusal to disclose them to another party was proper, are to be deemed judicial records open to the public.").  Indeed, a contrary rule could have wide-ranging implications; it could mean that attorney-client privileged materials, trade secret materials and other sensitive materials submitted for *in camera* for review by the court would suddenly be subject to public access as judicial records. Surely, that cannot be right. Accordingly, the only text messages constituting judicial records are the ones entered as exhibits at the hearing and filed on the Court's public docket.

### B. The Media Parties Lack Standing and, in any Event, Cannot Establish Good Cause to Modify the Protective Order.

#### 1. The Media Parties Lack Standing to Modify the Protective Order.

Although the Seventh Circuit permits press organizations to intervene in criminal cases for the purpose of vindicating the public's presumptive right of access, that procedure generally has been limited to efforts to obtain access to judicial proceedings and records. *See, e.g., In re Associated Press,* 162 F.3d 503, 513 (7th Cir.1998); *Seattle Times Co*, 467 U.S. at 33. As discussed above, the records sought by the Media Parties here are not judicial records; thus, the rebuttable presumption

11

of access does not apply to them and the proper means of seeking access is a FOIA request.

The Media Parties' delay in seeking to intervene should prevent intervention at this time. The Media Parties could have and should have sought to intervene when the first and second motions for entry of protective orders were filed (October 7, and October 22) (R. 20, 47), or after they saw that no BWC recordings were presented at the public evidentiary hearing conducted by the Court on November 5, 2025. R. 63. But they failed to seek to intervene until the hearing at which the Court considered the government's motion to dismiss the indictment and submitted no written motion or memoranda until after the Court dismissed the indictment and concluded the case. Under the Seventh Circuit's decision in *Bond v. Utreras*, 585 F.3d at 1065, the dismissal of the indictment with prejudice renders the Media Parties' claim of access to *unfiled* discovery not only untimely but moot.

Contrary to the Media Parties' contention, the narrow exception for issues "capable-of-repetition" does not apply here. The exception "applies only where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Milwaukee Police Association v. Board of Fire & Police Commissioners of the City of Milwaukee*, 708 F.3d 921, 932 (7th Cir. 2013); *United States v. Juvenile Male*, 564 U.S. 932, 938, 131 S. Ct. 2860, 2865 (2011). As indicated above, any time limitations were of the Media Parties' own making; there would have been plenty of time for the Media Partners to litigate the right of

access to BWC recordings, photographs, and text messages, had they sought to do so in October. Nor does this case present issues that are "capable of repetition" and likely to "evade review." Should the Media Partners choose to litigate its right of access to unfiled discovery in a future case, they can obtain review simply by seeking access sooner.

### 2. The Media Parties Cannot Establish Good Cause to Modify the Protective Order.

In any event, the Media Parties have not come close to showing good cause for this Court to modify the unopposed protective order entered by the Court. Federal Rule of Criminal Procedure 16(d)(1) authorizes courts to issue protective orders governing the discovery of materials in federal criminal cases, as follows:

(d) Regulating Discovery.

(1) Protective and Modifying Orders. At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief. The court may permit a party to show good cause by a written statement that the court will inspect ex parte. If relief is granted, the court must preserve the entire text of the party's statement under seal.

Notably, the plain language of Rule 16(d) neither requires nor precludes the issuance of a protective order under specific circumstances. Rather, the Court retains discretion to issue a protective order upon a showing of "good cause." *Accord Alderman v. United States*, 394 U.S. 165, 185 (1969) ("[A] trial court can and should, where appropriate, place a defendant and his counsel under enforceable orders against unwarranted disclosure of the materials which they may be entitled to inspect.").

When the government moves for the entry of a protective order, the government bears the burden of demonstrating "good cause" under Rule 16(d). *United States v. Isa*, 413 F.2d 244, 248 (7th Cir. 1969). To *modify* a Rule 16(d)(1) protective order, courts have used the same standard applicable in the civil context. *See United States v. Morales*, 807 F.3d 717 (5th Cir. 2015). Contrary to the Media Parties' suggestion, R. 77 at 10, this standard generally assigns the party seeking relief the burden of showing good cause to modify or vacate the existing protective order. *Heraeus Kulzer, GmbH v. Biomet, Inc.*, 881 F.3d 550, 566 (7th Cir. 2018); *see also Murata Mfg. Co. v. Bel Fuse, Inc.*, 234 F.R.D. 175, 179 (N.D. Ill. 2006) ("It should be no surprise that, there having been good cause to enter the protective order in the first place, there must be good cause shown before it can be vacated."). Courts consider the following four factors to resolve motions to modify protective orders: "(1) the nature of the protective order; (2) the foreseeability, at the time of issuance of the order, of the modification requested; (3) the parties' reliance on the order; and most significantly (4) whether good cause exists for the modification." *Heraeus Kulzer, GmbH,* 807 F.3d at 565.

