**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 25 CR 636 |
| | ) | |
| **MARIMAR MARTINEZ** and | ) | |
| **ANTHONY IAN SANTOS RUIZ** | ) | |
| | ) | |
| | ) | |

**MEDIA PARTIES' REPLY IN SUPPORT OF MOTION TO INTERVENE FOR ACCESS
TO JUDICIAL RECORDS AND TO MODIFY THE PROTECTIVE ORDER**

## ARGUMENT

The government's argument that: (1) the materials the Media Parties seek are simply unfiled discovery; and (2) that the government's abrupt dismissal of this and other felony prosecutions fails to provide good cause to modify the protective order is wrong on both counts.

First, the Court should reject the government's efforts to categorize as mere "unfiled discovery" materials that played a central role in this case and likely led to its relatively short life. The government relied on the BWC footage as corroborating evidence in a sworn declaration submitted to the Court to induce it to authorize this very prosecution, and it was the subject of intense cross-examination in an evidentiary hearing on Defendants' claim of gross government misconduct. Similarly, the text messages became the centerpiece of Defendants' claim that the government had engaged in serious misconduct by shooting one of the Defendants without justification, bragging about it, and tampering with critical evidence. Defendants' claim was not only vetted through a public evidentiary hearing but also apparently bolstered by the Court's decision to conduct an *in camera* review of the messages after which it ruled they gave necessary context to other messages that were made public.

Second, the government's descriptions of its operations and its commentary on the guilt or innocence of those detained are marked by inconsistencies that extend well beyond its actions in this case, including its retreat from multiple cases it once portrayed as ironclad. Adding to that what Judge Ellis found to be false testimony and violations of constitutional rights, the overall picture more than justifies the public's concern about the legitimacy of Operation Midway Blitz. Those concerns amply support modifying the protective order that the government now raises as a roadblock to public access.

On October 4, 2025, there was a collision between a civilian vehicle and a Border Patrol vehicle in the Brighton Park neighborhood of Chicago. (Dkt. 1, ¶ 9-10). Agent Charles Exum then shot a civilian, Defendant Martinez, five times. (Dkt. 1, ¶ 15)[1]. What followed was a prosecution marked by the government's press release and social-media campaign announcing that it had apprehended a dangerous felon and "terrorist" who "rammed" federal agents with her car[2]—followed by a stark reversal in which it completely abandoned the case it once touted. (Dkt. Nos. 69, 70). But testimony in this case and the government's brief in a related case— before the United States Supreme Court—expose material factual discrepancies in the government's words and conduct here. Now that this case has been dismissed and the initial sufficiency of the government's evidence against Defendant Martinez has been called into question, the government objects to the release of body-worn camera footage, photographs, and text messages that were either central to an open court hearing or that the government claimed corroborated its version of the facts. (Dkt. No. 1 ¶ 15, 16).

As the public's eyes and ears, the Media Parties have a right and a responsibility to explore the *bona fides* of Operation Midway Blitz. The government promoted Operation Midway Blitz as a legitimate public service initiative to take foreign criminals[3] off the streets, but when the public, through the press, seeks to examine why the government has abandoned so many of its

---

[1] The Complaint refers to Agent Exum as BPA 1, but Agent Exum has since testified about the shooting at an evidentiary hearing. *See* Ex. A, Transcript of Proceedings, Nov. 5, 2025, 42:18-43:1.

[2] *See* Group Ex. B, *Press* Release, DHS, UPDATE: DHS Deploys Special Operations After Multiple Violent Attacks on Federal Law Enforcement by Domestic Terrorists in Chicago (Oct. 4, 2025) ("This morning, Border Patrol law enforcement officers were ambushed by domestic terrorists that rammed federal agents with their vehicles."); @TriciaOhio, X (Oct. 4, 2025) ("This morning, during routine patrolling in Broadview, in the same area of Chicago that law enforcement were assaulted yesterday, our brave law enforcement officers were rammed by vehicles and boxed in by 10 cars."); Press Release, DHS, DHS Debunks Governor Pritzker's Harmful Lies About Operation Midway Blitz in Chicago, Federal Law Enforcement (Oct. 6, 2025) ("Over the weekend, Border Patrol law enforcement officers were ambushed by domestic terrorists that rammed federal agents with their vehicles.").

