IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 25 CR 636 |
| | ) | |
| v. | ) | |
| | ) | |
| MARIMAR MARTINEZ and | ) | |
| ANTHONY IAN SANTOS RUIZ, | ) | Chicago, Illinois |
| | ) | December 19, 2025 |
| Defendants. | ) | 9:00 a.m. |

TRANSCRIPT OF PROCEEDINGS - TELEPHONIC HEARING AND RULING
BEFORE THE HONORABLE GEORGIA N. ALEXAKIS

APPEARANCES (Telephonically):

For the Government:        HON. ANDREW S. BOUTROS
                           UNITED STATES ATTORNEY
                           BY:  MR. RONALD L. DeWALD, JR.
                                MR. AARON R. BOND
                           Assistant United States Attorneys
                           219 S. Dearborn Street, Suite 500
                           Chicago, Illinois  60604

For Defendant Martinez:    CHERONIS & PARENTE, LLC
                           BY:  MR. CHRISTOPHER PARENTE
                           140 S. Dearborn Street, Suite 404
                           Chicago, Illinois  60603

For Defendant Santos Ruiz: FEDERAL DEFENDER PROGRAM
                           BY:  MR. BENJAMIN HORWITZ
                           55 E. Monroe Street, Suite 2800
                           Chicago, Illinois  60603

For Intervenors ABC News,  MANDELL P.C.
Washington Post, Chicago   BY:  MR. STEVEN P. MANDELL
Tribune, Chicago Sun-Times,One N. Franklin Street, Suite 900
and WBEZ:                  Chicago, Illinois  60606

APPEARANCES (Continued):

For Intervenor                BARON HARRIS HEALEY
CBS Broadcasting, Inc.:       BY:  MR. BRENDAN J. HEALEY
                              150 S. Wacker Drive, Suite 2400
                              Chicago, Illinois   60606

Court Reporter:               COLLEEN M. CONWAY, CSR, RMR, CRR
                              Official Court Reporter
                              219 S. Dearborn Street, Room 1918
                              Chicago, Illinois   60604
                              (312) 435-5594
                              *colleen_conway@ilnd.uscourts.gov*

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard via teleconference:)

THE CLERK:  25 CR 636, U.S.A. versus Martinez, et al.

THE COURT:  Good morning, everyone.  This is Judge Alexakis.

Why don't we start with appearances from the government.

MR. DeWALD:  Good morning, Your Honor.  Ron DeWald and Aaron Bond on behalf of the United States.

THE COURT:  Good morning.  And then who do we have for Ms. Martinez?

MR. PARENTE:  Good morning, Your Honor.  Chris Parente.

THE COURT:  Good morning, Mr. Parente.

Do we have anyone for Defendant Ruiz?

MR. HORWITZ:  Good morning, Judge.  Ben Horwitz of the Federal Defender Program.

THE COURT:  Good morning, Mr. Horwitz.

And then who do we have for the intervenors through the proposed intervenor?

MR. MANDELL:  Good morning, Your Honor.  Steve Mandell on behalf of ABC News, Washington Post, Chicago Tribune, Chicago Sun-Times, and WBEZ.

MR. HEALEY:  And good morning, Your Honor.  Brendan Healey on behalf of CBS Broadcasting, Inc.

THE COURT:  Good morning, Mr. Mandell.  Good morning,

Mr. Healey.

I have a cold, so I apologize in advance for the coughing that I will be doing over the next several minutes.

But we are here on a motion to intervene that has been filed by a number of press organizations for purposes of modifying the protective order and gaining immediate access to evidence in this case, including video footage and photographs.

I have reviewed everything that was filed, and I am prepared to rule on the motion, without hearing argument, and prepared to do that orally today.

(Court coughs.)

THE COURT: Excuse me.

So various members of the press have moved to intervene to modify the parties' agreed-upon protective order and to gain immediate access to certain material.

Defendant Martinez previously expressed that she did not oppose the motion. Defendant Ruiz took no position on the motion. The government has opposed it.

I have reviewed the intervenors' filings, the government's response, and the pertinent legal authority, and I am going to deny the motions to intervene.

First, I need to address the timing of the intervention motions, as that bears on the issue of Article III standing.

Here's the pertinent language from *Bond v. Utreras*,

U-t-r-e-r-a-s, 585 F.3d 1061, pincite 1072, a Seventh Circuit case from 2009.

*Bond* reads: "When a third party seeks intervention ... for the purpose of challenging a protective order in a case or controversy that is no longer live -- as when the case has been dismissed and none of the original parties have sought this relief postjudgment -- the intervenor must meet the standing requirements of Article III..."

