IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 25 CR 636-1 and 2 |
| | ) | |
| v. | ) | |
| | ) | |
| MARIMAR MARTINEZ and ANTHONY IAN SANTOS RUIZ, | ) | Chicago, Illinois |
| | ) | February 6, 2026 |
| Defendants | ) | 9:30 a.m. |

TRANSCRIPT OF PROCEEDINGS - MOTION
BEFORE THE HONORABLE GEORGIA N. ALEXAKIS

APPEARANCES:

| | |
|---|---|
| For the Government: | HON. ANDREW S. BOUTROS<br>UNITED STATES ATTORNEY<br>BY: MR. RONALD DE WALD<br>MR. AARON BOND<br>Assistant United States Attorney<br>219 S. Dearborn Street, 5th Floor<br>Chicago, Illinois 60604 |
| For Defendant Martinez: | CHERONIS & PARENTE LLC<br>BY: MR. CHRISTOPHER V. PARENTE<br>MR. DAMON M. CHERONIS<br>140 South Dearborn Street, Suite 404<br>Chicago, Illinois 60603 |
| | GALLAGHER LAW OFFICES, LLC<br>BY: MR. MICHAEL L. GALLAGHER<br>161 North Clark Street, Suite 2060<br>Chicago, Illinois 60601 |
| For Defendant Ruiz: | FEDERAL DEFENDER PROGRAM<br>BY: MR. BENJAMIN HORWITZ<br>55 East Monroe Street, Suite 2800<br>Chicago, Illinois 60603 |

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

Court Reporter: JENNIFER COSTALES, CRR, RMR, CRC
Official Court Reporter
219 S. Dearborn Street, Room 1714
Chicago, Illinois 60604
(312) 435-5895
jenny.uscra@yahoo.com

(Proceedings heard in open court:)

THE COURTROOM DEPUTY: 25 CR 636, USA versus Martinez.

THE COURT: Good morning, everyone. Why don't we start with appearances from the government.

MR. DE WALD: Good morning, Your Honor. Ron DeWald and Aaron Bond on behalf of the United States.

Your Honor, Mr. Bond has a suppression hearing in a different courtroom at 10:00 a.m. So if we go long, he may need to leave, and we express no disrespect.

THE COURT: I understand. I was actually going to say that, Mr. Bond.

MR. BOND: Thank you.

THE COURT: I know that you have that suppression hearing. I don't know how long we'll go, but yes, no disrespect if you just walk right out of the courtroom.

All right. And appearances for Ms. Martinez.

MR. PARENTE: Thank you, Your Honor. Chris Parente, Mike Gallagher and Damon Cheronis for Miramar Martinez, who is to my left.

THE COURT: And then for Mr. Ruiz.

MR. HORWITZ: Good morning, Judge. Ben Horwitz of the Federal Defender Program on behalf of Mr. Ruiz.

THE COURT: Good morning, everyone.

We are here on a motion to modify the protective

order that's been filed by Ms. Martinez. I've reviewed the parties filings. I appreciate how quickly everyone was able to respond to the short deadlines that I gave.

I'll note that the government has agreed to modify the protective order in significant respects. But that's not the end of the story, because the parties don't see eye to eye on everything that Ms. Martinez says she should be free to disseminate.

And as a more fundamental predicate matter, the government also has taken the position that I've been divested of authority, of jurisdiction to rule on the motion because of the pending appeal brought by the media entities, whose motion to intervene I previously denied.

And so before we can talk about the merits of the motion, I need to address the jurisdictional issue first. If I lack authority to rule on the motion, as the government maintains, then I cannot grant Ms. Martinez the relief that she seeks.

So let's talk about that analysis. "The filing of a notice of appeal does not automatically divest a district court's jurisdiction in all respects." And that language comes from *Intl FCStone Financial Inc. v. Jacobson*, 950 F.3d 491, pincite 502, a Seventh Circuit case from 2020.

Rather, it "divests the district court of its control over those aspects of the case involved in the appeal." And

that language comes from *Griggs*, 459 US 56, pincite 58, Supreme Court case from 1982.

As a result, a district court may continue to exercise jurisdiction over the underlying case so long as "there is no concurrent exercise of power on the same subject and little overlap of issues." And that language comes from *Apostol*, 870 F.2d 1335, pincite 1338, a Seventh Circuit case from 1989.