Two of these factors weigh strongly against modification of the protective order in this case. First, reliance on the order by the parties weighs against modification. The government relied heavily on the protective order when it produced discovery materials, without redaction, to the defense on an expedited basis. More specifically, the government produced BPA 3's BWC recordings without redactions of personal information, in order to expedite production to the defense. Subsequently, the

14

government produced unredacted recordings from two additional BWCs, including recordings from Agent Exum's BWC, neither of which were activated at the time of the collision or shooting. Finally, the government, relying on the protective order, also produced redacted text messages between Agent Exum and his wife, brother, and co-workers, from Agent Exum's telephone. Given all of this, the government's reliance interest on the protective order is substantial and to erode those reliance interests now could be destabilizing to the government's—indeed, both parties—reliance interests moving forward.

Second, the Media Parties have not met their burden of establishing good cause for the Court to modify the protective order at this time. They claim that the government's motion to dismiss the charges in this case, particularly in light of the government's dismissal of other similar cases, presents a "significant change in circumstances affecting the public's need for information." R. 77 at 12. This claim is unfounded. As a foundational matter, the Media Parties cannot establish any common law or constitutional right of public access to materials produced in discovery and never filed, presented to, or considered by, the Court in making any substantive determinations in the case. Moreover, there is a strong reason for leaving the protective order intact as public dissemination of the discovery materials reasonably could be expected to interfere with a separate but related ongoing criminal investigation.

Modification of a protective order to allow at the behest of a third party, rather than any of the parties, after dismissal of the indictment and conclusion of all

15

proceedings in the case will undermine reliance on protective orders in future cases which would be problematic and destabilizing. In criminal as well as civil cases, protective orders can help make trial preparation speedier, more efficient, and more robust. *See Bond*, 585 F.3d at 1080 (7th Cir. 2009) (Tinder, J. concurring). These benefits are diminished if parties cannot rely on the fact that agreed protective orders will not be vacated or modified at the conclusion of the case. As noted above, in reliance on the defendant's agreement to abide by a protective order, the government quickly produced recordings from BPA 3's BWC, despite privacy and other concerns. This could not have happened in the absence of the unopposed protective order. Where the parties have agreed to a protective order covering unfiled discovery materials which, for good cause, was judicially approved, the Court should honor that order absent extraordinary circumstances not present here.

The other two "modification" factors are neutral or inapplicable here. First, the government requested the unopposed protective order in this case to restrict dissemination of materials that could adversely affect law enforcement interests and the privacy interests of third parties. R.2,20. Second, the foreseeability of modification of the protective order is inapplicable here, since modification is being advocated by a third party, rather than one of the partes who negotiated the agreement. *See Smith v. Burge*, 2025 WL 2721046, *4 (N.D. IL. Sept. 24, 2025) (citing *Murata*, 234 F.R.D. at 180).

The Media Parties cannot show that they have a legitimate interest in modification that they cannot achieve without becoming a party to the case. As noted

above, the Media Parties may properly seek the Requested Materials from the executive branch through a FOIA request—the process Congress created for access to such records. *See* 5 U.S.C. § 552. According to the Media Parties, and confirmed by the United States Customs and Border Protection, at least one member of the Media Parties has filed an initial FOIA request with CBP seeking all available BWC videos, which was denied. The Media Parties are free to submit a modified request, or to pursue administrative appellate review under Title 6 C.F.R. §5.8, or seek dispute resolution services from the Office of Government Information Services (OGIS). And, of course, the Media Parties can file a FOIA lawsuit after they have exhausted their various administrative remedies.

## III.   CONCLUSION

WHEREFORE, the government respectfully requests that the Court deny the Media Parties' motions to intervene and to modify the protective orders previously entered by the Court.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By:     */s/ Ronald L DeWald*
RONALD DEWALD
AARON BOND
Assistant United States Attorneys