[3] *But see* Ex. C, Albert Sun, *Most Immigrants Arrested in City Crackdowns Have No Criminal Record*, NYT (Dec. 4, 2025).

Midway Blitz cases, why the actions of its high-ranking officers have been challenged by numerous judges in this district, and why its treatment of relevant evidence has been called into question, the government demands secrecy. Under these extraordinary circumstances, the press must be allowed to exercise its right to intervene in this criminal case for the purpose of obtaining the records that may shed further light on the government's actions.

## I.     THE REQUESTED MATERIALS ARE JUDICIAL RECORDS—NOT DISCOVERY

The government's opposition to Media Parties' motion to intervene is based largely on its contention that the Requested Materials are not judicial records (to which it concedes a right of access attaches), but merely unfiled discovery. (Resp. p. 8). That classification ignores the realities of this case, the history of Operation Midway Blitz, and the findings of constitutional improprieties in the execution of the operation by other courts in this district.

The government tries to limit the presumption of access to only those materials formally introduced into evidence, but it ignores the important context in which the materials were used in this case. For example, the government concedes that it attempted to bolster the affidavit it submitted to the Court to establish probable cause by claiming that BWC evidence corroborated its agent's testimony. (Resp. p. 2). Now, the government wants to prevent the disclosure of the very evidence it used to prosecute Defendants by relying on *Bond v. Utreras*, 585 F.3d 1061, 1075 (2009). But the government's reliance on *Bond* is misplaced.

In *Bond*, the intervenor sought access to discovery material submitted under a confidentiality order in a civil case that was settled before any of it became part of the public record. *Id.* at 1068 ("None of the discovery material—not that which was covered by the protective order nor any other discovery—ever found its way into the court file."). Because *Bond* settled before the court could consider any evidence, there was no need for the court to articulate

what constitutes a judicial record. Still, the Court indicated that the right of access would apply to more than just documents filed on the public docket. *Id.* (noting "Here, [Intervenor] is seeking access to discovery materials that have never been filed with the court *and have never influenced the outcome of a judicial proceeding*") (emphasis added). This is consistent with other Seventh Circuit rulings that certain materials do not need to be admitted as evidence or filed on the public docket to constitute a judicial record. *See Smith v. United States Dist. Ct. for Southern Dist.*, 956 F.2d 647, 650 (7th Cir. 1992) ("[W]hat transpires in the courtroom is public property."); *see also Carlson v. United States*, 837 F.3d 753, 760 (7th Cir. 2016) (distinguishing grand-jury transcripts and transcripts of criminal trials from "privately produced civil discovery that never makes it through the courthouse door" and finding that these materials do not need to be admitted into evidence to be considered judicial documents).

The government's reliance on *U.S. v. Wolfson*, 55 F.3d 58 (2nd Cir. 1995) also misses the mark. The Second Circuit in *Wolfson* held that there was no common law principle that documents reviewed *in camera* for the "sole purpose of confirming that they were properly withheld" were judicial records. *Id.* at 61. But that is not what happened here. In this case, the Court not only ruled that the text messages it reviewed should be turned over, but that they provided context to other texts that were read aloud and described in detail during an open court hearing.