And there are good reasons for this rule. *Bond* explained -- and this is at pincite 1071 -- "Intervention to challenge a protective order after a case has been dismissed interferes ... fundamentally. It revives a concluded case for the purpose of entertaining an outsider's claim of interest in the proceeds of the parties' discovery process."

Here, the indictment has been dismissed. It has been dismissed with prejudice. The matter is closed. There is no live case or controversy. And so the press must establish Article III standing before it can be permitted to intervene.

And that bottom-line Article III requirement doesn't change if I consider that Mr. Mandell, who's the attorney for many of the press organizations here, orally moved to intervene just moments before I granted the government's motion to dismiss the indictment at a late-afternoon hearing on November 20th. Nor does it change if I consider that Mr. Mandell asked me at that November 20th hearing to delay acting on the

government's motion to dismiss so that he could intervene before the matter was formally terminated.

The 4:00 p.m. hearing on November 20th had been on my calendar for at least 48 hours. I scheduled it on November 18th so that the parties could discuss next steps in pretrial proceedings. Then, early on the morning of November 20th, the government filed its motion to dismiss the indictment. Logically, I took up the motion to dismiss at the hearing that had already been scheduled for later that same day. The transcript from that hearing reflects that the parties were eager to put this matter to rest. They did not want me to delay the proceedings in any way to accommodate a last-minute intervention motion.

The parties' wishes aside, my authority to do anything other than grant the government's motion to dismiss is, and was, incredibly circumscribed. I had been presented with a motion to dismiss an indictment pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure. Under Rule 48(a), the government may dismiss an indictment with leave of court, but this only affords a court discretion -- and here, I'll quote from a Seventh Circuit case -- "to protect a defendant from the government harassing him or her by repeatedly filing charges and then dismissing them before they are adjudicated." And that quoted language comes from *In Re: United States*, 345 F.3d 450, pincite 452 and 453, a Seventh Circuit case from 2003.

There was no pattern of harassment here.  This was the first instance of an indictment against Ms. Martinez and Mr. Ruiz.  And, as became clear at the hearing, the government had agreed that the dismissal would be with prejudice.  The finality of the dismissal underscores the lack of risk of harassment.

So, for all intents and purposes, once the government filed its motion to dismiss under Rule 48(a) on the morning of November 20th, there was no live case or controversy from that point forward.

Nearly this exact scenario played out in the *Bond* case.  There, plaintiff and defendant settled their dispute, and the case was on the precipice of dismissal with prejudice when a journalist filed an intervention motion.  The Seventh Circuit found that:  "At that point, and certainly thereafter, when the case was in fact dismissed, a live Article III case or controversy between the parties no longer existed."  And the language that I just read is a quote from *Bond*.  Pincite is 1072.

The journalist was, therefore, required in *Bond* to independently establish his standing before being permitted to intervene.

Of course, much of what I have said so far assumes that the press had no reason to try to intervene until the government filed its motion to dismiss the morning of November

20th. But in light of the arguments the press has advanced in their motions to intervene, the record does not support that determination. Instead, the record supports a determination that the press could have acted much sooner than it did.

The press tells me that it is interested in the body-worn camera footage referenced in the criminal complaint. But if that's the case, they could have moved to intervene anytime after Magistrate Judge McShain signed that criminal complaint on October 5th, 2025.

As another example: The press tells me it is interested in Agent Exum's text messages. It could have moved to intervene after those text messages were featured during the November 5th, 2025 hearing on defendant's motion regarding the destruction of evidence.

The press tells me that they are interested in materials that I reviewed *in camera*. It could have moved to intervene after I publicly stated on November 5th, 2025 that I would be reviewing materials *in camera*. Or, it could have moved to intervene after I conducted the *in camera* inspection on November 17th, 2025, a date contemporaneously reflected on the docket.

Perhaps the press would argue that its interest in the evidence was not piqued until the government moved to dismiss this case, as this decision fit with the government's purported -- and here, I'll quote directly from the press'

motion, docket 77 at 1 -- the government's purported "recent practice of detaining and charging members of the public without sufficient evidence to secure a conviction."  But during the October 6th detention hearing in this matter, defense counsel for Ms. Martinez detailed the purported disparity between the government's narrative and the body-worn camera footage.