Put another way, I can continue to exercise jurisdiction where, as between the pending appeal and the pending motion in the district court, quote, "the subjects are distinct." And that last phrase also comes from the *Apostol* matter.

So here there is a notice of appeal pending. The question then is whether that notice has divested me of the authority to decide the dispute before me.

The scope of the dispute has been substantially narrowed by the parties. Here are the questions I would need to address to resolve what remains of Ms. Martinez's motion:

One, whether certain text messages exchanged between Agent Charles Exum and family members and between Agent Exum and coworkers bear on Ms. Martinez's ability to counter the government's narrative of who Ms. Martinez is and what happened on October 4, 2025, and therefore whether Ms. Martinez has demonstrated good cause to warrant lifting

the protective order as to those text messages.

Two, whether certain still images from Flock and LPR cameras would, if publicly disseminated, harm law enforcement interests, and if so, whether Ms. Martinez has demonstrated good cause to overcome this harm.

As for the pending appeal, the notice of appeal has been taken from my denial of a motion to intervene that was filed by several media entities.

That motion asked me to resolve the following three questions, and so these are the questions that would be implicated by the pending appeal:

One, whether the media parties had standing to intervene, an issue that involved questions regarding the timeliness of the intervention motion;

Two, whether certain items of evidence "referenced in public proceedings and/or submitted to the Court" are "public records to which rights of public access attach," or more simply put, whether particular pieces of evidence constituted judicial records; and

Three, whether I should have exercised my discretion to find that good cause existed to modify the protective order to allow the media access to the protected materials, given "the public's need for information" in light of government conduct in this case and others, despite the fact that no party bound to the protective order was seeking modification

of the order at that time.

When I put these lists of questions side by side, I conclude that the appeal from the denial of the intervention motion and the current motion to modify the protective order present distinct issues.

I already made that point during the December 2025 hearing when I denied the media's motion to intervene. I said, "I don't have a motion to modify the protective order in front of me from Mr. Parente. If Mr. Parente wants to file that motion, there is a separate analysis that I would undertake as to whether a protective order can be retroactively modified. But I don't have that motion in front of me."

Now I do. And to resolve it, I do not have to consider whether the media had standing to intervene when it tried to do so. I do not have to consider whether the evidence the media sought and still seeks constitutes judicial records. And I do not have to consider whether in light of public policy I should have sua sponte modified a protective order to advance the public's right to know over the wishes of litigants who had agreed to be bound by the order and who at that earlier point in time had expressed no interest in being released from those obligations.

Indeed, Ms. Martinez's motion does not present these "policy considerations." In light of the government's

substantial concessions, it involves only legal questions, specifically a determination of "good cause" as to two buckets of evidence. So I don't understand the government's argument that if I act on Ms. Martinez's motion, I would be, quote, "getting in front of the policy choice that the Court of Appeals will inevitably be making."

Yes, both the motion to intervene and the motion to modify have the protective order in their sights. But that link is not enough to divest me of jurisdiction.

The Seventh Circuit has explained that where an appeal is taken from an interlocutory decision, like an appeal of a preliminary injunction or an appeal from an order rejecting a claim of official immunity, the district court may still, quote, "finish its work and render a final decision." That language comes from *Wisconsin Mutual v. United States*, 441 F.3d 502, pincite 504, a Seventh Circuit case from 2006.

"Finishing the work" and rendering a final decision in that scenario means continuing to analyze the same legal and factual issues that the district court would have considered in determining that a moving party had demonstrated a likelihood of success on the merits and therefore warranted preliminary injunctive relief.

Similarly, where a case involves multiple litigants, the filing of an appeal by one litigant does not divest the district court of jurisdiction over the claims involving the

other litigants. That point is made in the same *Wisconsin Mutual* case I just cited. It's also made in *Doe v. City of Chicago*, 360 F.3d 667, pincite 673, a Seventh Circuit case from 2004.

So if the district courts in these other examples aren't divested of jurisdiction, then the circumstances described here are at least as sufficiently comparable to the ones presented here.

And with respect to the issue of mootness, meaning whether a decision today would moot the pending appeal, the parties both recognize, as have I, that even if I were to grant Ms. Martinez all the relief that she seeks, the pending appeal could very well still present a live dispute. As one example of how this could be, Ms. Martinez or the government could choose not to disclose any of the materials post modification of the order, or the parties could choose to disclose only certain materials and to certain press entities.