That the requested materials in this case were either described at length in Special Agent Malone's affidavit, relied on by the Magistrate Judge in signing the Complaint, reviewed by this Court *in camera*, or argued about in open court distinguishes them from the materials at issue in *Bond* and establishes that they are judicial records rather than discovery. That the Court summarily entered a protective order that the government demanded as a condition to providing

relevant material to the Defendants is not dispositive of whether the information is properly withheld from public scrutiny. *PepsiCo v. Redmond*, 46 F.3d 29, 31 (7th Cir. 1995); *Citizens First Nat'l Bank v. Cincinnati Ins. Co.,* 178 F.3d 943 (7th Cir. 1999).

## II. INTERVENTION WAS TIMELY AND THE PROPER VEHICLE FOR SEEKING ACCESS

### A. The Press has standing to intervene to request modification of a protective order.

The government concedes that the Media Parties have a right to intervene in a criminal matter to seek access to judicial records (Resp. p. 6) but argues that the "the records sought by the Media Parties here are not judicial records" (Resp. p. 11). This puts the cart before the horse. The Press's right to intervene here is not contingent on whether the Court will eventually decide to grant access to all the requested materials. Instead, at this stage, the Court should consider the Media Parties' "right to be heard in a manner that gives full protection of the asserted right [of access]." *In re AP*, 162 F.3d 503, 507 (7th Cir. 1998).

The Seventh Circuit has acknowledged that intervention is the proper mechanism for seeking access in a criminal case. *See id.* (reversing the denial of the press's motion to intervene and explaining "[i]n this circuit, we have intimated that the most appropriate procedural mechanism by which to accomplish this task is by permitting those who oppose the suppression of the material to intervene for that limited purpose"). Moreover, the Seventh Circuit has established that the news media can intervene to challenge a protective order that governs the exchange of discovery. *Grove Fresh Distribs. v. Everfresh Juice Co.*, 24 F.3d 893, 898 (1994) (finding that "the press does have standing to challenge a protective order for abuse or impropriety."); *Bond*, 585 F.3d 1080 (recognizing that third parties can challenge a protective order for good cause "even where the order covers non-judicial records that fall outside of the public's common law right of access") (J. Tinder, concurring). Any reasons that the government may have for

5

objecting to modification of the order are insufficient to establish that the Motion to Intervene itself should be denied for lack of standing.

The Government also incorrectly claims that the Media Parties lack standing because they could have chosen to intervene at an earlier stage in the case "when the first and second motions for entry of protective orders were filed (October 7, and October 22)" or when "they saw that no BWC recordings were presented at the public evidentiary hearing conducted by the Court on November 5, 2025." (Resp. p. 12). This ignores that possible earlier points of interest do not establish the Media Parties' timeframe for intervening. Rather, "[o]nce the judge not only flags an issue as important but also sets a schedule for its resolution, the time has come to intervene." *United States v. Blagojevich*, 612, F.3d 558, 561 (7th Cir. 2010).

In *Blagojevich*, the district court denied the motion to intervene to challenge the sealing of juror names because the judge had already told jurors that their identities would be kept confidential until the end of the trial. On appeal, the Seventh Circuit noted that, while the press was aware of the judge's comments about possibly deferring the release of juror names, "people need not intervene in response to musings." *Id.* However, once a party receives notice that "the court will hold a hearing to address a particular question, they must participate rather than wait and see what the court does." *Id.*

Here, the first protective order was filed on October 7, 2025 (Dkt. 2) and entered the same day (Dkt. 20). The motion for the second protective order and subsequent entry is not even available to the public on Pacer. There was no schedule or hearing on the issue that would govern the timeliness of a motion to intervene. Instead, the time to intervene was when the government abruptly moved to dismiss its case because a hearing would be held on the issue and, if granted, the protective order would allow for the destruction of the parties' materials. The

government announced its intention to dismiss the case on the morning of November 20, 2025, and the Court took up the Motion at a hearing just a few hours later. The Media Parties moved as quickly as possible to seek to intervene once a hearing was set. Although the Court declined to delay entry of the dismissal, it gave the Media Parties one day to file a written motion to intervene, and they did so in a timely fashion. Ex. D, Transcript of Proceedings, Nov. 20, 2025, 3:18-7:2. Given that the Media Parties made an oral motion to intervene prior to dismissal and the Court allowed the written motion to be submitted after the case was dismissed, the Court should reject the government's argument that the motion to intervene is moot. Resp. 12.[4]