Mr. Parente told Magistrate Judge McShain at that time:  "What you are hearing from the government -- and the government is not batting anywhere near a thousand in accuracy on their description of these kinds of cases in the district. It is not correct what they have said ... The video does not support what is being said."  And the transcript with Mr. Parente's comments is at docket 33 at pages 9 and 10.

Certainly, then the press could have moved to intervene, so that it might investigate itself whether the government was, in the press' words, "seemingly leveling charges that it could not prove."  And that language is taken from docket 77 at page 1.

Indeed, the materials in front of me show that the press knew it was interested in this case well before November 20th, 2025.  It made a FOIA request at some point before October 29th, 2025.  And that's reflected at docket 92-5.

As the Seventh Circuit held in *United States v. Blagojevich*, 612 F.3d 558, pincite 561, a 2010 case:  "Once the

judge not only flags an issue as important but also sets a schedule for its resolution, the time has come to intervene. People potentially affected by the decision can't sit on the sidelines, as if intervention were a petition for rehearing."

And here, the press "sat on the sidelines" until the case was over. So, as in *Bond*, it must establish its standing under Article III before being permitted to intervene.

So then I turn to the issue of whether the press has established standing to intervene.

It is a well-recognized federal common-law right of access to judicial records and documents, and that right is recognized in several Seventh Circuit cases. For purposes of today, I'll cite to *Smith v. United States District Court for the Southern District of Illinois*, 956 F.2d 647, pincite 649, (7th Circuit 1992).

The "general right of public access to judicial records is enough to give members of the public standing to attack a protective order that seals this information from public inspection," and that language is taken from *Bond*, 585 F.3d at 1074.

So the press here would have standing to intervene for purposes of asserting its right to access judicial records.

So then that leads to the question of what constitutes a judicial record and whether the press here is seeking judicial records.

I am going to read off a number of definitions of "judicial record" as set forth by the Seventh Circuit.

In *In Re: Cendant Corporation*, 260 F.3d 183, 192 (2001), "judicial record" was defined as records that "have been filed with the court, or otherwise somehow incorporated or integrated into a district court's adjudicatory proceedings."

That was a Seventh Circuit. I apologize. But that *In Re: Cendant* case -- give me one moment, folks.

(Pause.)

THE COURT: I'm sorry. I said Seventh Circuit. The *In Re: Cendant* case is actually from the Third Circuit.

Although several of the definitions I am about to give are from the Seventh Circuit, the Third Circuit's definition of "judicial records" in *In Re: Cendant* is consistent with how the Seventh Circuit has defined the term.

But going back to *In Re: Cendant*. It says: "While filing clearly establishes such status," meaning status as a "judicial record," the case goes on to say, "a document may still be construed as a judicial record, absent filing, if a court interprets or enforces the terms of that document, or requires that it be submitted to the court under seal."

And then from the Seventh Circuit case *City of Greenville*, 764 F.3d 695, pincite 697, a 2014 case, "judicial records" are defined as documents that have "affected judicial decisions."

And then *Greenville* goes on to say: "Public access depends on whether a document influenced or underpinned the judicial decision. The fact of filing may support an inference of influence. It suggests at least that the document was at the judge's fingertips, but not always." And then it goes on to say that: "The public has no right to access documents which cannot conceivably aid the understanding of judicial decisionmaking."

In *Bond*, the Seventh Circuit claimed that: A judicial record does not include "materials produced during discovery but not filed with the court." And that principle from *Bond* is repeated in *Carlson v. United States*, 837 F.3d 753, pincite 760, a Seventh Circuit case from 2016, standing for the proposition that: A nonparty does not have the right to intervene to seek documents that are never filed with the court.

And so with those definitions in mind, I will now discuss each item that the press has requested and determine whether it constitutes a judicial record.

Starting with the body-worn camera footage.

The press claims that the body-worn camera footage is a judicial record for two reasons, because it was "central to Magistrate Judge McShain's decision to sign the Complaint," and because defense counsel described the footage "in detail ... and offered to enter it on the public docket." And I'm quoting

from docket 77 at page 9.

There is no evidence in the record that the body-worn camera footage was ever filed or played in court, or that the BWC was considered by Magistrate Judge McShain before she approved the criminal complaint. If anything, the record reflects the opposite.

I've reviewed the transcript from the detention hearing over which Judge McShain presided. The relevant part appears at docket 33, at page 9, lines 23 through 25, and at page 10, lines 1 through 25. There, Mr. Parente describes the BWC for Judge McShain. He offers to show it to her if she wanted to see it. He said: "I thought the government might show it to you."