In any event, whether a decision by me on Ms. Martinez's motion could moot the ongoing appeal is not dispositive of whether I maintain jurisdiction over the questions now before me. In *Apostol*, 870 F.2d at 1338, the Seventh Circuit recognized that an appellate decision reversing the judgment on the merits "would affect or nullify the award of fees, but the subjects were distinct" and so the district court was not wholly divested of jurisdiction.

And, again, the Seventh Circuit has blessed the district court plowing forward with a case even after an appeal has been taken from an order granting a preliminary injunction. The district court in that scenario is not divested of jurisdiction, even if a subsequent grant of a motion to dismiss by the district court would moot the appeal pertaining to the preliminary injunction.

So for all of these reasons, I conclude that I maintain jurisdiction to decide Ms. Martinez's motion to modify the protective order.

Okay. So that takes us to the merits of the motion. And I want to first talk about the text messages and then I want to talk about the LPR and Flock images second.

On the text messages, I have one question. Is the universe of text messages limited to the text messages that I reviewed in camera?

MR. DE WALD: Yes, Your Honor.

THE COURT: Okay. There are no other text messages at issue?

MR. DE WALD: I don't believe so.

MR. PARENTE: I wasn't in the meeting, Judge. I don't know what you reviewed.

THE COURT: I want to make sure that when I am thinking of what the text messages convey I have a complete understanding of what the text messages are that would have

been produced.

MR. PARENTE: So my understanding, and the government obviously would know better, is I believe there is like a world of 220 text messages that were produced to us. I think about 180 were fully redacted. They gave us approximately 20 unredacted. And then after Agent Exum testified, my understanding is you reviewed the other 180 and then ruled that an additional 20 should be disclosed to us. So my universe is 40. But I don't know what's in the other 180.

MR. DE WALD: But these are the text messages that we presented to the Court and reviewed in camera.

THE COURT: Okay. So there isn't any other body of text messages that may have been produced under the protective order that I wouldn't have seen?

MR. DE WALD: Not to my knowledge.

THE COURT: Okay. All right. Okay. That's helpful.

So with respect to the text messages, here is what I'll say: So even after the indictment in this case was voluntarily dismissed by the government with prejudice, the Department of Homeland Security continues to allege that Ms. Martinez "ambushed" federal officers, "rammed" them with her vehicle, and while doing so "was armed with a semiautomatic weapon." And as we discussed at that last hearing, that claim was even echoed by Justice Alito in his dissent in *Trump v. Illinois*, 2025 WL 3715211, pincite star 4,

a December 23, 2025 decision.

These claims come on top of months of similar government messaging that is yet to be retracted or, at a minimum, coupled with a message that the government chose to drop the charges against Ms. Martinez.

That it ceded its opportunity to convict her in a court of law.

That she was presumed innocent as a defendant and now, because of how the government elected to exercise its prosecutorial discretion, she will never be found guilty of the charged offense.

Ms. Martinez argues that she has demonstrated good cause to warrant release of the text messages because the release of those messages will counter the government's public narrative of her and her actions.

I agree with Ms. Martinez.

Agent Exum's text messages provide insight into his perspective of the shooting. They bear on his credibility. They provide insight into how others within DHS leadership and within other government entities responded to the shooting. Having reviewed the text messages, I can see how they could be used to rebut the government's public version of events. I can also see, depending on the perspective of the reader, how they might also support the government's version of events. Either way, Ms. Martinez has demonstrated good cause for their

release.

The government's counter-arguments are unavailing. The government argues that the text messages are cumulative to what's been produced either through Agent Exum's testimony or FBI reports, which I presume to mean a reference to FBI 302s.

MR. DE WALD: Correct.

THE COURT: It's unclear from the government's argument whether the 302s capture the text messages through screenshots, verbatim transcripts or summaries of the messages. But summaries are not the same as seeing the text messages in their original form, especially for purposes of the nuanced task of judging credibility. And in any event, if the text messages are repetitive of already public information, then there can be no harm in disclosing them.

The government also argues that the text messages are irrelevant because they, quote, "contain statements of others who did not witness the incident that resulted in the criminal charges in this case."