**B. Good cause exists for modifying the protective order.**

The government contends that "there is a strong reason for leaving the protective order intact as public dissemination of the discovery materials reasonably could be expected to interfere with a separate but related ongoing criminal investigation." (Resp. 15). Yet, despite the government's promise to furnish more clarity in its response, it offers no additional details about the nature of this supposed other investigation. Ex. E., Transcript of Proceedings, Nov. 25, 2025, 20:16-19. It does not provide a declaration by a law enforcement officer confirming the existence of such an investigation and cites no authority to support the argument that it would affect the ability of the press to intervene and seek modification of the protective order in the present case.[5]

DHS also raised interference in its denial of the Washington Post's FOIA request for BWC footage. DHS' response there stated that the requests for ten body-worn camera videos were denied in full pursuant to several FOIA exemptions including 5 U.S.C. § 552 (b)(7)(A) for

---

[4] The Government misconstrues *Bond v. Utreras* in stating that, under the Seventh Circuit's decision in that case "the dismissal of the indictment with prejudice renders the Media Parties' claim of access to *unfiled* discovery not only untimely but moot." The *Bond* court held that an intervenor must establish independent standing to challenge a protective order after a case is dismissed—not that they may never intervene at this stage. *Bond*, 585 F.3d at 1071.
[5] Counsel for Martinez and Ruiz each stated that they were not aware of any new investigation involving either of their clients suggesting that, if another related matter is ongoing, the individual or individuals under investigation were not parties to this case.

records that could reasonably be expected to interfere with law enforcement proceedings. Ex. F, DHS Response to Washington Post FOIA Request. However, the government did not provide anything resembling the necessary justification for asserting this exemption. *See Libarov v. United States Immigr. ¶ Customs Enf't*, 138 F.4th 1010, 1018 (explaining that review of a FOIA exemption (b)(7)(A) usually involves assessing "the specificity of the agency's affidavit" describing how the release of documents could interfere with an ongoing investigation). And the government has not provided any explanation of the alleged interference here, or in the FOIA context.[6]

Even if the government had shown that there is a related investigation, the sudden argument that this case involves sensitive information that could compromise it is at odds with the government's repeated publicizing of its account of the incident at the core of this case through press releases, social media posts, and public statements. Simply put, the government is promulgating one version of events while refusing to disclose the videos, photographs and text messages that it maintains corroborate it—thereby depriving the public of the ability to judge independently what the government and the Defendants did here. The government cannot have it both ways.

The government argues that courts in the Seventh Circuit consider four factors when deciding whether good cause exists to modify protective orders. However, the only cited case for this test is *Heraeus Kulzer, GmbH v. Biomet, Inc.*, 881 F.3d 550 (7th Cir. 2018) which involves a *party's* request to modify the protective order. These *Heraeus Kulzer* factors take into consideration the nature of the protective order—which includes its scope and whether it was court imposed or stipulated to by the parties—because when a protective order is agreed to by

---

[6] The time necessary to challenge DHS's FOIA denial would jeopardize the newsworthiness of the materials sought.

the parties, the party seeking modification has a higher burden. *Romary Assocs. v. Kibbi, LLC*, 2012 U.S. Dist. LEXIS 1757 (N.D. Ill. Jan. 6, 2012). Here, the intervenors are third parties that did not agree to the protective order and are challenging it on the basis that it is being improperly used to restrict access to materials that were used to initiate and litigate the case. In their opening brief, Media Parties explained that the government's motion to dismiss, and the confidentiality order's guidance that information could be destroyed at the conclusion of the case, presented a significant change in circumstances necessitating the modification of the protective order. (Memo. 11.)