Nothing in that transcript reflects that the video has been played for Judge McShain. And the very nature of Mr. Parente's statements strongly suggests that it had never been played for Judge McShain.

The body-worn camera footage has never been played for me.

Certainly, the affidavit supporting the criminal complaint that Judge McShain approved describes the BWC footage, but the complaint and the supporting affidavit are already accessible to the public. And Mr. Parente's descriptions of the BWC footage, which he offered at that detention hearing and in other public proceedings, are also

accessible to the public.

The press has pointed me to *Smith*, the citation for which I've already provided. And in *Smith*, the Seventh Circuit wrote that: Judicial records subject to public access include "materials on which a court relies in determining the litigants' substantive rights."

But, again, there's nothing in the record to support the conclusion that the BWC footage was used by Judge McShain to determine the defendants' substantive rights.

And, again, I did not rely on BWC footage to make any substantive rights determinations.

And so, under the relevant definitions of the term "judicial record," the BWC footage is simply not a judicial record.

The press also seeks photographs. There are photographs in the public affidavit supporting the criminal complaint, but no other photographs have been filed or displayed in the proceedings before me. I have not reviewed photographs beyond those in the public affidavit.

There is nothing in the record to reflect that Judge McShain reviewed photographs either; again, other than those in the public affidavit.

And so there are no photographs that constitute "judicial records."

I turn now to the text messages that I reviewed *in*

*camera*.

The press seeks text messages that were sent and received by Agent Exum.

Some portion of those text messages were used in public proceedings and displayed in open court.

There are other text messages sent and received by Agent Exum that were produced in discovery and are subject to the protective order.

And then there are other text messages sent and received by Agent Exum that are in the government's possession and that are in my possession, but which were not produced in discovery.

I reviewed the text messages *in camera* to resolve a discovery dispute among the parties. I did not rely on the text messages to make any non-discovery-related decisions.

There is a difference between material produced for the Court's *in camera* review (for example, privileged materials, trade secrets, et cetera) and material filed with motions that require judicial resolution of the merits. The latter is subject to the common-law right of access. The former is not.

And that principle comes, again, from *Bond*, 585 F.3d at 1075, footnote 8. It reads: "The public does not acquire a right to access discovery material just because a judge might review it *in camera* in the course of discovery proceedings."

So the text messages, other than those that were already used in public proceedings, are not judicial records.

Then there's the category of "other evidence."

And the press broadly gestures to "other evidence" that was submitted to the Court, that the Court relied upon, or that was discussed in court.

And the press explains this request in varying ways. It says, for example, it seeks "other evidence ... otherwise addressed in open court during the pendency of the case."

Or it seeks "other material on which the government relied to induce the assigned Magistrate Judge to sign the Complaint."

Or it asked for "other material ... that any of the parties may have used to influence this Court in rendering its decision to grant the government's motion to dismiss or any other decision."

So I only engaged in two *ex parte* proceedings not already -- no, I only engaged in two *ex parte* proceedings. One was my *in camera* review of the text messages, which, as discussed, do not constitute a judicial record.

The other *ex parte* proceeding was my review of the search warrant application, which was previously under seal, but should no longer be under seal, and I directed that that search warrant application and the related materials be unsealed. I entered that order yesterday. I believe that

order has already been acted upon.

In rendering a decision on that search warrant, I only relied upon the information that was presented in the affidavit attached to the warrant itself. And so those judicial records are already accessible to the public.

At bottom, none of the items sought by the press constitute judicial records that are not already accessible by the public, and, as a result, the press has suffered no injury to a legally-protected interest and, therefore, lacks standing to intervene.

I also want to address the First Amendment as an alternative basis for standing.

I have determined that the press' standing cannot be grounded in the First Amendment. The press is perhaps attempting to pursue a First Amendment "right to receive" claim, where it argues that its right to receive and disseminate the information is hampered by the protective order. And that kind of claim is articulated in *Bond*.

But to maintain such a claim, the intervenor "must clearly establish the existence of 'a willing speaker.'" That's at pincite 1078 in *Bond*.

And *Bond* goes on to say: "A willing speaker is a party who would, but for the protective order, provide the intervenor with the information it seeks. And if the intervenor doesn't point to a willing speaker, it doesn't have

standing."

Here, the litigants have voluntarily found themselves to keep certain discovery confidential, and they have not sought relief from the requirements of the protective order. There is no motion from either defendant seeking to modify the protective order. Therefore, there is no willing speaker on which to premise a First Amendment "right to receive" claim.