The text messages are meaningful because they were either sent or received by Agent Exum. If a third-party communicated something to the agent regarding the incident, his response or lack thereof would be illuminative of his firsthand knowledge of and attitude towards the shooting. And, again, in any event, third-party messages provide necessary context for Agent Exum's messages. His messages

without that context can be in certain circumstances indecipherable. And we all know that to be true as evidenced by Agent Exum's struggle during the spoliation hearing to respond to questions about those text messages when presented with redacted versions of the exchanges.

The government also argues that Ms. Martinez, quote, "has not articulated how these text messages would or could have been introduced at trial." But it directs me to no case law standing for the proposition that a party can only show good cause for modification of a protective order if it establishes that the material in question is admissible under the Federal Rules of Evidence. Regardless, Agent Exum's messages are party opponent admissions as to Ms. Martinez. They are clearly relevant. They communicate his impression of the relevant events. They bear on his credibility. They have impeachment value. And the messages that he's being sent and to which he's responding could very well be admissible under a variety of theories: context, effect on listener, adoptive admission.

Finally, the government argues that the release of the messages would, quote, "serve only to further sully Agent Exum, his family and coworkers."

I understand the parties to be in agreement that names would be redacted other than Agent Exum's.

Am I right about that, Mr. Parente?

MR. PARENTE: Judge, hearing the ruling, again, I don't know if the government is going to appeal, and that might inform this, my suggestion -- I've tried to contact them. They're no longer responding to me -- my suggestion is that we get together over the weekend and come up with an agreed, to Your Honor's point, an agreed public release so that nobody's family members are in any way in danger, which Ms. Martinez knows full well how that feels, and we don't want to do that on that side.

So we are in full agreement, as long as they're willing to meet with us over the weekend, we can get together so we have an agreed universe of redactions and privacy interest and then the public can see what the public can see.

THE COURT: Mr. DeWald, is my memory correct that the wife's name has already been redacted?

MR. DE WALD: Yes, Your Honor.

THE COURT: Okay.

MR. DE WALD: In that though it indicates which text messages went to the wife -- his wife, excuse me. And there are -- I think there is other ones that name not by name but by relationship with the other family members.

THE COURT: Right.

MR. DE WALD: So that's what it is right now.

THE COURT: Right. And so I guess I will -- my ruling is premised on the idea that the parties will redact,

that the names of third parties will be redacted.

MR. DE WALD: Very well.

THE COURT: I see no reason why the public needs to know the specific name of the specific agent with whom Agent Exum is exchanging messages.

MR. PARENTE: Completely agree, Judge. And that's why I want agreement between the parties that we all agree that this is the version that's going to go public. That's fine. We have no interest in --

THE COURT: Whether you agree or not, that's my order. And so that would help avoid sullying, going to the sullying concern that the government has expressed, that redaction would help avoid sullying Agent Exum's coworkers and his relatives.

As to Agent Exum, in the abstract, I am not wholly unsympathetic to the concern, to the sullying concern as it applies to him. Here is what I struggle with. I don't understand why the United States government, after being given many, many opportunities to do so, has expressed zero concern about the sullying of Ms. Martinez's reputation. She's a United States citizen. She's a resident of this district. And under our legal system, it bears repeating, she is presumed innocent of any offense for which she has not been convicted.

So I am not persuaded by the sullying concern because

of that dichotomy, that discrepancy with which these two key players in this version of events are being treated by the government.

I'm also not persuaded by the sullying concern because of Agent Exum's testimony and demeanor during the spoliation hearing. He testified publicly that one feeling that comes through in those texts is a feeling of pride. He talked about pride in his shooting skills.

And so for those reasons I agree that the protective order should be modified to allow the disclosure of Agent Exum's text messages with the agreed-upon redactions to preserve the privacy of the third parties.

All right. So on to the Flock and LPR cameras. A couple of questions from me first. On the Flock still images, are the only still images ones involving Ms. Martinez?

MR. DE WALD: So, Your Honor, we have out of the universe of Flock, there is a smaller percentage that include the co-defendant. A much larger percentage includes Ms. Martinez. So these are photographs of their respective vehicles.

THE COURT: And is that --

MR. DE WALD: I'm sorry. Did you ask about Flock or LPRs?

THE COURT: Flock.

MR. DE WALD: Flock, yeah.