The government tells differing accounts of what led to this prosecution. Discrepancies appear across the initial complaint, Agent Exum's testimony, and, most recently, a case now before the United States Supreme Court. Indeed, the government made the "ramming" by, and subsequent shooting of Ms. Martinez a part of the record in a case now before the United States Supreme Court. *Donald J. Trump, President of the United States, et al. v. State of Illinois and City of Chicago*, No. 25A (U.S. Oct. 17, 2025) (regarding the President's authority to deploy National Guard troops in Illinois). Its characterization of the incident in its opening brief there materially departs from the description it presented here. For instance, in the National Guard case, the government stated that "[w]hen the federal officers exited their vehicle, one of the cars that had rammed into them drove directly at a Border Patrol agent, who drew *her* service weapon and fired at the driver." Ex. G, *Trump v. Illinois*, Application to Stay Order and Request for Immediate Administrative Stay (emphasis added). Yet, in this case, the government has repeatedly identified the shooter as a male. *See* Compl. ¶ 15. And, before the Supreme Court, the government continues to claim that Ms. Martinez "rammed" her car into the agent's vehicle despite the agent's admission in this case that this is not an accurate characterization of the

events. Ex. H, Transcript of Proceedings, Nov. 5, 2025, 77:9-15 ("Rammed wouldn't really be the—I may have used that, but it would be more like a hit. Ram to me is more of a head-on maneuver. So this was side to side. So I would describe it more of, I guess you'd say hit and not rammed.").

These differing accounts raise significant questions about the government's claims about this troubling incident where a civilian was shot multiple times by a federal agent, charged with a felony and then saw those charges dismissed in a matter of weeks. The discrepancies in the government's various accounts coupled with questions raised by other judges about its conduct in a wide array of other cases arising out of immigration enforcement are cause for concern.

After observing that the government had abandoned a number of cases that it had represented to him were prosecution-worthy—and that another judge in this district had determined that "DHS sworn declarations are unreliable, that the candor of its agents is open to question, and that sworn testimony of its CBP chief contained knowing falsehoods"—Judge Fuentes recently modified the protective order in *U.S. v. Briggs,* so that "[v]iewers of the available videos may reach their own conclusions about it and about this prosecution." Ex. I, *United States of America v. Briggs*, 25-CR-610, Memorandum Opinion and Order at 5.

Judge Fuentes' rationale, in and of itself, supports modification of the protective order in this case. As does the government's own assertion that the Requested Materials corroborate its often-changing description of events. Likewise, its acknowledgement that the agent's text messages are pertinent to issues raised during public Court hearings. There is more than good cause to make this information public.

## CONCLUSION

For these reasons, ABC News d/b/a American Broadcast Companies, Inc.[7], the Washington Post, the Chicago Tribune, the Chicago Sun-Times, and WBEZ respectfully request that the Court grant them leave to intervene and grant them access to all BWC footage, photographs and text messages relied on in bringing and/or dismissing charges against the Defendants, reviewed by the Court or identified in testimony before the Court in this matter.


Dated: December 11, 2025                            Respectfully submitted,

                                                    By: /s/ Steven P. Mandell

                                                    Attorneys for Media Parties


Steven P. Mandell (ARDC 6183729)
smandell@mandellpc.com
Brian D. Saucier (ARDC 6226006)
bsaucier@mandellpc.com
Julia P. Dacy (ARDC 6351557)
jdacy@mandellpc.com
MANDELL P.C.
One North Franklin, Suite 900
Chicago, IL 60606
312-801-6337

---

[7] The Media Parties inadvertently omitted that ABC News is a d/b/a of American Broadcasting Companies, Inc. from their opening brief and apologize for the oversight.

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that a copy of the foregoing document has been served on December 11, 2025 via the Court's CM/ECF system on all counsel of record who have consented to electronic service.

/s/ Steven P. Mandell