And so, for all of these reasons, I conclude that the press does not have standing to intervene in this matter. And the motions to intervene that appear at dockets 73 and 86 are, therefore, denied.

Is there anything further that we need to discuss at this time? I'll start with the government.

MR. DeWALD: Not from the government, Your Honor. Thank you.

THE COURT: Mr. Parente?

MR. PARENTE: Nothing, Your Honor.

THE COURT: Mr. Horwitz?

MR. HORWITZ: No, Judge. Thank you.

THE COURT: Mr. Mandell?

MR. MANDELL: Well, Your Honor, obviously, you've put a lot of effort into this, and you've relied heavily on *Bond*. Would you permit me just to address *Bond* and why we believe it's distinguishable in this case?

THE COURT: I have read your filings, Mr. Mandell.

MR. MANDELL: But the one major distinction in *Bond* is that -- first of all, the Seventh Circuit found that it was purely private discovery, which the body-cam footage is not. It was relied extensively on the affidavit.

And then, secondly, Mr. Parente, during the November 25th hearing, although he didn't move to modify the protective order, he specifically said that the information should be released to correct the record, referring to what he believed to be some misstatements by the government. And the Court asked him: So Ms. Martinez's position is that you don't oppose the motion? And he said he did not.

But I think there is a willing speaker here. I think there is a controversy here. The fact that the Court at a status hearing set for November 20th, and then the same day that the government filed its motion dismissing the case, I think it would be unfair and set a bad precedent to allow the government to preempt any kind of intervention.

And then, finally, one thing that the Court, I don't believe, has addressed is the cloud, I think *Bond*, the concurring opinion recognized that the press has a right to come in to seek modification of a protective order, especially when there's some assertions that it's used for an improper purpose.

Numerous judges in this district, Judge Perry, Judge Fuentes, Judge Ellis, have called into question the

government's conduct in this Operation Midway Blitz, and that in and of itself, I think, provides a controversy sufficient for the Court to modify the protective order.  So --

THE COURT:  So, Mr. --

MR. MANDELL:  -- I know you've --

THE COURT:  So, Mr. Mandell, yeah, I have hewed to the definition of "judicial record."  Okay?  And --

MR. MANDELL:  Yes.

THE COURT:  -- the opinion that you pointed me to from Judge Fuentes does not engage in any of that analysis.  You cited no opinion or reasoning from Judge Ellis, and you cited no opinion or reasoning from Judge Perry.

Even if any of those judges engaged in a different analysis of what constitutes a judicial record, one, their legal conclusion as to what constitutes a judicial record is not binding on me; and, two, that is a context-specific determination.  It is an application of a legal definition to a particular context, particular judicial decisions that were made in this particular case.

And so what Judge Ellis may have done or what Judge Perry may have done or what Judge Fuentes may have done in light of the decisionmaking that was done in these other cases does not control the definition of what constitutes a judicial record in this case.

And then with respect to Ms. Martinez's non-opposition

of the press' intervention motion.

I don't have a motion to modify the protective order in front of me from Mr. Parente. If Mr. Parente wants to file that motion, there is, as you know, Mr. Mandell, a separate analysis that I would undertake as to whether a protective order that a party, who is bound by the protective order, would enter into, whether that protective order can be retroactively modified. But I don't have that motion in front of me.

And so I disagree with your characterization of Ms. Martinez as a willing speaker, because there has been no motion on behalf of Ms. Martinez to modify the protective order.

Again, if Mr. Parente wants to file that motion, I will consider that motion. But until I have that motion, I can't agree with your characterization on the idea that I have a speaker here who is willing to speak, but is bound by a protective order, when that same speaker has not taken steps to relieve themselves of the obligations of that protective order.

Mr. Healey --

MR. MANDELL: So --

THE COURT: -- anything you want to add?

Mr. Mandell, I have another matter. I assure you that I have given your motion careful attention.

MR. MANDELL: Right, Your Honor --

THE COURT: Mr. Healey --

MR. MANDELL: -- but can I speak --

THE COURT:  -- is there any -- Mr. Healey, is there anything that you would like to add?

MR. HEALEY:  I have nothing to add, Your Honor.

THE COURT:  Okay.  All right.  Thank you, everyone.

MR. MANDELL:  Thank you, Your Honor.

MR. HEALEY:  Thank you, Your Honor.

(Proceedings concluded at 9:29 a.m.)

*     *     *     *     *

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

*/s/ Colleen M. Conway, CSR, RMR, CRR*          *12/19/2025*

Official Court Reporter                    Date
United States District Court
Northern District of Illinois
Eastern Division