THE COURT: So the Flock images would capture Ms. Martinez's vehicle and Mr. Ruiz's vehicle?

MR. DE WALD: There are, and I'm going to -- the number is up near 300 images. And a smaller percentage are Mr. Ruiz's car for the previous 30 days. The larger percentage is Ms. Martinez' car for the previous 30 days. No Flock photograph shows both cars together.

THE COURT: And does any Flock photograph depict any vehicle other than Ms. -- well, is focused, I suppose I should say, is focused on any vehicle other than Ms. Martinez's or Mr. Ruiz's?

MR. DE WALD: Every single photograph includes at least one of their cars and in traffic. So there are other cars as well.

THE COURT: Okay. Mr. Horwitz, I know that you've previously represented that Mr. Ruiz takes no position on the motion. But because I did not realize that there were still images of his vehicle that were encompassed in the discovery, and in light of that, any ruling on my end that would permit the disclosure of the Flock images seem like they would implicate Mr. Ruiz's privacy interests. What is his position?

MR. HORWITZ: I haven't addressed that specifically, but I think our position remains the same, that we don't have an objection to however the Court would like to rule.

THE COURT: Okay. All right. And then on the Flock

cameras, these are cameras that are mounted in public, correct?

MR. DE WALD: Correct.

THE COURT: So if I wanted to find them, I could find them, correct?

MR. DE WALD: I believe so. I guess there is so much technology out at any given location that it would be hard to determine whether or not that's a Flock camera or something else, but --

THE COURT: But they're not concealed? Like I'm thinking of POD cameras that CPD uses, for example.

MR. DE WALD: But my understanding is POD cameras are the big box with the big blue lights and things like that. I don't believe that the Flock cameras are so marked.

THE COURT: But they're public?

MR. DE WALD: Correct.

THE COURT: They're not concealed behind a wall, for example?

MR. DE WALD: That's my understanding, yes.

THE COURT: Okay. Is that your understanding too, Mr. Parente?

MR. PARENTE: It is. I mean, my understanding of Flock is it's a private company that I'm assuming the government contracts with.

And, again, as I told Mr. DeWald, we can avoid this

issue in its entirety with a statement even today that the government does not view Mrs. Martinez as a domestic terrorist. I mean, that's the value of the Flock cameras to us. I don't care whether people know where the Flock cameras are. What I care is that they used that, I'm assuming, to support the Solicitor General's statement to the Supreme Court that this was a carefully orchestrated ambush and they were attempting to show some sort of careful orchestration, which never existed.

So if they want to give a public statement today along with Tricia McLaughlin that the United States government conclusively says Miramar Martinez is not a domestic terrorist, we don't need Flock, we don't need LPR. That's the only value of that to us. And then they can protect their --

THE COURT: I'm here to rule on the motion, not to participate in negotiations with the parties.

Mr. DeWald, having said that, any interest in taking Mr. Parente up on his offer?

MR. DE WALD: Your Honor, we believe that what we're talking about here is the modification.

Now, defense counsel made a big point in his reply brief that DHS is our client in a criminal matter. No agency is the client, let alone DHS. They can't tell us what to do. We can't tell them what to do. And I cannot comment on any other inter-agency discussions that we had. And it will be

improper for me to stand here after we dismiss the case with prejudice as well as with an ongoing investigation to comment on any kind of facts whatsoever.

THE COURT: Okay.

MR. DE WALD: Now, we discussed this with defense counsel and we explained our concerns. And what we're trying to establish is that sensitivity of, as you were discussing, good cause versus the law enforcement sensitive nature of this other evidence. That's the struggle.

So I think there is ways that Mr. Parente and I can come together to show that on so many times over the last 30 days that his client's car was in certain locations in the suburbs of Chicago. But I don't think that's going to be satisfactory to him, which is why we're in front of you now.

THE COURT: Okay. Well, I'm not going to comment on your representations of what obligations, responsibilities, commitments lie between the Department of Justice and other executive agencies. There is a unitary executive theory.

MR. DE WALD: Yep.

THE COURT: I will say that much.

I will also say that my responsibility today is to rule on the dispute that has been presented in front of me. And it's clear that the parties have not resolved the dispute on their own as to the Flock cameras and the LPR images.

Based on the exchange that I just witnessed and based

on the filings, I'm not, for a variety of reasons, not optimistic that any kind of agreement is imminent, and so I'm going to go ahead and finish the ruling on the disputed issues.

Okay. So then let's talk about the Flock camera, the Flock images first, separate and apart from the LPR cameras.

So according to Ms. Martinez, the Flock cameras capture her vehicle's activity for the 30 days preceding the shooting. Ms. Martinez argues that the Flock images would show her engaged in routine, everyday activities and they would rebut the implication of DHS's statements and in particular a recent press release.

And that press release stated as follows:

That Border Patrol law enforcement officers were ambushed by domestic terrorists, that it rammed federal agents with their vehicles. The woman, Miramar Martinez, driving one of the vehicles was armed with a semiautomatic weapon and has a history of doxing federal agents.

And then there is earlier DHS press releases that accuse Ms. Martinez of soliciting the following on social media one week before the shooting, specifically she wrote, DHS says:

Hey to all my gang let's fuck those motherfuckers up, don't let them take anyone.

If the Flock images of Ms. Martinez's vehicle show

her engaged in a month of run-of-the-mill activities, as Ms. Martinez represents that they will, the images could very well dispel the government's narrative. Now, to be clear, I haven't seen the Flock images.

But, again, if Ms. Martinez's representations of what they depict are accurate, the Flock images would serve to rebut the statement's implication, that statements that I just read from DHS, that is one of several "domestic terrorists" that "rammed federal agents with their vehicles," and Ms. Martinez had coordinated with her "gang," that she had prepared and arrived intentionally armed for an altercation, and that she has a history of disruptive behavior.

And as I said in the context of the text messages earlier, if the images turn out to support the government's narrative, there is value there too.

Members of the public may draw their own conclusions as to the significance of these images. But under either scenario, Ms. Martinez has shown good cause for their release.

The government argues that these images would compromise government investigations as they would reveal the location of Flock cameras. But as I understand it, the cameras are not hidden or concealed. They're mounted in public. They may not be as obvious as POD cameras, but they can be found if someone has an idea of what to look for. And images of Flock cameras, you know, when it comes to how does

somebody know what to look for, you can Google Flock cameras and get a pretty good idea of what you should be looking for if that's what you might to be looking for. So any person who wanted to find these cameras could without triangulating their locations from the limited batch of images that may be released.

And I understand based on our earlier exchange that these Flock images also would include images of Mr. Ruiz's vehicle. But in light of my earlier exchange with Mr. Horwitz, that doesn't change my analysis. There is no active objection to the release of those images.

As for the LPR images, I conclude that the LPR images are of minimal value to Ms. Martinez. She readily admits that the LPR data "does not have to do with her and is focused on other vehicles." That comes at page 10 in the reply brief.

Ms. Martinez claims that the images are instead relevant to the government's failed attempt to "prove up its 'domestic terrorist' label" using "all of its law enforcement techniques." That's language from the same page.

But the fact that the government used LPRs in this investigation is already public thanks to the parties' briefing of this motion. And the specific license plate numbers and the states of the three other vehicles driving on Kedzie are irrelevant to Ms. Martinez's quest to clear her name, share her story and show how the government's public

narrative may stray from the truth.

I'm also mindful of the privacy concerns of the owners and/or drivers of these other vehicles, whoever they may be. Permitting the disclosure of these images would necessarily draw other individuals into this case and likely bring unwelcome and unsolicited attention their way. That would happen without their consent or even their input.

Those considerations balanced against the lack of probative value of the evidence to Ms. Martinez outweighs against lifting the protective order as to the LPR related evidence.

Okay. So for all of those reasons, I am largely granting Ms. Martinez's motion to modify the protective order. The only exception being as to the LPR images. So that's my ruling.

In terms of actual modifications to the protective order, I guess is the parties' intention to submit a proposed modified protective order?

MR. DE WALD: I think that would be appropriate. As you know, we've gotten most of the way there in an agreement. We could not get all the way there. And if defense counsel wants to engage in good faith and to get the redactions done and get everything done in the next several days, once we have some sort of agreement, we can submit it to the Court for the Court's signature, and then defense counsel can do as he sees

fit with respect to that discovery.

And if we have any further disputes with respect to redactions and things like that, I suppose I don't want to, but perhaps we can come back and get the Court's intervention at that point.

THE COURT: Mr. Parente.

MR. DE WALD: But I'm optimistic in light of the Court's ruling today that we're going to be able to take it the rest of the way.

THE COURT: Mr. Parente.

MR. PARENTE: I'm optimistic too, Judge. Just two things. One, I do disagree with the characterization that DHS is not the client of the U.S. Attorney's Office in this case. I think that's wrong. But it doesn't matter now.

MR. DE WALD: It does.

MR. PARENTE: And then two, I would ask the US Attorney's office, under ABA Rule 3.3, candor towards the Court, to review the criminal complaint in this matter and any other filings they made when they adopted their non-client's position in these filings and correct anything they've said about Mrs. Martinez that is now I believe incorrect. And I can direct them to those things if they'd like.

THE COURT: Okay. I've looked at the motion for protective order that the -- I'm sorry. I've looked at the protective order that exists. It seems to me it's not going

to be a heavy lift to modify that language to reflect my ruling. I'll leave it to all of you to sort out any redactions. I'll expect to see a proposed modified protective order submitted to my proposed order inbox. You can submit it on your own timeframe. And if you need the Court's assistance, if you need my assistance in resolving any disputes, you can send an email to my chambers and we can make arrangements for that.

Again, going back to Mr. Ruiz, is the idea that Mr. Ruiz would also no longer be bound by the protective order to the same degree that Ms. Martinez would no longer be bound by the protective order?

MR. DE WALD: I would think so, Your Honor.

THE COURT: Mr. Horwitz.

MR. HORWITZ: Yes, I think that this should be -- it should affect the parties equally.

THE COURT: Okay.

MR. DE WALD: There is one more matter, Your Honor.

THE COURT: Sure.

MR. DE WALD: So we in our motion, we talked about the things that we had agreed with with defense counsel. His reply seemed to suggest that he wants back to all of discovery. So what we're going to do in talking with Mr. Parente is making sure that we are identifying what all that discovery is. And if there is any other things that we

have not talked about today that we need to raise, we will do that. But once again, I am optimistic that in light of the Court's ruling we're going to get there without any further help.

THE COURT: Yeah, and just to make sure I'm tracking, Mr. DeWald, I'm looking at footnote 3 of the government's response. So the government doesn't -- it says that the government does not oppose modifying the protective order as it pertains to, one, the BWC recordings of Agent Exum and two other agents; two, all FBI reports of interviews of Agent Exum and the other two agents; three, photographs and associated reports by FBI's evidence response team; four, Ms. Martinez's 911 call; and, 5, FBI reports regarding Ms. Martinez's custody and medical treatment.

So we've got those five buckets of evidence plus the text messages plus the Flock images.

MR. DE WALD: Correct.

THE COURT: Is there anything else, Mr. Parente, that you have in mind?

MR. PARENTE: There is, Judge. And, again, hopefully I can work it out. But this all came out of we sat down together for three hours on Friday. And I gave up a lot of stuff that I did think was helpful in the hopes that we could agree to something. And then their 1:30 a.m. filing obviously indicated that that --

MR. DE WALD: 12:30.

MR. PARENTE: -- 12:30 a.m. filing indicated that was -- so when you're negotiating for something, you're giving in, and the other party says no, the deal is off, then obviously I'm back to square one.

THE COURT: Okay.

MR. PARENTE: I don't think it's anything that matters that we'll have to come back. But that's why I put the footnote in there, you know, that we're back to square one and there is something else.

MR. DE WALD: Right. And, look, based upon defense counsel's filings, while I'm optimistic we can reach an agreement, I don't know, and that's why I just flagged it now. I don't want the Court to be upset, that it thinks it has ruled on everything when there is this kind of subpart. That's all.

THE COURT: No. I appreciate the clarification. I'm here to help.

MR. DE WALD: Thank you.

THE COURT: I'm here all week, all of next week. So come find me if you need assistance resolving any other disputes.

MR. DE WALD: We appreciate it, Your Honor.

MR. PARENTE: Thank you, Your Honor.

THE COURT: Thank you.

MR. HORWITZ: Thank you, Your Honor.

MR. GALLAGHER: Thank you, Your Honor.

(Proceedings concluded at 10:07 a.m.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/Jennifer Costales* *February 9, 2026*

Jennifer Costales
Official Court Reporter

Date